## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**ORMET CORPORATION, et al.** [1]<br>Debtors. | Chapter 11<br><br>Case No.  13-10334 (    )<br><br>Jointly Administered |

## DECLARATION OF JAMES BURNS RILEY IN SUPPORT OF
## FIRST-DAY MOTIONS AND APPLICATIONS

I, James Burns Riley, hereby declare:

1.      I am Chief Financial Officer and Secretary of Debtor Ormet Corporation (the "Parent"), which is the 100% parent company of Ormet Primary Aluminum Corporation ("OPAC"), Ormet Aluminum Mill Products Corporation ("OAMP"), Specialty Blanks Holding Corporation ("Specialty Blanks"), and Ormet Railroad Corporation ("Railroad"), which are collectively referred to herein as the "Companies" or the "Debtors."  I am familiar with the day-to-day operations, business affairs, books and records of the Debtors.

2.      I submit this Declaration in connection with the voluntary chapter 11 petitions and first-day motions and applications of the Debtors in the above-captioned chapter 11 cases.  All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon information supplied to me by counsel to the Debtors, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition and related business

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers):  Ormet Corporation (2006); Ormet Primary Aluminum Corporation (9779); Ormet Aluminum Mill Products Corporation (9587); Specialty Blanks Holding Corporation (7019); and Ormet Railroad Corporation (0379).  The service address for all of the Debtors for purposes of these chapter 11 cases is:  43840 State Route 7, Hannibal, Ohio 43931.

issues.  If I were called upon to testify, I could and would testify competently to the facts set forth herein, and am authorized to submit this Declaration on behalf of the Debtors.

3.      Part I of this Declaration describes the businesses of the Debtors and the relevant background preceding the filing of their chapter 11 petitions.  Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtors concurrently herewith.  I am familiar with the first-day motions and applications filed by the Debtors.

## I.      BACKGROUND

**The Chapter 11 Filings**

4.      The Company filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 25, 2013 (the "Petition Date"). A motion for joint administration of the Debtors' bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure 1015(b) is pending before the Court. Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their businesses and managing their affairs as debtors and debtors-in-possession. As of the date hereof, no trustee, examiner or committee has been appointed in any of these Chapter 11 cases.

**The Company**

5.      Ormet Corporation is headquartered at its smelting operations located along the Ohio River, in Hannibal, Ohio (the "Hannibal Facility").  Ormet Corporation is a holding Company with its wholly owned subsidiary, Ormet Primary Aluminum Corporation (OPAC), as the Debtors' operating entity, which includes the smelter operation in Hannibal, Ohio and a refinery operation in Burnside, Louisiana.  The Hannibal smelter is a major producer of primary

aluminum in the United States and is capable of producing up to 270,000 tonnes[2] of primary aluminum per year when operating at full capacity (the "Hannibal Smelter"). The alumina refinery in Burnside, Louisiana is capable of producing up to 540,000 tonnes of smelter grade alumina per year when operating at full capacity (the "Burnside Refinery", and together with the Hannibal Smelter, the "Facilities").

**Overview of Aluminum Industry**

6.    Aluminum, among the most plentiful elements in the earth's crust, is produced from bauxite, an ore containing aluminum in the form of aluminum oxide, commonly known as alumina. Bauxite is primarily found in South America, Australia and Africa. After the bauxite is mined, it is transported to an alumina production facility where the alumina is extracted from the bauxite. To make aluminum, the oxygen is then extracted from the alumina by combining alumina with a molten electrolyte called cryolite in a cell and then passing direct-current electricity from a consumable carbon anode into the cryolite, splitting the alumina into molten aluminum metal and carbon-dioxide. Primary aluminum can be simply molten metal or a solid form of the molten metal, such as sow and T-bar. Primary aluminum can then be re-melted, and by adding necessary alloys, produce extrusions or cast into ingots or billets, which are then pressed or rolled to form sheet, plate, foil, wire, rod and bar, allowing casting operators to fabricate the aluminum for use in a variety of industries.

7.    Primary aluminum, the primary revenue source of the Company, is sold in the global market based on the price quoted on the London Metal Exchange ("LME"), in U.S. dollars. In April 2011, the LME price of aluminum (the "LME Price") hit a recent peak of approximately $2,775/tonne. Over the ensuing 16 months, the LME Price steadily dropped, to a

---

[2] The use of the term "tonnes" herein refers to metric tonnes, consisting of 1,000 kilograms, or 2,204.62 pounds.

recent low of under $1,800/tonne in August 2012. Over the last six months, the LME Price has primarily traded in a range from $1,800 - $2,150/tonne, and as of February 22, 2013, the LME Price was $2,014/tonne. An additional component to the pricing formula for the Debtors' aluminum is the Mid West Premium (the "MWP"), a localization addition to the price, which is quoted in cents per pound. The current premium is approximately $0.115 per pound or approximately $254 per tonne.

## Company History and Current Business Operations

### *History of the Company*

8.      The Company was organized by Olin Corporation and Revere Copper and Brass, Inc. in 1956 to enter into the global market for alumina and aluminum. A year later, the Company began construction on the Hannibal Smelter and the Burnside Refinery. In 1958, as construction was completed, the Hannibal Smelter started making aluminum for the first time. The Company also opened the Burnside Bulk Marine Terminal (the "Burnside Terminal") near the Burnside Refinery in Burnside, Louisiana, to accept delivery of bauxite for use in the alumina production facility at the Burnside Refinery.

9.      Over the following forty-five years, the Company went through a series of transactions, including a change of ownership in 1974, when Consolidated Aluminum Corporation acquired Olin's interest, the purchase of what is now OPAC in 1986, and the purchase of 13 miles of railroad track between Powhatan, Ohio and the Hannibal Facility in 1996. In 2004, the Company operated eight facilities in six states, including the aluminum refinery in Hannibal, the alumina production facility in Burnside, a rolling mill in Hannibal, a recycling plant in Friendly, West Virginia, and a coated sheet and foil facility in Jackson, Tennessee. However, as a result of market conditions at the time, including low LME Prices for

primary aluminum, rising energy costs, increased competition, and fallout from the Enron bankruptcy, and despite substantial efforts in implementing a financial improvement plan, the Company filed a petition for relief under chapter 11 in the Southern District of Ohio on January 30, 2004 (jointly administered under Case Number 04-51255).

10.     On December 15, 2004, the Court entered its Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.  Pursuant to the 2004 Plan of Reorganization, former creditors, led by Matlin Patterson Asset Management ("Matlin Patterson") became the new equity interest holders in Reorganized Ormet.  The 2004 Plan of Reorganization became effective on April 1, 2005.

11.     Over the next couple years, following emergence from bankruptcy, the Company made a series of strategic decisions, resulting from market conditions, to focus on the production of primary aluminum.  In the fourth quarter of 2006, the Company idled the alumina refinery plant in Burnside and in the fourth quarter of 2007, the Company curtailed operations at the billet casting plant at the Hannibal Facility.  Also in 2007, the Company ceased operation at its Burnside Terminal, classifying the terminal as "held for sale" on the Company's balance sheet. In May 2007, Matlin Patterson completed the sale of all of its interest in the Company.[3]

12.     In early 2011, as aluminum prices were moving higher, the Company made the decision, subject to obtaining acceptable financing, to restart the Burnside alumina refinery. Over the next 6 months, the Company received acceptable financing (as detailed below), made improvements to the facility and re-commissioned the Burnside Refinery.  On November 1,

---

[3] As of the Petition Date, the Parent had 18,662,272 shares of common stock outstanding, of which over 81% are held in "street" names.  As the Company is not a reporting company under the Securities Exchange Act of 1934, stakeholders that beneficially own more than 5% of the outstanding shares are not required to file notifications of their ownership interest, and therefore, the identity of some of the beneficial owners of the Parent's common stock are not known to the Company.

2011, the refinery began operations and it currently operates at approximately 73% of capacity. The alumina produced at the Burnside Refinery provides substantially all of the alumina necessary to operate the Hannibal Smelter, with the remaining alumina required for the Hannibal Smelter purchased from third party suppliers on the spot market.

13.     While the Company moved forward with restarting the alumina refinery, on June 2, 2011, the Company closed on the sale of the Burnside Terminal and certain specified parcels of land.  In conjunction with the sale, the Company entered into a Terminal Services Agreement to provide the Company with loading and unloading services in support of its operations at the Burnside Refinery.  As of the date hereof, the billet casting operations, idle since 2007, remain idle and no final determination has been made regarding its future.

14.     Over the last several years, the Company has also adjusted its output capacity at the Hannibal Smelter as it has modified the number of operating potlines, as circumstances and financial conditions warrant.  In 2009, the Company reduced operations to 4 of 6 available potlines and continued at that operating level through 2010.  As aluminum prices increased, the Company re-energized the two idled potlines, in January and February 2011.  As prices have again retreated, in September 2012, the Company began the process of idling two of the potlines, and today operates four of the six potlines.

### Current Company Operations

15.     The Company currently operates: (i) the Hannibal Smelter, a reduction plant located in Hannibal, Ohio and (ii) the Burnside Refinery, an alumina refinery located in Burnside Louisiana.  Each of the Facilities is owned by the Debtors.

### The Hannibal Facility

16.     The Hannibal Facility encompasses 256 acres along the Ohio River in Hannibal, Ohio and consists of a billet casting operation (currently idle), a reduction plant (aluminum smelter) comprised of six potlines (1,032 pots), and the corporate headquarters.  The Hannibal Facility is among the largest aluminum smelters in the United States and has a capacity to produce approximately 270,000 tons of molten aluminum on an annual basis.

17.     When the alumina arrives in Hannibal, whether from the Burnside Refinery or from a third party provider, the Hannibal Facility then combines the alumina with electricity in the reduction process.  The Hannibal Facility employs approximately 850 hourly employees and 160 salaried employees when operating at capacity. Current operations require 722 active hourly and 153 active salary employees.

### The Burnside Refinery

18.     The Burnside Refinery is an alumina refinery situated on approximately 1,100 acres in Burnside, Louisiana.  The Burnside Facility produces smelter-grade alumina which is used in the molten aluminum industry to produce primary aluminum.  The Burnside Facility is one of only four alumina refineries in the United States and can produce approximately 540,000 tons of smelter-grade alumina when operating at full capacity.

19.     The Company has entered into long term supply agreements for its bauxite requirements, which is shipped primarily from Brazil to the Burnside Terminal, where it is unloaded and transported to the Burnside Refinery.   The Burnside Refinery consumes approximately 1.2 million tons of bauxite when operating at capacity.  Once the alumina is refined, it is transported in river barges on the Mississippi River and Ohio River to the Hannibal Facility for use in the production of primary aluminum at the reduction plant.  The Burnside

7

Refinery employs approximately 200 hourly employees and 60 salaried employees when operating at capacity. Current operations require 153 active hourly and 55 active salary employees.

### Customers

20.     The Company's principal customers for its primary aluminum and alumina (when produced in excess of internal requirements) are international commodity traders. Pursuant to its contracts to sell primary aluminum, the predominant arrangement is for the customers to pay the LME Price plus the MWP, based on the average price for the month in which they are purchasing the aluminum. However, under the terms of the contracts, the Debtors are able to lock in prices in an effort to hedge against future market conditions. As the prices have remained soft, the Company has not been in a position to lock-in prices at sustainable levels and have been forced to ride the ebbs and flows of the market; accordingly, the Company's revenues have remained at low levels.

### Employees

21.     As of February 18, 2013, the Debtors had a roster force in the aggregate of approximately 1,188 employees (the "Employees") at the Facilities, of which approximately 1,107 are scheduled to work. Of the roster Employees, approximately 977 are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"). The Collective Bargaining Agreement for the employees in Hannibal was ratified by the members in June 2011 and expires December 31, 2016 (the "Hannibal CBA"). The CBA for the hourly workers in Burnside was entered into in March 2011 and expires December 31, 2014 (the "Burnside CBA" and together with the Hannibal CBA, the "CBAs"). The Company has been in active discussion with the USW which

resulted in a Memorandum of Understanding dated January 12, 2013. The Debtors have continued conversations with the USW on additional modifications to the Hannibal CBA, which has resulted in a Restructuring Memorandum of Understanding dated February 24, 2013, which further will modify the Hannibal CBA, upon ratification.

### Retiree Obligations

22.     Historically, the Company has provided a Defined Benefit ("Pension") Plan for eligible retirees. As of December 31, 2011, the Company had under-funded pension liabilities of approximately $147.0 million under GAAP. The Company contributed in excess of $20.4 million in 2012 and expects its obligations for 2013 contributions to be approximately $16.3 million. The amounts contributed are determined on an actuarial basis, to provide the plan with assets sufficient to meet the projected benefits to the plan beneficiaries. As a result of recent changes in the law, the annual obligations of the Company with respect to the pension were adjusted in fall 2012, resulting in a potential reduction in contributions of approximately $6.3 million for calendar year 2012 and $10.4 million for calendar year 2013.

23.     In addition to the pension obligations, the Company has contractual obligations to contribute to an hourly VEBA. As part of the Hannibal CBA, the Company is required to make fixed periodic payments into the Voluntary Employee Beneficiary Association trust (the "VEBA Trust") for the benefit of its current and future eligible retired hourly employees. As of December 31, 2012, the Company has approximately $48.5 million in undiscounted contractual obligations to the VEBA Trust for the benefit of the hourly retirees. The Hannibal CBA provides for the Company to make monthly contributions and contribute 5% of its profits (as defined in the CBA) on a quarterly basis in order to fund the hourly VEBA Trust. From time to time, the Company and USW have agreed to defer payment of the monthly contributions into

9

future years, including an agreement in January 2013 to defer payments until June 2013, as the parties continue to work towards a global settlement and agreement on certain revisions to the CBA.  The Board of Directors also has authorized the Company to make contributions to a VEBA Trust for eligible salaried retirees.  As of December 31, 2013, the Company has a $4.9 million undiscounted liability and contributes $900,000 annually with respect to the salaried retirees.

### Use of Electricity

24.     As much as one-third of the Company's operating expenses are from the use of the electricity necessary to extract oxygen from alumina in the production of primary aluminum. Accordingly, in accordance with a State of Ohio program that allows substantial users of electricity to enter into a unique arrangement to promote economic development, in September 2009, the Company and AEP Ohio ("AEP") (as successor in interest to Columbus Southern Power Company and Ohio Power Company), agreed to terms with respect to certain discounts for the Company's electricity usage and executed a power agreement (the "Power Agreement") reflecting the terms as approved by the Public Utilities Commission of Ohio ("PUCO").

25.     The Power Agreement establishes maximum discounts for calendar years 2010 through 2018, with a link of the Company's electric rate to the price of aluminum.  The maximum annual electricity discount for the Company in 2010 and 2011 was $60 million per year.  For 2012, the maximum discount was $54 million, which is then reduced by $10 million each year until fully phased out by 2018.  The annual discounts that are not used in a given year may be carried over for use in years 2013-2018, subject to certain restrictions.  Each month, the Company is limited to using 12.5% of the maximum annual discount.  In 2012 the Company exhausted the discounts in August and for the three months ended December 31, 2012, the

average cost of electricity billed was $58.16 per MWh, while the average cost for the year was $39.66 per MWh when you take into consideration the discount.

26.    In September 2011, AEP filed an amended Electrical Service Plan ("ESP") with the PUCO, which included a rate re-design of generation rates, based on the establishment of a Load Factor Provision ("LFP") for demand metered customers.   As designed the Company would have had a significant increase in its electric rates.   This proposal was originally accepted by PUCO and then ultimately reversed after a significant public uproar.   AEP filed another amended ESP proposal in March 2012, which, if approved as proposed, would have increased electric rates to the Company by approximately $7 million annually.   AEP also proposed a mechanism in the amended ESP for recovering from its customers its deferred fuel balances through a phase-in recovery rider.   The estimated impact of this fuel recovery proposal is a rate increase to the Company of approximately $10.3 million per year.   On August 8, 2012, the PUCO issued its Opinion and Order resolving the ESP (the "PUCO Order").   Pursuant to the terms of the PUCO Order, the rates paid by the Company will increase by $5.50/MWh through 2014.   This has the effect of increasing the Companies electricity pricing by as much as $26 million per year, well beyond that proposed by AEP.   The PUCO Order was designed to accelerate the AEP recovery of deferred costs so that AEP would be at market rates when the new ESP expired in the end of May 2015.

27.    Following entry of the PUCO order, and facing significant liquidity constraints, the Company reached out to Jobs Ohio, a public-private enterprise that promotes economic development in the State of Ohio, to seek support for short-term payment relief allowing time for aluminum prices to recover, and the Company time and liquidity to pursue a process to restructure its debt.   On October 17, 2012, the PUCO entered a revision to the Power Agreement,

deferring the Company's power payments that were due in November and December, for power consumed in October and November, with the payments to be repaid over 12 months beginning January 2014. As a result of this deferral, the Company saved $27.4 million in the short term, allowing it time and liquidity to continue discussions with various constituents in an effort to pursue all strategic alternatives or be well positioned to enter bankruptcy, as was necessary.

**Capital Structure**

28.    As of the Petition Date, the Debtors owed approximately $180.3 million on account of debt financing plus accrued interest. The Debtors' obligations include: (i) $139.5 million in amounts owing under the Term Loan, including $109.6 million under the Term A Loan and $29.9 million under the Term B Loan (each as defined below), (ii) $39.3 million owing with respect to the ABL Facility (as defined below), and (iii) $1.5 million owed with respect to the State of Louisiana Economic Development Loan Program Loan ("EDLOP"). The following is a brief summary of the Debtors' pre-petition secured debt obligations.

*The Term Loans*

29.    On March 1, 2010, as part of the refinancing of certain Senior Secured Subordinated Notes due November 1, 2010 and a Subordinated Term Loan due November 30, 2010 (together, the "Old Notes"), Parent, OPAC and OAMP, each as borrowers (the "Borrowers") and Specialty Blanks and Railroad as guarantors (the "Guarantors") and the Lenders from time to time party thereto (the "Term Loan Lenders"), with The Bank of New York Mellon, as Agent (the "Agent" and collectively with the Borrowers, the Guarantors, and the Term Loan Lenders, the "Term Loan Parties"), entered into that certain Term Loan and Security Agreement (the loan evidenced thereby, the "Term A Loan"). The Term A Loan was made in the principal amount of $110 million, issued with a 5% original issue discount ("OID"),

and matures on March 2, 2014.  The investors under the Term A Loan are investment funds affiliated or managed by Wayzata Investment Partners LLC (collectively, "Wayzata").  Wayzata was the holder of the Term A Loan Notes.

30.    On May 6, 2011, the Term Loan Parties entered into the First Amendment to Term Loan and Security Agreement (the "First Term Loan Amendment").  Pursuant to the First Term Loan Amendment, the Lenders agreed to provide additional funding (the "Term B Loan" and together with the Term A Loan, the "Term Loans"), in the face value of $30 million, and maturing on March 2, 2014, issued at a 5% OID.  The Term Loans bear interest at 14% per annum, payable in cash on a quarterly basis.  In June of 2011 the sale of the Burnside Terminal resulted in the paydown of $10 million prorata between Term Loans A&B.

31.    The First Term Loan Amendment also authorized the Company to enter into the EDLOP (as defined below) with the State of Louisiana to assist in funding the restart of the Burnside Refinery.  On March 28, 2012, the Term Loan Parties entered into the Second Amendment to Term Loan and Security Agreement (the "Second Term Loan Amendment") to modify certain conditions related to the repayment of the indebtedness incurred on account of the EDLOP.  On September 28, 2012, the Term Loan Parties entered into the Third Amendment to Term Loan and Security Agreement (the "Third Team Loan Amendment"), pursuant to which the Term Loan Lenders agreed to PIK the October 1, 2012 interest payment, adding the payment amount to the principal amount owed under the Term Loans.  On December 26, 2012, the Term Loan Parties entered into the Fourth Amendment to Term Loan and Security Agreement (the "Fourth Term Loan Amendment"), pursuant to which the Term Loan Lenders agreed to PIK the January 2, 2013 interest payment, adding the payment amount to the principal amount owed under the Term Loans.

13

32.     The Term Loans are secured by substantially all assets of the Company, subject in all respects to the relative priorities set forth in the Intercreditor Agreement (as defined below), and a carve-out for the Louisiana Collateral (as defined below).

### The Asset Based Revolving Loan

33.     Concurrently with entry into the Term A Loan, the Borrowers and Guarantor entered into that certain Amended and Restated Loan and Security Agreement (the "ABL Facility"), with The Lenders and Issuing Bank From Time to Time Party Thereto (the "ABL Lenders") and Wachovia Capital Finance Corporation (Central) (n/k/a Wells Fargo Capital Finance, LLC) as Administrative Agent (the "ABL Agent" and collectively with the Borrowers, Guarantors and ABL Lenders, the "ABL Parties") .  The ABL Facility was an asset backed loan facility with a maximum credit limit of $50 million, expiring on March 1, 2013.  The ABL Facility is subject to a borrowing base availability calculation based on accounts receivable and inventory and subject to a reserve.  Interest, as elected by the Company, is based on the London Interbank Offered Rate ("LIBOR") plus 2.75% per annum with a 2.0% per annum minimum LIBOR, or the prime rate plus 0.50% per annum depending on the interest method elected.  The ABL Facility also has a commitment fee of 0.625% per annum, payable monthly, on the unused portion of the facility from time to time.

34.     Concurrent with entry into the First Term Loan Amendment, the ABL Parties entered into that certain Amendment No. 2 to Amended and Restated Loan and Security Agreement ("Second ABL Amendment").  Pursuant to the Second ABL Amendment, the ABL Lenders agreed to increase the credit limit under the ABL Facility from $50 million to $60 million.

35.     The Second ABL Amendment also authorized the Company to enter into the EDLOP with the State of Louisiana to assist in funding the restart of the Burnside Refinery.  On March 28, 2012, the ABL Loan Parties entered into the Amendment No. 4 to Amended and Restated Loan and Security Agreement (the "Fourth ABL Amendment") to modify certain conditions related to the repayment of the indebtedness incurred on account of the EDLOP.

36.     In addition to the Second ABL Amendment and Fourth ABL Amendment, which were entered into in conjunction with the decision to restart the Burnside Refinery, make the necessary improvements thereto, and address the EDLOP, the ABL Facility was amended on December 21, 2010 (the "First ABL Amendment"), December 23, 2011 (the "Third ABL Amendment"), and July 18, 2012 (the "Fifth ABL Amendment", and collectively with the First ABL Amendment and the Third ABL Amendment, the "EBITDA Amendments").  The EBITDA Amendments were entered into in order to adjust the EBITDA requirements under the ABL Facility, including an adjustment to the minimum amount of excess availability during the term of Fifth ABL Amendment, which includes June – August, 2012.  Finally, on October 12, 2012, the ABL Parties entered into Amendment No. 6 to Amended and Restated Loan and Security Agreement, reducing the necessary reserve and allowing the Company incremental liquidity.

37.     The ABL Facility is secured by substantially all assets of the Company, subject in all respects to the relative priorities set forth in the Intercreditor Agreement (as defined below), and a carve-out for the Louisiana Collateral.

*The Intercreditor Agreement*

38.     Concurrent with entry into the Term A Loan and the ABL Facility, the Term Loan Agent and the ABL Agent entered into that certain Intercreditor Agreement (the "Intercreditor Agreement") to set forth the relative priorities of the respective collateral under the Term Loans

and the ABL Facility.  Pursuant to the terms of the Intercreditor Agreement, the ABL Facility has a first lien priority position on the Companies' accounts and inventory, and assets related thereto, including without limitation, chattel paper, instruments, documents, letters of creditors, commercial tort claims, and general intangibles (the "ABL Facility Priority Collateral").  In addition, the ABL Lenders have a subordinate security interest in all Term Loan Priority Collateral (as defined below).  The Term Loans are secured by a first position priority security interest on the Debtors' property, plant, and equipment, and all other assets of the Company that do not constitute ABL Facility Priority Collateral (the "Term Loan Priority Collateral").  The Term Loan Lenders have a subordinate security interest in all ABL Facility Priority Collateral.

39.     Notwithstanding the foregoing, under the terms of the First Term Loan Amendment and the Second ABL Facility Amendment, the Term Loan Lenders and the ABL Lenders agreed to carve-out from their collateral a first priority security position in favor of the State of Louisiana for certain vacant real property located near the Burnside Refinery to secure the EDLOP.

### The Louisiana Economic Development Loan

40.     In conjunction with re-starting the Burnside Refinery in 2011 and in order to incentivize the Company to hire and retain employees at the facility, the State of Louisiana, through the Louisiana Economic Development Commission, agreed to provide a $1.5 million Economic Development Loan ("EDLOP Loan").  The EDLOP is secured by a first priority security interest in certain real estate of the Company near the Burnside Facility.  The EDLOP Loan may be converted to a grant, in whole or in part, based on the number of jobs and total annual payroll for employees at the Burnside Refinery.  The first payment is due and owing on March 15, 2013; however, based on 2012 payroll, this initial payment will be fully forgiven.

**Events Leading up to the Chapter 11 Cases**

41.     The Company is seeking the protection of chapter 11 of the Bankruptcy Code to provide breathing room to facilitate a sale of the Company's assets, maintain operations and maximize value for the benefit of the Company, its estates, and the parties-in-interest.  The last couple years have demonstrated the risks inherent in operating a business with revenues directly tied to the price of internationally traded commodities.  In late 2010 and early 2011, the LME price of aluminum was rising, as were the prices for alumina.  In an effort to take advantage of existing infrastructure and in order to mitigate the rising costs of alumina, the decision was made to re-start the Burnside Refinery and for the Company to produce its own alumina, which is one of the key raw materials necessary for their primary aluminum smelter.

42.     Since April 2011, however, the LME has dropped from $2,750 per metric tonne to a low of $1,840 per metric tonne in August 2012 or in excess of $900 per metric tonne.  Every $100 drop in the price of primary aluminum in the open market has the potential to result in annual revenue loss to the Company of approximately $27 million, when the Hannibal Smelter is operating at full capacity.

43.     While revenues are directly tied to the spot price of aluminum, the expenses are tied to the price of electricity, purchased raw materials, employees, and legacy costs, of which only a portion can be controlled.  Further, despite the apparent benefit of the built-in discounts in the Power Agreement, those savings are scheduled to be reduced by $10 million annually, while the underlying base price of electricity is increasing.  The legacy costs associated with the pensions and VEBA Trusts are relatively fixed.  Accordingly, over the past six months, the perfect storm has occurred where prices have fallen and expenses have risen.  The result is a liquidity crunch.

44.     To ease the liquidity crunch, and provide time to continue discussions with key constituents in an effort to pursue all alternatives and streamline this bankruptcy proceeding, the Company has taken several steps to improve incremental liquidity.  In August 2012 the company started to reduce its operating levels to generate cash by monetizing working capital. In October, the Company obtained the approval of the PUCO to allow for the deferral of the electricity payments due AEP in November and December 2011, providing approximately $27.4 million in incremental liquidity.  The Company also reached agreement with Wayzata, in its capacity as pre-petition term loan lender, in which Wayzata agreed to PIK their October 1, 2012 and January 2, 2013 interest payments, providing approximately $9.3 million in incremental liquidity.  Finally, the Debtors obtained an agreement by the Pension Benefit Guaranty Corporation (the "PBGC"), wherein the PBGC agreed to forbear from perfecting its lien upon the Debtors' missed minimum funding contribution which was due January 15, 2013, providing an additional $3.3 million in liquidity as well as additional time to pursue a negotiated restructuring either in or out-of-court.  These efforts provided additional time and liquidity to complete a marketing process and identify opportunities to solve the long-term structural problems faced by the Company.

45.     At this time, continuation of the business operations without taking immediate action would result in a worsening liquidity crisis, putting the long-term viability of the Company at stake.  The Company forecasts a need for significant additional cash during 2013.  Accordingly, the Company made the decision to seek protection under the Bankruptcy Code to facilitate a sale of the Company's assets to a purchaser who is willing, under certain terms and conditions, to contribute cash resources to continue operations.

**Marketing Efforts.**

46.   Concurrently with seeking additional liquidity, and based on the time gained through the incremental liquidity events, the Debtors, in conjunction with Evercore Partners ("Evercore"), their investment banker, moved forward with a full marketing process, to identify parties interested in purchasing the Assets or equity of the Debtors, either in-court (if necessary) or out of court.  Evercore reached out to 21 parties, including both strategic and financial buyers.  Of those 21 third parties, nine expressed initial interest and entered into non-disclosure agreements ("NDAs"), permitting initial due diligence.  Of the nine parties that moved forward, two ultimately expressed interest in a possible transaction, although neither were willing to provide terms (including price) or conditions to move forward with a possible sale.  The only offer received was the offer of Smelter Acquisition, LLC, an affiliate of Wayzata, pursuant to the terms of a Stalking Horse Purchase Agreement.

**Post Petition Financing**

47.   Concurrently with seeking additional liquidity and pursuing a marketing process, the Debtors and Evercore moved forward in efforts to identify potential financing options in the event of a bankruptcy filing.  Evercore contacted 15 potential parties that are known in the industry as providing debtor-in-possession financing (not including the existing lenders).  The Debtors sought $30 million in incremental liquidity through a new money DIP term loan and financing to take out the existing Pre-Petition Revolving Loan Financing Agreement.  The Company received three third-party DIP proposals, including a revolving loan proposal and two term loan proposals.  After discussions with their advisors, the Company did not move forward with the proposals for the term loans, as both parties required the proposed loans to be senior in priority to the existing Term Loan Secured Parties, and the cost of financing taken as a whole,

exceeded that proposed by the Term Loan Lenders. The Debtors also received a proposal to replace the Revolving Loan Secured Parties. However, in evaluating both proposals, taken as a whole, the Debtors, in consultation with their advisors, deemed the terms of the Revolving Loan DIP Credit Agreement provided by the Revolving Loan Secured Parties to provide the best option for the Debtors.

48.     Accordingly, the Debtors have agreed to terms with their prior lenders on the terms of post-petition financing. The Pre-Petition Term Loan Lenders have agreed to provide $30 million in the form of a new-money DIP Term Loan, with security senior to their existing Pre-Petition Collateral. The ABL Lender has agreed to the terms of a revolving loan facility that will roll-up their Pre-Petition Revolving Loan Financing Agreement and provide necessary liquidity and access to funding during the term of this bankruptcy proceeding.

**Restructuring Goals.**

49.     Over the last several months, the Company has had continuing discussions with Wayzata, the ABL Lenders, Jobs Ohio, the USW, the PBGC and other parties-in-interest in an effort to reach a consensual resolution to the long-term challenges facing the Company. At the same time, the Company, in concert with Evercore, its investment banker, moved forward with a process to identify parties interested in pursuing a transaction with, or contributing capital to, the Company.

50.     The Company and Wayzata have agreed to terms on a Stalking Horse Asset Purchase Agreement pursuant to which Wayzata has agreed to purchase substantially all of the Company's assets, subject to higher or better bids. To fund the continuing losses of the Company and the bankruptcy process, Wayzata has agreed to lend $30 million in new money, pursuant to a Senior Secured Super-Priority Debtor-in-Possession Term Loan and Security

Agreement, providing sufficient liquidity for the Debtors to run an auction process, prosecute the Chapter 11 case, and pursue agreements with other parties-in-interest. The Company also reached agreement on the terms of the Super-Priority Senior Secured Debtor in Possession Second Amended and Restated Loan and Security Agreement with Wells Fargo to allow continued use of this ABL Facility through the bankruptcy proceedings.

51.     In addition to identifying a Stalking Horse Bidder and securing adequate funding, the Company has reached a deal in principle with the USW on the terms of a modified Hannibal CBA and modified Burnside CBA. The Company understands the importance of its workforce and the continued strong relationship it maintains with the USW. The modifications will help reduce the obligations necessary to fund the hourly VEBA, permit the Company to pursue a termination of the defined benefit pension plan, and transitions from the existing defined benefit plan and multiemployer plan into a defined contribution plan that provides long-term cost certainty for the Company. The Company has also had significant discussions with the Pension Benefit Guaranty Corporation ("PBGC") regarding the potential termination of the Company's pension plan and the PBGC's potential takeover of the plans and the resolution of the claims relating to termination of the Plan and any potential DRA Premium. Discussions are ongoing with the PBGC. Finally, the Company is prepared to file and prosecute a further revision to the Power Agreement with the PUCO, allowing for further short term savings in the price of power.

52.     While the Company recognizes substantial work remains to successfully emerge as a stronger entity, it is committed to preserving jobs and maximizing returns for the creditors.

## II.    SUMMARY OF FIRST-DAY PLEADINGS[4]

53.    The Debtors have requested various types of relief in "first-day" motions and applications (collectively, the "First-Day Pleadings") in order to minimize the adverse effects of the commencement of the chapter 11 cases on their business.   I believe that a critical and necessary element in successfully administering these chapter 11 cases is the approval of the Debtors' First Day Pleadings submitted concurrently herewith.   The factual background and support for each respective First Day Pleading is set forth below.

### A.    Debtors Motion for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")

54.    Debtor Ormet Corporation owns 100% of the stock of its subsidiaries, Ormet Primary Aluminum Corporation, Ormet Aluminum Mill Products Corporation, Specialty Blanks Holding Corporation, and Ormet Railroad Corporation.   Accordingly, I understand from counsel that each is an "affiliate" as defined in the Bankruptcy Code.

55.    I understand that the joint administration of the Debtors' chapter 11 cases will permit the Clerk of Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest.   The Debtors anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect many or all of the Debtors.   Accordingly, I believe joint administration will eliminate the need for duplicative notices, motions, applications, orders, and other pleadings, thereby saving considerable time and expense, to the benefit of the Debtors and their estates.   Joint administration also will enable parties in interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in all of these cases.

---

[4] Throughout this Section II., capitalized terms not defined shall have the meaning ascribed to them in the relevant First-Day Pleading.

56.    Joint administration will not adversely affect the rights of the Debtors' respective creditors because the Joint Administration Motion requests only the administrative consolidation of the Debtors' estates and as such, each creditor may still assert a claim against a particular estate.  In fact, creditors' rights will be enhanced by the reduction in costs resulting from joint administration.

57.    Accordingly, I believe that joint administration of the Cases is in the best interests of the Debtors, their estates and creditors and all parties in interest.

**B.    Debtors' Application for Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c) and Section 105(a) of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date (the "KCC Application")**

58.    By the KCC Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") to act as the claims and noticing agent of the Court (the "Claims and Noticing Agent") in connection with these Chapter 11 cases, pursuant to the terms and conditions of the Engagement Agreement between the Debtors and KCC.  Prior to selecting KCC to act as Claims and Noticing Agent, the Debtors obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure selection from a competitive process.  The Debtors submit, based on the three engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of service and expertise.

59.    Pursuant to the KCC Application, the Debtors request entry of an order appointing KCC as claims and noticing agent of the Court *nunc pro tunc* to the Petition Date. The Debtors have thousands of potential creditors and other parties in interest in their chapter 11 cases.  Although I understand that the office of the Clerk of the United States Bankruptcy Court

23

for the District of Delaware (the "Clerk's Office") ordinarily would serve notices on the Debtors' creditors and other parties in interest and administer claims against the Debtors, the Clerk's Office may not have the resources to undertake such tasks, especially in light of the size of the Debtors' creditor body and the expedited timelines that frequently arise in chapter 11 cases. In fact, I understand from counsel that given the number of creditors we anticipate having in these cases, the Debtors are required to retain a claims and noticing agent. I understand KCC is a nationally recognized specialist in chapter 11 administration and has vast experience in noticing and claims administration in other chapter 11 cases of this size and complexity.

60.     I believe that the appointment of KCC as claims and noticing agent in the Debtors' cases will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts. Accordingly, I propose to appoint KCC to act as the claims and noticing agent in these cases.

C.     **Debtors Motion for an Order Granting Extension of Time For Filing Schedules and Statements and List of Equity Security Holders ("Schedules Motion")**

61.     The Debtors are large, complex enterprises. Because of (a) the substantial size and scope of the Debtors' businesses, (b) the complexity of their financial affairs, (c) the limited staffing available to perform the required internal review of their accounts and affairs, and (d) the press of business incident to the commencement of these chapter 11 cases, the Debtors were unable to assemble, prior to the Commencement Date, all of the information necessary to complete and file the Schedules and Statements.

62.     Given the urgency with which the Debtors sought chapter 11 relief and the more critical and weighty matters that the Debtors' limited staff of accounting and other personnel must address in the early days of these cases, the Debtors will not be in a position to complete

24

the Schedules and Statements within the first 30 days of these cases.  Completing the Schedules and Statements for each of the Debtors will require significant collection, review and assembly of information.  Nevertheless, recognizing the importance of the Schedules and Statements in these chapter 11 cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.  Accordingly, I believe and submit that a 30-day extension of time to file the Schedules and Statements is necessary and appropriate.

63.    Accordingly, I propose that the Court extend by an additional 30 days, for a total of 60 days, until April 26, 2013, the date by which the Schedules and Statements must be filed.

64.    Additionally, I believe that "cause" exists to extend the time to file the Equity List, as I understand is required by the Bankruptcy Rules.  The common stock of Ormet Corporation is thinly traded publicly on the pink sheets and likely has hundreds of equity security holders.  Ormet Corporation itself does not maintain a list of equity security holders, and therefore has to gather the names and addresses of its equity security holders from the transfer agent.  While the Debtors are prepared to file, with the Petitions, lists of the known large equity holders, based on available information, Ormet Corporation will not be able to gather, sort and review complete information on the full list of equity security holders prior to the Equity List Original Deadline.

65.    At present, the Debtors estimate that an extension of an additional thirty (30) days from the Equity List Original Deadline, through and including April 10, 2013 will be necessary to provide sufficient time to assemble and verify information and prepare the Equity List.

**D.** **Motion of the Debtors and the Debtors in Possession for an Order (A) Authorizing the Continued Use of the Debtors' Centralized Cash Management System, (B) Authorizing Maintenance of the Debtors' Existing Checks, Bank Accounts, and Business Forms, (C) Authorizing Continued Use of Intercompany Arrangements and Granting Other Relief in Connection Therewith; (D) Granting an Interim Waiver of the Requirements Contained in Bankruptcy Code Section 345(b); and (E) Granting Related Relief (the "Cash Management Motion")**

*The Cash Management System*

66.     The Debtors maintain a cash management and disbursement system in the ordinary course of their business operations (the "Cash Management System"). In order to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these Chapter 11 proceedings, I believe it is vital to the Debtors that they maintain their system of managing cash.

67.     Prior to the commencement of these Chapter 11 cases, in the ordinary course of business, the Debtors maintained nine (9) bank accounts (the "Bank Accounts") at two (2) financial institutions (the "Banks").  The Bank Accounts include, but are not limited to, master, lockbox, accounts payable, payroll, benefits, and a sweep investment account. A list of the Debtors' Banks and Bank Accounts is attached to the Cash Management Motion as Exhibit A. A diagram of the flow of cash and Bank Accounts is attached to the Cash Management Motion as Exhibit B.  The Debtors submit that all of the Bank Accounts are maintained with financially stable banking institutions.

68.     The Debtors utilize the following processes to manage their cash:

    a.   The Debtors maintain a lockbox account into which revenues from general business operations flow.  As revenues are generated, the accounts are swept, on a daily basis, either (i) to pay down obligations under the Amended and Restated Loan and Security Agreement, as amended (the "Revolving Loan") or (ii) into the sweep investment account.

b. As funds are needed for operations and payroll, the Debtors either borrow from the Revolving Loan or transfer money from the sweep investment account into the master account. As funds are then needed, funds are transferred to the hourly payroll, salary payroll and accounts payable accounts (the "Payment Accounts") for distribution. The Payment Accounts are each zero balance accounts.

c. In addition to the master account, sweep investment account, lockbox account and Payment Accounts, the Debtors maintain three accounts that hold money for claim related to workers' compensation or dental and vision (the "Benefit Accounts"). The Benefit Accounts are managed by third party administrators. Balances in the Benefit Accounts are for outstanding checks plus the input amount, if any.

69.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System will prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates.

70.    The Cash Management System utilizes the Bank Accounts to effectively and efficiently collect, transfer, and disburse funds as needed in the Debtors' general business operations. The Cash Management System provides significant benefits to the Debtors, including the ability to: (i) closely track, and thus control, all corporate funds, (ii) ensure cash availability, and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Indeed, I believe a disruption in the Cash Management System could cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations.

71.    The Cash Management System allows the Debtors to manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and this Court, to trace funds through the system and ensure that all transactions are

adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

72.      I believe it is both essential and in the best interests of the Debtors' respective estates and creditors that the Cash Management System be maintained.  The Debtors' Chapter 11 cases will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System. Accordingly, the Debtors respectfully request that the Court authorize the continued use of the Cash Management System.

73.      Additionally, I believe the Debtors' existing deposit practices are appropriately tailored to their business needs. Accordingly, the Debtors submit that strict compliance with Bankruptcy Code Section 345 and the U.S. Trustee's Guidelines would be overly burdensome and restrict the Debtors' investment and banking options to the detriment of their estate and their creditors.

*Intercompany Transactions*

74.      In addition, in the ordinary course of business, while the vast majority of payments are made in the name of Ormet Primary Aluminum Corporation, certain of the Debtors maintain business relationships with each other, resulting in intercompany receivables and intercompany payables (the "Intercompany Claims").  In particular, except for one of the Bank Accounts, each of the Bank Accounts is held in the name of Ormet Primary Aluminum Corporation.  As such, in connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System, at any given time there may be Intercompany Claims owing by one Debtor to another (the "Intercompany Transactions").

75.     I believe that continuation of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors.  The Debtors maintain records of all Intercompany Transactions (including fund transfers) and, therefore, the Debtors are able to ascertain, trace, and account for the Intercompany Transactions.   At the same time, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted, to the detriment of the Debtors.

76.     Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates and creditors, and all parties-in-interest.

**E.     Debtors' Motion for an Order Authorizing the Debtors to Pay Certain Prepetition Taxes Pursuant to Section 105(a), 363(b), 507(a) and 541 of the Bankruptcy Code (the "Tax Motion")**

77.     In connection with the normal operation of their business, the Debtors incur a commercial activity tax, real and personal property taxes, commercial activity, and use taxes (collectively, the "Taxes") on behalf of various taxing authorities for payment to such authorities.  The Debtors pay the Taxes to the various Taxing Authorities on a monthly, quarterly or yearly basis, generally in arrears, depending on the particular Tax, as such payments become due and payable.  The average total amount of sales, use, property, and franchise taxes incurred on a monthly basis is approximately $184,000, which consists of $100,000 in use taxes, $65,000 in property taxes, $18,000 in commercial activity tax, and $1,000 in franchise taxes.   The Debtors estimate that, as of the Petition Date, there is approximately $475,000 in outstanding pre-petition tax obligations, including accrued taxes not yet billed by the appropriate taxing authority.

78.     On a periodic basis, the Debtors pay to the Taxing Authorities all sales, use, property, commercial activity, franchise and other taxes by funds drawn by check or by means of an electronic funds transfer.

79.     As of the Petition Date, the Debtors' financial records indicate that they are substantially current on their payment of Taxes to all Taxing Authorities.  Therefore, the Debtors seek this relief out of an abundance of caution and to permit full payment in the event any Taxes accrued prepetition were not paid prepetition or if any payments sought to be made prepetition are rejected, lost or otherwise not received in full by any Taxing Authority.

80.     I believe that the failure to pay the Taxes could have a material adverse impact on the Debtors' ability to operate in the ordinary course of business and could result in the Debtors' officers and directors being held personally and/or criminally liable for the failure to pay.  Furthermore, I believe that the Taxing Authorities may cause the Debtors to be audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtors' attention from their business operations and reorganization.  The payment of the Taxes is also necessary to avoid potential administrative difficulties.  I believe prompt and regular payment of the Taxes will help avoid unnecessary government actions.

81.     Accordingly, I believe that the relief requested in the Tax Motion is in the best interest of the Debtors, their estates and creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their business in an economic and efficient manner, without disruption.

**F.**     **Debtors' Motion For Authority Pursuant to Sections 363, 366 and 105(a) of the Bankruptcy Code for an Interim and Final Order (I) Prohibiting Utility Service Providers from Altering, Refusing, or Discontinuing Service; (II) Authorizing Payment of Certain Pre-Petition Claims of Certain Utility Providers as Part of Adequate Assurance Payments; (III) Deeming Utilities Adequately Assured of Payment; and (IV) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utility Motion")**

82.     In the ordinary course of business, the Debtors obtain electricity, natural gas, telephone, water, waste disposal and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies"). A nonexclusive list of the Utility Companies that provide the Debtors with Utility Services is attached to the Utility Motion as Exhibit A (the "Utility Service List"). Included in the Utility Service List are the average monthly obligations for the Debtors' use of the identified Utility Service.

83.     The Debtors' 2012 average monthly obligations related to Utility Services were $14,200,000 (the "Monthly Utility Obligations"). This total includes three parties (the "Primary Utilities") that collectively represent 99% of the monthly utility obligations, including one party that represents over 88% of the Monthly Utility Obligations, approximately $12,500,000 per month.

### *AEP Ohio*

84.     The production of primary aluminum involves the extraction of oxygen from alumina, which is done by combining alumina with a molten electrolyte called cryolite in a cell and then passing direct current electricity from a consumable carbon anode into the cryolite, splitting the alumina into molten aluminum metal and carbon-dioxide. This process uses a substantial amount of electricity. The result is that power represents as much as 1/3 of the Debtors' overall expenses.

31

85.     Given the tremendous amount of power the Debtors utilize on a daily basis, the Debtors have previously entered into a unique arrangement (the "Power Agreement") with AEP Ohio ("AEP"), as successor in interest to Ohio Power Company and Columbus Southern Power Company, as approved by the Public Utility Commission of Ohio (the "PUCO").  Pursuant to the Power Agreement, the Debtors receive certain discounts as consideration for the economic activity that maintaining the plant and jobs provides to the local community and the state of Ohio.  The Power Agreement provides the Debtors with payment terms of 21 days upon receipt of a bill from AEP.

86.     I believe continuation of the Debtors' relationship with AEP, including the benefits of the Power Agreement, is among the most critical to their ongoing business operations. Based on the favorable terms of the Power Agreement and the discounts available to the Debtors in this unique arrangement, the Debtors are unable to obtain power on better terms from alternative sources.[5]  I believe AEP would qualify as a Critical Vendor under the Critical Vendor Motion.  In order to maximize the value of the Debtors' estates, I believe it is imperative for the Debtors to pay AEP in the ordinary course of business, including with respect to all accrued and unpaid pre-petition obligations.  The Debtors have paid all invoices received to date in a timely manner, including the February payment for January electricity.  Accordingly, the only pre-petition amounts, other than the deferred payments, accrued and unpaid are from February 1, 2013 through the Petition Date.  As I understand from counsel, electricity is likely a good under Ohio law, and therefore, a sizable portion of the obligations with respect to the February

---

5 The current Power Agreement provides the Debtors with up to $120,000,000 in discounts between 2013 and 2018. These discounts include up to $44,000,000 in 2013 and decreases by $10,000,000 each year thereafter until the discount ends.  The Debtors have had discussions with AEP and State of Ohio on proposed modifications to the existing Power Agreement that will reduce the time of the Power Agreement and condense all discounts into 27

electricity may be entitled to priority under Section 503(b)(9) of the Bankruptcy Code. Therefore, payment in the ordinary course primarily affects timing, and not the amount of payment.

87.     Given the Debtors' payment of pre-petition obligations to AEP in the ordinary course of business, I believe a further deposit is unnecessary for AEP to be deemed adequately assured of future performance.   In addition to ordinary course payment of pre-petition obligations pursuant to the terms of the Power Agreement, the Debtors' recognize that AEP maintains its rights under the Power Agreement in the event the Debtors' fail to make a timely payment for post-petition services provided.   These rights include the right to terminate the Power Agreement if the Debtors' are more than two days late with respect to any monthly payment obligation.

88.     The Debtors are unable to operate without access to sufficient electricity for the production of primary aluminum.   Accordingly, I believe any action taken by AEP to alter, refuse or discontinue service to the Debtors' will have a devastating effect on the business operations and the value of the estate for the benefit of parties in interest.   The Debtors have identified their relationship with AEP as critical to maximizing the value of the estate and seek to continue payments in the ordinary course of business.

89.     I believe that both making a payment of the pre-petition obligations and allowing AEP to receive a deposit similar in nature to the adequate assurance deposit discussed herein would cripple the Debtors' estates by severely limiting the availability of funds under the proposed debtor-in-possession financing agreements and risks substantial harm to the Debtors

---

months.  The Debtors have filed a motion to authorize the filing of an application with the PUCO concurrently herewith.

and their estates during these proceedings.  Based on the totality of the facts and circumstances of these cases, I believe continued payment, in the ordinary course of business, and continuation of the Power Agreement is in the best interest of the Debtors and satisfies the requirements of adequate assurance of future performance with respect to AEP.

### Shell Energy and Entergy

90.     While not as power intensive as primary aluminum production, the production of alumina from bauxite requires substantial use of electricity and natural gas.  The Debtors have maintained relationships with Entergy for electricity and Shell Energy for their natural gas requirements.  Entergy holds a deposit of $310,000, approximately one and one-half to two months of electricity requirements for the production of alumina at the Debtors' alumina refinery in Burnside, Louisiana.  Shell Energy maintains a margin account, with a minimum of $1,750,000, the equivalent of approximately one month's natural gas requirements (depending on the cost per cubic feet) held on account, and is the counter-party to a natural gas supply contract.  Pursuant to the agreement with Shell Energy, the Debtor is required to increase this account if Shell Energy's exposure exceeds $1,750,000, until the application or the margin account is made to the Debtors' payment accounts, approximately 25 days following the end of the month for which natural gas was provided.

91.     Similar in many respects to the importance of electricity in the production of primary aluminum, natural gas is essential to the production of alumina from the raw material, bauxite.  In recognition of the importance of a consistent supply of natural gas, prior to the Petition Date, the Debtors entered into an agreement with Shell Energy for their natural gas requirements (the "Shell Agreement").  Pursuant to the Shell Agreement, the Debtors are

required to pay for the prior month's natural gas twenty-five days following the end of the month (i.e. the January natural gas bill was due February 25.

92.    In recognition of the critical nature of their relationship with Shell Energy, and the inability to find an alternative source of natural gas on terms and conditions comparable to the terms of the Shell Agreement, the Debtors seek authority to continue the margin account, in the ordinary course of business, and for Shell Energy to be authorized to offset any accrued but unpaid pre-petition obligations from the existing account, as part of the adequate assurance of payment.

93.    I believe permitting Shell Energy to apply the existing account to its pre-petition claim and allowing Shell Energy to retain a margin account is in the best interest of the Debtors' estates and provides adequate assurance of future performance for Shell Energy.

94.    Entergy provides electricity to the Burnside refinery. While not to the same level as AEP and Shell Energy, Entergy is unique in comparison to the Normal Utility Companies in that it currently holds a deposit from the Debtors. The amount of the deposit is $310,000, which is equivalent to approximately one and one-half to two months of electricity requirements in Burnside, LA.

95.    As adequate assurance for Entergy, the Debtors seek to allow Entergy to offset the pre-petition obligations that may be due and owing, and thereafter, maintain a one month deposit, in the amount of $150,000. To the extent the pre-petition amounts due and owing exceed $150,000, the Debtors will pay, as a post-petition deposit (after accounting for the offset by Entergy for the payment of the pre-petition claims), the amount necessary to maintain the $150,000 deposit level.

96.    The Debtors believe a one month deposit, in combination with the payment of all pre-petition obligations in full, provides sufficient adequate assurance of future performance by the Debtors with respect to Entergy.

### The Other Utility Companies

97.    The remaining Utility Companies provide utility services necessary in the ordinary course of maintaining an ongoing business, including telephone, water, basic electricity and natural gas needs and similar services (the "Normal Utility Companies"). To the best of my knowledge, there are no defaults or arrearages with respect to the Debtors' undisputed invoices for pre-petition Utility Services.

98.    After deducting for the average monthly utility obligations of the Primary Utility Companies, the Debtors average monthly obligations for the Normal Utility Companies is approximately $100,000. The Debtors propose to provide adequate assurance of payment to the Normal Utility Companies by depositing an initial sum equal to one-half (½) month of Utility Services for each Normal Utility Company, calculated as an historical average over the past six (6) months (the "Adequate Assurance Deposit") into a newly-created, interest-bearing segregated account (the "Adequate Assurance Deposit Account") maintained at Wells Fargo Bank, N.A., within twenty (20) days of the Petition Date. The Adequate Assurance Deposit Account shall be maintained solely for the benefit of the Normal Utility Companies on a pro rata basis (with each Normal Utility Company designated a portion of the Adequate Assurance Deposit equal to one-half (1/2) month of its Utility Services), unless (i) any such Normal Utility Company agrees to a lesser amount, (ii) any such Normal Utility Company already holds a deposit equal to or greater than one-half (½) month of Normal Utility Services, or (iii) any such Normal Utility Company is currently paid in advance for its Utility Services. Accordingly, based on the historical usage of

the Utility Services, the Debtors estimate that the Adequate Assurance Deposit will be approximately $50,000.

99.     Based on the foregoing, I believe that the proposed adequate protection is appropriate under the circumstances and support the entry of an Order granting the Utility Motion.

G.     **Debtors' Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code §§ 105(a), 363(b), 1107(a), and 1108 Authorizing the Debtors to File and Enter Into a Proposed Modification to the Power Agreement With AEP Ohio (the "AEP Motion")**

100.     The Debtors obtain their power from AEP, as the successor to Ohio Power Company and Columbus Southern Power Company.  Due to their usage levels of electrical power, the Debtors are categorized as a GS-4 customer under applicable regulations, with base electricity rates, including applicable tariffs and riders, set by the Second Revised Sheet No. 24-1, et seq., of PUCO No. 20.  Under these rates, the Debtors cost of electricity would currently be $58/MWh.  At this rate, the Debtors would pay approximately $21 million per month to operate the smelter at full capacity, before taking into account any discounts which might be applied under a unique arrangement.

101.     The State of Ohio, through the Public Utility Commission of Ohio (the "PUCO"), allows certain GS-4 customers (like the Debtors) to seek approval of unique arrangements to offset the expense of electricity, in order to facilitate economic development and create and maintain jobs in the state.

102.     As a result of the Debtors' impact on the local economy including the jobs created and maintained in the Monroe County area, and the services required to support the necessary infrastructure, the PUCO approved such an arrangement for the Debtors, the Power Agreement

between Ormet Primary Aluminum Corporation and AEP (as previously modified, the "Power Agreement"), a copy of which is attached to the AEP Motion as Exhibit A. The Power Agreement, which was originally entered into on September 16, 2009, provides for discounts to the Debtors to help offset their power expense.

103.    Under the Power Agreement, the Debtors received discounts of $60 million in 2010 and 2011 and $54 million in 2012. Looking ahead, the Debtors are authorized to receive a maximum discount of $44 in 2013, $34 million in 2014, $24 million in 2015, $14 million in 2016, and $4 million in 2017. The discounts are linked, in part, to the LME price. As the LME price deviates from a target LME price designed to produce a breakeven free cashflow with no discount, the Debtors' discount potential is adjusted. If the price is below the target LME, the discounts increase up to the maximum for the year, to help offset the reduction in revenue. If the LME exceeds the price target, then the Debtors will have premiums applied to the base GS-4 rate. Based on depressed LME prices in recent years, however, the Debtors have been in a position to take the maximum allowable discounts. Despite receiving these discounts, the cost of electricity has been rising rapidly, while the LME price has continued to be depressed, contributing substantially to the Debtors' current liquidity crisis.

104.    Facing significant liquidity concerns, in October 2012, the Debtors sought a deferral of their November and December power payments. On October 17, 2012, the PUCO entered an order, granting the deferral (the "Deferral Order"). A copy of the Deferral Order is attached to the AEP Motion as Exhibit B. Pursuant to the terms of the Deferral Order, the payments that would have been due in November and December (for October and November power usage) were deferred, with repayment to be made over 17 months, beginning in January 2014. The total amount of deferral was approximately $27,400,000. The PUCO, in approving

the Deferral Order, did note that any further request for relief by the Debtors must be accompanied by a detailed business plan that shows the Debtors' long-term ability to exist without ratepayer support.

105.    In evaluating the long-term prospects for a successful restructuring and in discussions with the Stalking Horse Bidder, the Debtors identified finding a short term improvement in the price paid for electricity as an important step in maximizing the value of the Debtors' and their estates.  Accordingly, the Debtors engaged in discussions with Jobs Ohio, a private/public enterprise that pursues economic development activity for the benefit of the State of Ohio, and AEP with respect to supporting further modifications to the Power Agreement (the "Modification").   The primary objective of these discussions and the Modification is to accelerate the timeframe to take the $120 million in remaining discounts, from 5 years to a 27 month period commencing January 2013.    In order to operate under the terms of the Modification, I understand that the Debtors must first execute the Modification with AEP and thereafter, file a proposal with the PUCO seeking approval of the Modification.  The PUCO will then set the proposal for a public hearing, which I understand may be up to 90-120 days from filing of the proposal.  After the hearing, the PUCO may approve the Modification, and then the Modification becomes effective against the Debtors and AEP.  Accordingly, there are several steps and substantial time necessary to move from entry into the Modification to the effective date.

106.    Accordingly, based on the benefits for the benefit of the estates, I believe entry of an order approving the AEP Motion is in the best interest of the Debtors and their estates.

**H.    Debtors' Motion for Order Pursuant to 11 U.S.C. § 105(A), 507(a)(4), and 507(a)(5) (A) Authorizing the Debtors to Pay Prepetition Wages and Salaries, and Honor Certain Employee Benefits, (B) Directing All Banks to Honor Prepetition Checks for Payment of Prepetition Obligations, and (C) Authorizing the Debtors to Honor Workers' Compensation Obligations (the "Employee Wage Motion")**

107.    The Debtors have a roster force of approximately 1,188 full-time employees between the aluminum reduction plant and corporate offices in Hannibal, Ohio and the alumina refinery in Burnside, Louisiana (the "Employees"), of which approximately 1,107 are scheduled to work[6]. Of these Employees, approximately 977 are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW").

108.    The Debtors' Employees perform a variety of critical functions in the production of alumina and aluminum, including numerous manufacturing maintenance and engineering functions, as well as administrative, accounting, supervisory, management and other tasks. To operate during these bankruptcy proceedings, the Debtors must retain their Employees' skills as well as their knowledge and understanding of the Debtors' infrastructure, operations and customer and vendor relationships.

109.    I believe nonpayment of Employee compensation and benefits could severely undermine morale and impose real hardship on the Employees and generate doubts about the stability of the Debtors and their operational prospects. Thus, by the Employee Wage Motion, the Debtors seek authority to pay and/or honor, except as otherwise identified in the Employee Wage Motion, certain pre-petition claims or policies for, among other things: wages, salaries, and other compensation, federal, state, local and other withholding taxes and other amounts

---

[6] The Debtors also employ certain temporary and part-time employees as necessary. By this Motion, the Debtors seek authority to maintain this practice, and to honor all obligations to these temporary and part-time employees.

withheld (e.g. garnishment, child support, Employees' share of insurance premiums, taxes and 401(k) contributions), Employee health benefits, insurance benefits, workers' compensation benefits, flexible spending accounts, vacation time, employee assistance plans, jury duty leave, bereavement leave, temporary military leave, education leave, life insurance, short and long-term disability coverage, and certain other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described herein, the "Employee Wages and Benefits"), and to pay all costs incident to the foregoing including any payments to third party administrators (the "TPAs") or other administrative service providers.  Further, the Debtors request the right to modify, change and discontinue any of the Employee Wages and Benefits, and to implement new Employee Wages and Benefits in the ordinary course of business in their discretion and without the need for further Court approval.[7]

110.    Finally, the Debtors request that banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing.  The Debtors also seek authority to issue new post-petition checks or fund transfer requests with respect to pre-petition obligations that may have been dishonored by the banks in respect of the Employees' pre-petition wages, benefits and deductions, if necessary.

*Wages, Salaries and Other Compensation*

111.    The Debtors have four primary groups of Employees: (i) hourly Employees in Hannibal, OH (the "Hannibal Hourly Employees"), (ii) hourly Employees in Burnside, LA (the

---

[7] By the Employee Wage Motion, the Debtors do not seek authority to modify, change or discontinue any provisions contained within a collective bargaining agreement.  Notwithstanding the foregoing, to the extent the Debtors do not honor certain obligations arising as a result of pre-petition actions, whether such obligations become due pre-petition or post-petition, the Debtors reserve the right to challenge the priority of such obligations, to the extent such obligations were accrued prior to the Petition Date.

"Burnside Hourly Employees"), (iii) salaried Employees in Hannibal, OH (the "Hannibal Salaried Employees"), and (iv) salaried Employees in Burnside, LA (the "Burnside Salaried Employees").[8]  In most cases, the Hourly Employees are paid in arrears, on Thursday or Friday, for time accrued through the prior Saturday or Sunday.  The Salaried Employees are paid monthly in the case of exempt employees and twice monthly in the case of non-exempt Employees.  For the non-exempt Employees, the mid-month payment occurs on the 15th of each month and all Salaried Employees are paid on the last day of each month, (or the last business day immediately preceding such date).  Salaried Employees are paid current for the period ending on the payment date, with the exception of any overtime pay, which is paid one month in arrears.  The Debtors' average weekly gross payroll is, in the aggregate, approximately $1,360,000 (the "Wages").  The Debtors' payroll is made through electronic transfer of funds directly to the Employee's accounts and via checks made directly to the Employee.

112.    As of the Petition Date, the Debtors have not paid their Employees all pre-petition Wages.  Additionally, compensation may be due and owing as of the Petition Date because:

    a.  some discrepancies may exist between the amounts paid and amounts Employees or others believe should have been paid, which upon resolution, may reveal that additional amounts are owed to such Employees;

    b.  there may have been difficulties in completing an electronic fund transfer into an Employee's account; and

    c.  the Employee's checks may not have cleared the financial institutions.

113.    The Debtors are asking for authority to pay all amounts earned by their Employees for the pre-petition period, and therefore estimate that, as of the Petition Date,

---

[8] The Hannibal Hourly Employees and Burnside Hourly Employees are referred to as the "Hourly Employees"; the Hannibal Hourly Employees and Hannibal Salaried Employees are referred to as the "Hannibal Employees"; the Burnside Hourly Employees and Burnside Salaried Employees are referred to as the "Burnside Employees"; and the Hannibal Salaried Employees and the Burnside Salaried Employees are referred to as the "Salaried Employees."

$2,350,000 will be outstanding, consisting of accrued wages, salaries, overtime pay, and other compensation.  The Debtors do not believe any individual is owed in excess of $11,725 for accrued but unpaid Wages.

114.    I believe the sum of the pre-petition Employee Wages and Benefits is relatively minimal in amount when compared with the size of the Debtors' estates and the damage to the Debtors' Chapter 11 cases that would ensue if Employee morale were disrupted by the Debtors' failure to meet their Employee Wages and Benefits obligations.

*Remitting and Paying Appropriate Deductions and Withholdings*

115.    The Debtors routinely withhold certain amounts from Employees' paychecks, including without limitation, Social Security, Medicare, federal and state income taxes, contributions to Health and Welfare Plans (as defined below), contributions to defined contribution retirement plans, and payroll deductions for various optional insurance programs, charitable deductions, loan payments, union dues and garnishment, political action committee fees, child support and other similar obligations (collectively, the "Withholding Obligations"). Upon receipt, the Debtors forward the Withholding Obligations to various third party recipients. The Debtors believe that such Withholding Obligations, to the extent that they were in the Debtors' possession as of the Petition Date and/or remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates.

116.    Due to the commencement of these Chapter 11 cases, some of these Withholding Obligations may have been deducted from the Employees' earnings and not forwarded to the appropriate third-party recipients prior to the Petition Date.  Accordingly, the Debtors seek authority to continue to forward pre-petition Withholding Obligations (which the Debtors hold in trust) to the applicable third party recipients on a post-petition basis, in the ordinary course of

business, as routinely done prior to the Petition Date.  On average, each month, the Withholding Obligations total approximately $1,800,000 and the Debtors' estimate that as of the Petition Date, the Withholding Obligations not yet forwarded to third party recipients is approximately $285,000.

*Honoring Reimbursable Expenses*

117.    Prior to the Petition Date, and in the ordinary course of business, Employees incurred certain expenses on the Debtors' behalf, including, without limitation, meals, parking, automobile mileage and other business related expenses (the "Reimbursable Expenses").

118.    Employees use their personal funds to pay for the Reimbursable Expenses, and submit expense vouchers for approval.  I believe the Employees are willing to use their own funds based on the expectation and belief they will be reimbursed for these expenses by the Debtors.  Upon approval of the expenses, the Debtors reimburse the Employees out of corporate funds.  Reimbursable Expenses average approximately $50,000 per month, and the Debtors estimate that as of the Petition Date, approximately $35,000 remains outstanding.

119.    To the extent any Employees incurred the Reimbursable Expenses, such expenses were incurred on the Debtors' behalf and in the scope of their employment, with the understanding that such expenses would be paid by the Debtors.  Accordingly, the Debtors request authority, to (a) honor all pre-petition obligations related to the Reimbursable Expenses and (b) maintain such policies in the ordinary course of business.

*Employee Benefits*

120.    In the ordinary course of business, the Debtors provide Employees, with a number of benefits designed to assist Employees and their eligible dependents in meeting certain financial burdens, including those arising from illness, disability, and death (collectively, the

"Employee Benefits"), including but not limited to: (a) Health and Welfare Benefits (as defined below); (b) Vacation Time, Holiday Pay and other paid leave (each as defined below); (c) Savings Plans (as defined below); (d) workers' compensation programs; and (e) other miscellaneous employee benefits.  The Debtors seek authorization, but not direction, to pay or otherwise continue to honor these Employee Benefits, solely to the extent described herein.

### Health and Welfare Benefits

121.    The Debtors offer several health and welfare benefit plans (collectively, the "Health and Welfare Plans") for their Employees depending, in part, on their status as Hourly or Salaried Employees, and Hannibal or Burnside Employees, including, without limitation, coverage for medical, prescription, dental, vision, life (including for spouse and dependents), short-term and long-term disability, sickness and accident insurance, business travel accident insurance, accidental death and dismemberment, flexible spending accounts and employee assistance programs (collectively, the "Health and Welfare Obligations").[9]  Certain Health and Welfare Plans are self-funded through contributions made by the Debtors and the Employees, and administered by third parties that, among other things, process and administer claims and seek reimbursement for compensable claims from the Debtors.

122.    For the benefit plan year ending in 2012, the Debtors total expenditures for the Health and Welfare Plans were approximately $15,100,000.  Due to the manner in which such expenses are incurred and claims are processed under the Health and Welfare Plans, it is difficult to determine the extent of the Debtors' obligations at any particular time.  Based on historical experience and expected future trends, the Debtors estimate that the monthly cost of the Health

---

[9] The Debtors have attempted to identify each of the Health and Welfare Plans offered, however, certain Health and Welfare Plans may have been overlooked or not identified and included within this Motion.  To the extent any

and Welfare Plan Obligations (including administrative payments to third-party administrators) is approximately $1,300,000, of which $1,000,000 is paid pursuant to collective bargaining agreements.

123.    Pursuant to the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), the Debtors provide for temporary continuation of health care benefits at group rates to former Employees and eligible dependents.  Because the Debtors' Health and Welfare Plans are self-insured, the Debtors are responsible for payment of amounts over the premiums paid by the former Employees (the "COBRA Receipts").  In order to comply with the requirements of COBRA, the Debtors request that former Employees and eligible dependents retain the right to coverage under the Debtors' Health and Welfare Plans in accordance with the requirements of COBRA and request authorization to pay any obligations arising under such plans, regardless of when such obligations accrued.  The Debtors average monthly COBRA Receipts total approximately $1,800.  Current outstanding obligations related to COBRA Receipts were incurred within 180 days of the Petition Date and resultant claims are likely to be afforded priority status pursuant to Section 507(a)(4) of the Bankruptcy Code.

124.    By this Motion, the Debtors seek authority, in their sole discretion to continue the Health and Welfare Plans in the ordinary course of business and pay Health and Welfare Plan Obligations and COBRA Payments, as, and when, they become due and owing, including payments to TPAs.

---

Health and Welfare Plans are not expressly identified herein, the Debtor, nonetheless, seeks authority to maintain such programs in the ordinary course of business, in their sole discretion.

**Vacation, Holiday and Other Leave**

125.   The Debtors provide vacation time to their Employees as a paid time-off benefit ("Vacation Time"). Employees are generally entitled to one to five weeks of Vacation Time, based on the respective Employee's years of service to the Debtors. Salaried Employees are paid for Vacation Time at their base weekly equivalent rate. Hannibal Hourly Employees are paid at the greater of two percent (2%) of the prior year's gross earnings per week of vacation or their regular hourly rate as of January 1 of the current year. Burnside Hourly Employees are paid at the average hourly rate for the week prior to their vacation week. Additionally, under certain circumstances, the Debtors may, with the consent of the Employee, pay the Employee for Vacation Time without the Employees taking the time off.

126.   Vacation Time is provided as of January 1 of each year for use during that calendar year. The Debtors estimate that the average annual obligations arising from Vacation Time is approximately $4,200,000, of which $2,940,000 is for Hourly Employees. As of the Petition Date, the Debtors estimate that there is approximately $3,810,000 of accrued but unpaid, pre-petition liabilities pertaining to Vacation Time for calendar year 2013. By the Employee Wage, the Debtors seek Court approval to continue to permit Employees to accrue and use their Vacation Time in the ordinary course of business, without disruption.

127.   The Debtors provide full time Employees ten (10) or eleven (11) paid holidays per year (the "Holiday Pay"), depending on location. If a holiday falls on a weekend, Employees receive either the Friday before or the Monday following the holiday as an additional paid holiday. Holiday Pay is paid at their regular hourly or salary rates for holidays. The average annual cost of providing Holiday Pay is approximately $1,700,000.

128.    Full-time Employees are eligible for jury duty leave.  The Debtors provide paid time off for jury duty.  The average annual cost associated with the jury duty benefit is approximately $6,000.

129.    The Debtors offer Employees up to five (5) days of funeral leave for eligible family members.  The average annual cost of providing bereavement leave is approximately $62,000.

130.    By the Employee Wage, the Debtors request authority, in their sole discretion, to honor Vacation Time, Holiday Pay, jury duty leave, and bereavement leave (collectively, "PTO" and the related policies, the "PTO Policies") in the ordinary course of business and to permit Employees to continue to use their PTO in the ordinary course of business.

### Supplemental Unemployment Program

131.    The Debtors maintain a reduction in workforce program under which Hourly Employees, with the appropriate level of seniority, who have been separated or furloughed as a result of a downsizing or reorganization are provided pay for a specified period following such separation (the "Supplemental Unemployment Program").  The Supplemental Unemployment Program is self-funded and administered.  The Supplemental Unemployment Program provides, depending on length of service and location of employment, from 26 to 104 months of severance pay, on a declining basis, plus up to two years of medical benefits.  In the months leading to the Petition Date, approximately seven (7) Employees have become eligible for the Supplemental Unemployment Program as a result of the reductions in workforce.  The Debtors estimate that the average annual obligation on account of the Supplemental Unemployment Program for the payment to the affected Employees to be $50,000, based on one year of eligibility.  By the Employee Wage Motion, the Debtors seek authorization, but not direction, to maintain the

Supplemental Unemployment Program in the ordinary course of business, as set forth in the collective bargaining agreement.

### 401(k), Pension Plans and Retirement Plans

*401(k) Plan*

132.    The Debtors maintain, for Burnside Hourly Employees and certain other eligible Employees, qualified defined contribution plans that meet the requirements of Sections 401(a) and 401(k) of the Internal Revenue Code (the "Savings Plans").  In Burnside, eligible hourly employees receive a contribution by the Debtors on a per hour worked basis.  The Debtors estimate that their obligations to the affected Hourly Employees are approximately $41,000 as of the Petition Date.  The Debtors further estimate that Employee contributions total $56,500 on a monthly basis.

133.    Under the terms of the Savings Plan, eligible Employees can contribute a percentage of their compensation, through payroll deductions, both on a pre-tax and an after tax basis, up to limits imposed on these contributions under the savings Plan and the Internal Revenue Code.  Under a special feature of the Savings Plans, certain Employees are eligible to receive an employer match of up to 2% of wages, based on the Employee's own contributions to their Savings Plan and eligible earnings.  The Debtors estimate that the annual matching employer contributions to the Savings Plans to be approximately $250,000.

*Steelworkers Pension Trust*

134.    All of the Debtors' Hannibal Hourly Employees are covered under the Steelworkers Pension Trust ("SPT").  The SPT is a multi-employer defined benefit pension plan sponsored by the USW and administered by a board of trustees.  The Debtors contribute a pre-determined amount based on the number of hours worked during the contribution period by the covered Employees.  The Debtors estimate the annual contributions into the SPT to be approximately $1,400,000 based on historical numbers.  As of the Petition Date, the Debtors believe approximately $115,000 is due and owing from the Debtors on account of SPT contributions.

135.    By the Employee Wage Motion, the Debtors seek authorization, but not direction, to continue to honor all obligations under the SPT, including the payment of contributions for time worked pre-petition.

*Ormet Defined Benefit Plans*

136.    The Debtors also maintain the Ormet Defined Benefit Pension Plan, which is a qualified defined benefit plan under the Internal Revenue Code (the "Ormet DB Plan"), for certain Employees, former Employees and Retirees (the "DB Beneficiaries") and two other defined benefit plans for certain former Employees and Retirees (the "Other DB Plans" and together with the Ormet DB Plan, the "DB Plans").  Many complex and material issues relate to and impact the DB Plans, and continuing developments on various fronts will affect these issues and the DB Plan.  The Debtors will, at the appropriate time, seek the relief they believe appropriate with respect to the DB Plans when such issues and developments can more fully be assessed.  At this time, the Debtors do not seek to pay into or on account of the DB Plans,

minimum funding or other contributions or payments that are on account of pre-petition labor or otherwise give rise to pre-petition claims.

*VEBA Trusts*

137.    Certain hourly Employees, former hourly Employees and hourly retirees (collectively, the "VEBA Recipients") are eligible for retiree health care and death benefits pursuant to a Voluntary Employee Benefits Trust (the "VEBA Benefit Trust").  The VEBA Benefit Trust is administered in accordance with the Ormet Corporation Hourly Retiree Group Benefit Plan (the "Retiree Group Plan"), and the Ormet Corporation Hourly Retiree Benefit Trust established pursuant to the Plan.  The Debtors have no direct responsibility to those VEBA Recipients whose benefits are maintained by the VEBA Benefit Trust; instead, the VEBA Benefit Trust is responsible for providing the benefits.  The Debtors are required to pay into the VEBA Benefit Trust $736,633 per month through May 2013; then $903,633 per month through December 2014; and finally $667,000 per month through May 2018, which includes company contributions and administrative expenses.  As part of the USW negotiations, the USW has agreed to defer the Debtors' payments to the VEBA Benefit Trust through June 2013.  Presently, the Debtors do not seek authority to make payments to the VEBA Benefit Trust.

138.    Certain Salaried Employees, former Employees and retirees (collectively, the "Salaried VEBA Recipients") are eligible for retiree health care and death benefits pursuant to a separate Voluntary Employee Benefit Trust (the "Salaried VEBA Trust").  The Salaried VEBA Trust is administered in accordance with the Ormet Corporation Salary Retiree Group Benefit Plan and the Ormet Corporation Salaried Retiree Benefit Trust established pursuant to the Plan. The Debtors do not have direct responsibility to the Salaried VEBA Recipients, whose benefits are maintained by the Salaried VEBA Trust.  The Debtors are required to pay into the Salaried

VEBA Trust approximately $75,000 per month through May 2018.  By the Employee Wage, the Debtors seek authorization, but not direction, to continue to make payments to the Salaried VEBA Trust in the ordinary course of business.

### Workers' Compensation Programs

139.    Pursuant to the laws of both Ohio and Louisiana, I understand the Debtors are required to maintain workers' compensation policies and to provide their Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program").  The Debtors' have historically participated in the self-insured workers' compensation programs administered by the Ohio Bureau of Workers' Compensation and State of Louisiana Workforce Commission (the "State Agencies"), respectively (the "Self-Insured Programs").  The Debtors are self-insured up to $1,000,000 per claim and maintain an excess workers' compensation policy (the "Excess Workers' Compensation Program") with ACE American Insurance Company, which provides stop-loss coverage to the extent any workers' compensation claims under the Self-Insured Programs exceed $1,000,000.  Coverage under the Excess Workers' Compensation Policy is provided in the amounts required under applicable state law.

140.    The Workers Compensation Program is maintained by third party administrators, who pay claims by checks written directly on the Debtors' accounts.  The Debtors believe that they are current in the payment of all workers' compensation claims.  However, the Debtors cannot be sure that all checks issued with respect to workers' compensation claims have been cashed and honored prior to the Petition Date.  Accordingly, there could be some pre-petition checks at risk of being dishonored if deposited after the Petition Date.

141.    The beneficiaries of the Debtors' Workers Compensation Program include Employees that were employed by the Debtor's current operating entity, Ormet Primary Aluminum Corporation, as well as former Employees of Ormet Aluminum Mill Corporation which ceased operations in December 2005.

142.    By the Employee Wage, the Debtors seek authority to maintain their Workers' Compensation Program in the ordinary course of business, without disruption and to pay all obligations arising under the Workers' Compensation Program.

### Miscellaneous Employee Benefits

143.    In addition to the foregoing, the Debtors have a number of miscellaneous practices, programs and policies in place to provide benefits and protections to various groups of Employees.  The miscellaneous programs include, but are not limited to, employee assistance programs, work shoe allowance program and authorized leave for employment with the union, service in the armed services, and education, without loss of seniority (collectively, the "Other Employee Programs").  I believe the Other Employee Programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce.  The average monthly obligations for the Other Employee Programs are, in the aggregate, negligible in the context of the Debtors' aggregate compensation and benefit obligations.  Accordingly, the Debtors seek authority to maintain the Other Employee Programs and honor those obligations that arose prior to the Petition Date in the ordinary course of business.

### Administrative Functions Related To Employee Benefit Plans

144.    As is customary in most large companies, and noted herein, the Debtors utilize the services of several professionals, consultants, and other TPAs in the ordinary course of their businesses in order to facilitate the administration and maintenance of their books and records

related to certain of the Employee Benefits (the "Administration Expenses").  The amount the Debtors pay these professionals and consultants average approximately $180,000 per month.

145.    These administrative services are necessary to the Debtors administration of Employee Benefit Plans and ensure that the Debtors' multiple benefit programs are operated in the most cost-effective and efficient manner.  Accordingly, the Debtors request that they be authorized, but not directed, to pay, in the ordinary course of business, the pre-petition Administration Expenses owing to such TPAs.

146.    Accordingly, in light of the foregoing, I believe the relief requested in the Employee Wage Motion is in the best interest of the Debtors, their estates and the parties in interest in these bankruptcy cases.

**I.    Debtors' Motion Pursuant to Sections 105(a), 363(b), and 503(b) of the Bankruptcy Code Authorizing (I) the Debtors to Continue and Renew Their Casualty, Property, and Other Insurance Policies and Honor all Obligations in Respect Thereof; and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "Insurance Motion")**

147.    In connection with the operation of their businesses, the Debtors maintain various liability and property related insurance policies, including general liability, property, automobile, umbrella, excess workers compensation and employer's liability, executive and organization liability, director and officer liability, fiduciary liability, employment practices, crime, storage tank, and hull and marine liability insurance (collectively, the "Insurance Programs") in the ordinary course of business.  The Insurance Programs are provided by several private insurance carriers (the "Insurance Carriers").  Attached to the Insurance Motion as Exhibit A is a summary of the Debtors' Insurance Programs.

148.    Maintaining the Insurance Policies is a necessary cost of preserving the value of the Debtors' estates.  The nature of the Debtors' business makes it essential for the Debtors to

maintain their Insurance Policies on an uninterrupted basis.  I believe the nonpayment of premiums, deductibles, or any related fees could result in one or more of the Insurance Carriers declining to renew the insurance policies or refusing to enter into new insurance agreements.  If the Insurance Policies are terminated, the Debtors could be exposed to substantial liability for personal and/or property damages that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies.  The Debtors would also be required to obtain replacement policies on an expedited basis, potentially incurring significant increase in cost over their current premiums, substantially harming the estate.

149.    Many of the Insurance Policies have a renewal date of March 1.  Accordingly, in the ordinary course of business, the Debtors bound renewal policies over the last several days.  Certain of the premiums associated with those Insurance Policies will be required to pay in the initial days of the bankruptcy proceedings.

150.    In many cases, the coverage is required by various regulations, laws and contracts that govern the Debtors' business operations.  Specifically, I understand the Debtors could lose good standing certification in states that require the Debtors to maintain certain levels of insurance coverage.  Moreover, the Debtors' post petition financing agreements required the Debtors to maintain sufficient insurance coverage.

151.    The continuation of the Insurance Policies on an uninterrupted basis, and the payment of all prepetition and post-petition insurance obligations, are essential to continuing the Debtors' operations and preserving the value of the Debtors' estates.  Accordingly, I believe the relief requested in the Insurance Motion is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

**J.      Debtors Motion For Entry of an Order Authorizing the Debtors to (A) Pay Pre-petition Claims of Shippers and Warehousemen and (B) Satisfy Customs Duties Imposed on Shipments from Foreign Suppliers (the "Shippers and Warehousemen Motion")**

152.      It is essential for the Debtors' businesses and their efforts to maximize value for the benefit of creditors, that they maintain a reliable and efficient supply and distribution system both domestically and internationally.  In the ordinary course of business, the Debtors' rely upon (i) reputable common carriers, movers, shippers, and companies that transport raw materials and goods (together, the "Materials") from their original source to the Debtors' facilities (the "Shippers"), and (ii) the warehousemen, bailees, storage facilities, unloading services, and other providers of storage services for the Materials (the "Warehousemen").

153.      As a global supplier of primary aluminum, the Debtors rely on timely and cost effective deliveries of materials that are purchased from vendors, including numerous foreign suppliers.  Many of these Materials have a limited number of providers and the cost and time involved to replace current vendors would prove detrimental to the estate.  The Material are shipped via ocean cargo and accepted for use by the Debtors.  For example, the refinery in Burnside receives Materials including bauxite from South America, which is necessary for the production of alumina; and the reduction plant in Hannibal received anodes from Asia, which are necessary for the production of primary aluminum.  Once the alumina is produced, it is held until shipped via river barge up the Mississippi and Ohio rivers until reaching Hannibal.  In order to maintain the value of, and successfully rehabilitate the Debtors, I believe the Debtors must continue to be deemed reliable and dependable among their suppliers.  Maintaining this reputation depends in substantial part on the timely delivery of Materials from the Debtors'

suppliers; in turn, the Debtors' ability to make timely deliveries depend on a successful and efficient system for the shipment and warehousing of the Materials.

154.    Because the Debtors depend so heavily on the Shippers and Warehouseman, I believe it is essential to incentivize such parties to continue performing timely services and providing the Materials.  For example, I believe that if the Debtors are unable to obtain bauxite on a timely basis, the Debtors will be unable to produce alumina and will be forced to seek alumina in the marketplace, on an emergency basis, subject to unknown costs and availability from limited sources.  As a consequence, the Debtors may not be able to produce aluminum in the quantities necessary to satisfy customer requirements, thereby causing substantial harm to the value of the Debtors' business and reorganization efforts.

155.    As I understand from counsel, under certain applicable laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which secured the charges or expenses incurred in connection with the transportation or storage of goods.  I also understand that, as bailees, they may be entitled to adequate protection of a valid possessory lien. Accordingly, I believe making payments of pre-petition obligations is in the best interest of the Debtors' and their estates.

156.    In 2012, the Debtors paid the Shippers approximately $43.2 million for the services provided, and anticipate up to $2.5 million may be outstanding as of the Petition Date. In 2012, the Debtors paid the Warehousemen approximately $6 million for the services they provide, and believe approximately $.5 million is outstanding as of the Petition Date.

157.    In addition to the pre-petition obligations to Shipper and Warehouseman, as the Debtors' import substantial amounts of the Materials from suppliers outside the United States and are required to pay certain foreign duties, custom duties and similar expenses related to

importing Materials (the "Customs Duties").  The Debtors contract with a customs agent (the "Agent"), who pays the obligations upon arrival of product into the harbor.  The Agent and Debtors estimate the amount due in advance, with the Debtors' pre-funding the anticipated expenses.  The Agent then makes the payment, and the parties calculate any over-payment or under-payment and perform a true-up going forward.  The average annual expense for Custom Duties is approximately $240,000 and the Debtors estimate $10,000 is outstanding as of the Petition Date.

158.    I believe it is essential for the Debtors to maintain authority to continue to pay, in the ordinary course of business and to the extent necessary to preserve the value of the estate, in the Debtors' sole discretion, certain pre-petition claims of Shippers and Warehousemen and obligations related to the Custom Duties, including pre-petition obligations to the Agent.  The Debtors believe certain of the Shippers and Warehousemen may assert possessory liens upon the Materials in their possession, and non-payment would result in the Shippers and Warehousemen retaining the materials in their possession, risking a significant disruption in business operations, and substantially harming the Debtors and their estates.  Additionally, the Agent may not turn over any property in its possession to the Debtors, frustrating the ability of the Debtors to obtain necessary materials in the ordinary course of business.  Finally, I understand from counsel that Customs Duties are entitled to priority under the Bankruptcy Code, and the payment, in the ordinary course of business, will prevent disruption and not harm the creditor constituents in these cases.

159.    Accordingly, I believe the relief requested in the Shippers and Warehousemen Motion is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

**K.    Debtors Motion for an Interim and Final Order Authorizing, Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, Payment of Certain Prepetition Claims of Critical Vendors (the "Critical Vendor Motion")**

160.    Certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date, and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date, (the "Critical Vendor Claims").  The Critical Vendor Claims include, among other claims, claims for certain chemicals necessary for the production of alumina or aluminum, repair services from parties uniquely qualified to provide such services, materials used in the production process where alternative suppliers are limited and the price structure benefits the Debtors, and environmental clean-up services.  By this Critical Vendor Motion, the Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay certain pre-petition claims of such Critical Vendors in an aggregate amount not to exceed $2.5 million (the "Critical Vendor Cap").  By the Interim Order, the Debtors seek the authority to pay only a portion of the Critical Vendor Cap, up to a maximum of $1.0 million (the "Interim Cap").  I believe the amount requested under the Interim Cap is the minimum amount necessary to avoid the risk of immediate harm that would result if no Critical Vendor Claims were able to be paid until the Final Hearing.

161.    I believe that payment of the Critical Vendor Claims is vital to the operations of the Debtors' businesses, and necessary to maintain current operations and maximize value for the benefit of the estates.  Interruption to certain materials, equipment and services provided by the critical vendors may affect the flow of production, causing immediate and substantial harm to the Debtors and their estates.  The Debtors' production of aluminum is balanced against its alumina supply, including the alumina coming from the refinery in Burnside, LA.   The aluminum

production process requires constant operations as, if production does shut down for more than five hours, the cost to restart the line is significant, if not catastrophic.

162.    In establishing the vendors that are truly critical, the Debtors reviewed their accounts payable and consulted with appropriate members of their management team to identify those vendors that are the most essential to the Debtors' operations using the following criteria: (a) whether the vendor is a "sole-source" provider, (b) whether the vendor is essential due to the logistical concerns that would materially hinder the Debtors from obtaining the goods or services from an alternate source, (c) whether certain customizations or other unique factors prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (d) whether the vendor may be a forward contract merchant and the parties are subject to a forward contract, (e) whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured in the case of non-sole source providers, and (f) whether a vendor meeting the standards of (a), (b), (c) or (d) is likely to refuse to continue providing goods or services to the Debtors on a post-petition basis if its pre-petition balances are not paid.

163.    After carefully assessing the universe of vendors against the foregoing criteria, the Debtors identified certain parties as Critical Vendors and estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors in calculating the Critical Vendor Cap, both on an interim and final basis.

164.    The Critical Vendors provide the Debtors with, among other things, raw materials, supplies, and services unique to the alumina refining and aluminum smelting processes and necessary to the Debtors' ongoing operations.  Among the services provided by Critical Vendors includes repair and maintenance services such as environmental and plant turnaround

services.  Similarly, certain Critical Vendors are the only supplier of the specific products or services they provide, and finding an alternative supplier may prove impossible.

165.    Interruption to certain materials, equipment, and services provided by the Critical Vendors may affect the flow of production, causing immediate and substantial harm to the Debtors and their estates.  The Debtors' production of aluminum is balanced against its alumina supply, including the alumina coming from the refinery in Burnside, LA.  The aluminum production process requires constant operations as the cost to restart a potline is significant, if not catastrophic in the case of an unplanned shutdown.

166.    Accordingly, I believe the importance of having the flexibility to work with these parties is essential to protect the value of the estates for the benefit of the Debtors' and their estates.

**L.    Motion of the Debtors and Debtors-in-Possession for an Order Authorizing the Debtors to Pay Certain Prepetition Obligations to Foreign Vendors Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (the "Foreign Vendor Motion")**

167.    In the ordinary course of their business, the Debtors regularly purchase certain raw materials, including without limitation, bauxite, alumina, anodes, cathode blocks, and aluminum fluoride (collectively, the "Raw Materials") from a handful of significant vendors based outside the United States (collectively, the "Foreign Vendors")[10].  These Raw Materials are essential to each aspect of the Debtors' business operations, as certain materials are necessary in both the production of alumina and aluminum.  If a consistent supply of Raw Materials is not timely received, I believe the Debtors will be required to substantially curtail, or prematurely terminate their operations over the next few weeks, to the detriment of creditors, employees and

all other parties-in-interest.  These Raw Materials cannot be quickly or inexpensively re-sourced to another supplier due to long lead times associated with volume required, logistics, engineering, quality, and customized specifications.

168.    Upon information and belief, I understand that if the Debtors' outstanding pre-petition obligations to certain Foreign Vendors (the "Foreign Vendor Claims") are not satisfied, it is likely that the Foreign Vendors would take action that could severely disrupt the Debtors' operations.  Because the Foreign Vendors may lack minimum contacts with the United States, they may not be subject to the jurisdiction of the Court or the provisions of the Bankruptcy Code, such as the automatic stay.  Without the protection of the automatic stay afforded by Section 362 of the Bankruptcy Code, failing to pay the Foreign Vendors might place the Debtors at risk of asset seizures, lien filings and other self-help remedies that may be available to Foreign Vendors under the laws of their respective jurisdictions.  Additionally, Foreign Vendors may argue that the Debtors' obligations arise out of forward contracts that provide certain rights to the Foreign Vendors, including the right to terminate a supply agreement notwithstanding the automatic stay.[11]

169.    For the reasons discussed herein, the Debtors believe authorization to continue paying the Foreign Vendors is essential to maintaining normal business operations and preserving value for the benefit of the estates and their creditors.  In 2012, the Debtors' purchases of Raw Materials from Foreign Vendors was approximately $150 million.  By this

---

[10] In addition, the Debtors obtain certain goods and services from entities headquartered in Canada.  Given their general understanding of the American bankruptcy system, the Debtors have included these parties as critical vendors under the Critical Vendor Motion.

[11] By this motion, the Debtors do not seek to acknowledge that any agreement with a Foreign Vendor is a forward contract, nor does the Debtor seek to assume any contract pursuant to Section 365 of the Bankruptcy Code. The Debtors will review these agreements and reserve all of their rights under the Bankruptcy Code with respect thereto.

Motion, the Debtors seek authority, in their sole discretion, to pay Foreign Vendors Claims of such Foreign Vendors in an aggregate amount not to exceed $9.5 million (the "Foreign Vendor Cap"). The Debtors believe the Foreign Vendor Cap is the amount required to ensure continued delivery of Raw Materials necessary to maintain ordinary course business operations. However, by the Interim Order, the Debtors seek authority to pay only a portion of the Foreign Vendor Cap, up to a maximum of $7.5 million (the "Interim Cap")[12]. I believe the amount under the Interim Cap is the minimum amount that may be necessary to avoid the immediate harm that would result if no Foreign Vendor Claims were able to be paid until the Final Hearing.

170.    Accordingly, I believe the Foreign Vendor Motion is essential to continuation of the Debtors' business and maximizing the value of the estate, and is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

**M.    Debtors' Emergency Motion for Entry of an Order Under 11 U.S.C. §§ 105, 362 and 541 and Fed. R. Bankr. P. 3001 and 3002 (A) Limiting Certain Transfers of Equity Interests of the Debtors, (B) Limiting Worthless Stock Deductions by Certain Owners of Equity Interests of the Debtors and (C) Approving Related Notice Procedures (the "NOL Motion")**

171.    The Debtors have had significant operating losses in the recent past ("NOLs"). The Debtors' NOLs are an extremely valuable asset because, as I understand from counsel, under the Internal Revenue Code (the "IRC"), the Debtors can carry forward their NOLs to offset their future taxable income for up to 20 taxable years and thereby reduce their future aggregate tax obligations.

172.    The Debtors' NOLs are currently estimated to be approximately $101,000,000, which, based on the 35% federal corporate tax rate, are worth approximately $35,000,000 in

---

Moreover, authorization to pay the Foreign Vendor Claims shall not affect the Debtors' right to contest the amount or validity of any such charges, in whole or in part.

potential future federal income tax savings.  Additional state tax savings may also be available

by utilizing Debtor's NOLs.  These tax savings -- and the accompanying increase in the Debtors'

cash flow -- are a valuable asset to the estate.

173.    I understand that a corporation's ability to use its NOLs may be reduced under

certain circumstances.  This Motion focuses on two of those circumstances:

a)    <u>If the Corporation Experiences an "Ownership Change."</u>  A corporation that undergoes an "ownership change" is limited in the amount of taxable income that it can offset against its NOLs. Pursuant to IRC Section 382(g), an "ownership change" occurs if, immediately after a "testing date," and as measured during a rolling 3-year "testing period," the percentage of the corporation's stock (measured by value) held by shareholders owning 5% or more of the stock of the corporation (a "5% Shareholder") increases by 50 percentage points or more. For example, if a 10% shareholder purchased additional stock and became a 61% shareholder, the percentage of stock owned by 5% Shareholders would have increased by 51 percentage points, thereby causing an "ownership change."

b)    <u>"Ownership Change" When 50-Percent Shareholder Claims Worthless Stock Deduction.</u>  An "ownership change" may be deemed to occur on the last day of the tax year in which a "50-percent shareholder" declares its stock in the debtor corporation to be worthless by taking a worthless stock deduction for federal income tax purposes.  A "50-percent shareholder" means any person owning 50 percent of the debtor corporation's stock (measured by value) at any time during the 3-year period ending on the last day of the taxable year in which the loss deduction is taken.

174.    I understand that once all or part of a NOL is disallowed under IRC Section 382

its use is limited for the next twenty years and once a claim for a worthless stock deduction has

been made or an equity interest is transferred, the deduction or transfer, as the case may be,

cannot be nullified without court action.  Thus, unrestricted transfers of equity securities in and

of the Debtors or the taking of the worthless stock deduction by a 50-percent shareholder could

hinder the Debtors' reorganization efforts by causing them to lose their ability to use NOLs to

offset future taxable income.

---

[12] The amounts set forth herein were established out of an abundance of caution.  There are currently two shipments

175.    Because of the significant potential tax savings (approximately $35,000,000 to be utilized over future years) that will be lost if an "ownership change" occurs, it is necessary to restrict the trading of equity interests in and of the Debtors and the taking of worthless stock deductions to facilitate a successful restructuring.  Accordingly, I believe the NOL Motion is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

      **N.**      **Emergency Motion For Interim and Final Orders (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Super-Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(a); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362; (C) Authorizing Debtors to Enter Into Agreements with Wells Fargo Capital Finance, LLC; (D) Authoring the Debtors to Enter Into Agreements with Wayzata Investment Partners, LLC; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion")**

176.    The Debtors have determined that, under the current circumstances, the post-petition financing proposals made by the Secured Parties most clearly satisfy the Debtors' urgent financing needs.  The Debtors have engaged in extensive arm's length negotiations, in good faith, with the Secured Parties, culminating in the Revolving DIP Loan Documents and the Term DIP Loan Documents, respectively.

177.    Leading up to these Chapter 11 cases, the Debtors engaged in extensive negotiations with various parties, including the Secured Parties, in an effort to obtain additional liquidity.  Before the Petition Date, the Debtors, in conjunction with Evercore, attempted to obtain post-petition financing proposals from other lenders, but were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under Section 364(a) or

---

of anodes that the Debtors believe may be post-petition, and therefore would not be required under the caps herein.

364(b) of the Bankruptcy Code, unsecured credit pursuant to Section 364(c)(1) of the Bankruptcy Code or secured credit pursuant to 364(c)(2) or (3) of the Bankruptcy Code.

178.    In exploring all of their options, the Debtors recognized that substantially all of the Debtors' assets are completely encumbered by first and second liens in favor of the Secured Parties, such that either (i) the liens securing the pre-petition secured loans would have to be "primed" to obtain post-petition financing, (ii) the Debtors would have to find a post-petition lender willing to extend credit to pay off the pre-petition secured loans or (iii) the Debtors would have to find a post-petition lender willing to extend credit on a junior basis.

179.    As discussed above, the Debtors, in conjunction with Evercore, contacted 15 potential parties that are known in the industry as providing debtor-in-possession financing (not including the Revolving Loan Secured Parties and the Term Loan Secured Parties).  The Debtors sought $30 million in incremental liquidity through a new money DIP term loan and financing to take out the existing Pre-Petition Revolving Loan Financing Agreements.  The Debtors received three third-party DIP proposals, including a revolving loan proposal and two term loan proposals.  After discussions with their advisors, the Debtors did not move forward with the proposals for term loans, as both parties required the proposed loans to be senior in priority to the existing Term Loan Secured Parties and the Term Loan Secured Parties were unwilling to subordinate their existing liens except pursuant to the terms of the Term DIP Loan Documents. Furthermore, the terms of the two term loan proposals, taken as a whole, were inferior to the term loan proposed by the existing Term Loan Secured Parties.  The Debtors also received a proposal to replace the Revolving Loan Secured Parties.  However, in evaluating both proposals, taken as a whole, the Debtors, in consultation with their advisors, deemed the terms of the

Revolving Loan DIP Credit Agreement provided by the Revolving Loan Secured Parties to provide the best option for the Debtors.

180.    In light of the above, and after thoroughly considering all other options, I believe that the proposals by the Secured Parties, which, upon information and belief, provided for the consensual priming of debt owning pursuant to the Pre-Petition Secured Financing Agreements, are in the best interests of the Debtors and all of their stakeholders.  Specifically, I believe that the financing available under the DIP Loan Documents was superior to all other options because it eliminates the risk of a "priming" fight with the Secured Parties and will enable the Debtors to, among other things, avoid the cessation of their operations, maintain the continuity of their operations pending reorganization, or a sale of assets, and maximize the value of their businesses as a going concern and their related properties.  Accordingly, the Debtors have determined, in the exercise of their respective best and reasonable business judgment, that the financing to be provided by the Secured Parties is the most favorable funding available under the circumstances and addresses the Debtors' immediate necessary financing needs while they reorganize their businesses.

### III.   <u>CONCLUSION</u>

181.   In order to preserve and maximize the value of their business and successfully reorganize, the Debtors' immediate goal is to engage in business as usual following the commencement of these chapter 11 cases.  I believe that, if the Court grants the relief requested in each respective First Day Pleading, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtors' estates, their creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 25th day of February, 2013 at Cincinnati, Ohio.


James Burns Riley
Chief Financial Officer