**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ORMET CORPORATION, et al., | ) | Case No. 13-10334 (MFW) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**[1]

Before the Court is the Objection of the Steelworkers Pension Trust (the "Trust") to the sale of the Debtors' Hannibal Smelter and related assets to Niagara Worldwide LLC (the Buyer") free and clear of any successor liability claim of the Trust. The sale is supported by Ormet Corporation and its affiliates (the "Debtors"), Wayzata Investment Partners LLC (the "Lender"), and the Official Unsecured Creditors' Committee.  For the reasons set forth below, the Court will overrule the Trust's objection and approve the sale.

I.   BACKGROUND

On February 25, 2013, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors were a major producer of aluminum in the United States and owned an alumina refinery in Burnside, Louisiana and an aluminum smelter

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52 of the Federal Rules of Civil Procedure incorporated by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

in Hannibal, Ohio.  As of the Petition Date, the Debtors employed over 1100 employees, the vast majority of which were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Union (the "Steelworkers Union").

Prior to the Petition Date, the Debtors had engaged an investment banker and conducted a full marketing process to sell all their assets as a going concern.  Post-petition, the Debtors continued their sales effort, obtaining approval of bid procedures and a stalking horse bidder Smelter Acquisition, LLC ("Smelter").  When no other bids were received, an Order was entered on June 10, 2013, approving the sale of substantially all the Debtors' assets to Smelter.  There was a condition precedent to closing on the sale to Smelter, however: that the Debtors obtain relief from the Public Utilities Commission of Ohio ("PUCO") modifying the terms of their contract for the purchase of electricity from Ohio Power Company and Columbus Southern Power Company ("AEP-Ohio").

In a preliminary order entered on July 11, 2013, PUCO denied immediate emergency relief requested by the Debtors and scheduled further proceedings to consider the ultimate relief requested. As a result the Debtors began the initial process of reducing operations at their two plants.  In its ultimate ruling on October 2, 2013, PUCO provided some relief to the Debtors but not

all the relief required by the Smelter Asset Purchase Agreement.

As a result of the PUCO rulings, the sale to Smelter did not close and the Lender declared the Debtors in default of the post-petition DIP financing.  The Debtors ceased all production of aluminum in Hannibal on October 7, 2013, but kept the Burnside facility on "hot idle" status to permit it to be sold as a going concern.  On October 16, 2013, the Debtors filed a Motion for approval of procedures for the wind down of the estates, which has been approved on an interim basis since then.  As part of the wind down, the Debtors renewed their efforts to sell their assets.  On October 26, 2013, the Debtors filed a motion to sell the Burnside refinery to Almatis, Inc.  That sale was approved by Order dated November 12, 2013, and closed on December 12, 2013.  The Debtors also sold their raw material inventory pursuant to the wind down procedures.  Those sales permitted the repayment in full of the DIP loan.

The efforts to sell the Hannibal facility took much longer, but by June 9, 2014, the Debtors had obtained a bid from CCP ORMT Acquisition, LLP (the "Stalking Horse") at a cash price of $15,250,000.  The Court approved bid procedures on June 19, 2013, and an auction was held on June 26, 2014, resulting in a final cash bid of $25,250,000 by the Buyer.  The Stalking Horse was determined to be the back-up bidder at $25,000,000 (after consideration of its breakup fee).

A hearing to consider approval of the sale of the Debtors' Hannibal facility and its related assets to the Buyer was held on June 30, 2014. The only objection remaining to that sale was one filed by the Trust, which is the holder of a claim estimated at $5 million for under-funding of the Debtors' pension plan. After considering the testimony and arguments of the parties, the Court granted the Trust's request to provide additional briefing on its argument that the Court should not approve the sale of the assets free of the Trust's potential successor liability claim against the Buyer. Cognizant of the Debtors' dwindling cash position and the July 29, 2014, deadline for closing the sale contained in the Asset Purchase Agreement with the Buyer, however, the Court directed briefs be filed by the Debtors and any parties in support of the sale by July 7 and by the Trust by July 11.

The Debtors and the Lender timely filed their briefs in support. The Trust did not. Instead, the Trust filed a Motion seeking an extension until July 17, 2014, to file its brief.[2] That Motion was opposed by the Debtors. Notwithstanding that request, the Trust filed its supplemental brief on July 14, 2014. Although it did not grant the extension request, the Court has considered the Trust's brief in making its ruling.

---

[2] The motion was, however, listed for hearing on the next omnibus hearing date in the case (August 28, 2014, at 2:30).

II.  JURISDICTION

The Court has subject matter jurisdiction over this core proceeding.  28 U.S.C. § 1334(b) & § 157(b)(2)(M).

III. DISCUSSION

The objection of the Trust raises two issues: can the sale to the Buyer under section 363(f)[3] be free and clear of any successor liability claim that the Trust may have against it and should the Court deny the Debtors' request of a waiver of the fourteen-day waiting period under Rule 6004(h) and 6006(d) staying finality of any order approving the sale to permit the Trust to file an appeal and seek a further stay.

  A.  Sale Free and Clear of Successor Liability

The Debtors and Lender contend that the Court may enter an order under section 363(f) selling the assets to the Buyer free and clear of the Trust's asserted successor liability claim for under-funding of the pension plan.  In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003) (affirming sale under § 363 free and clear of successor liability claims for employment and sex discrimination); In re Leckie Smokeless Coal Co., 99 F.3d 573 (4th Cir. 1996) (authorizing sale free and clear of claims for future medical benefits under the Coal Industry and Retiree

---

[3] Section 363(f) allows a debtor to " sell property under . . . this section free and clear of any interest in such property of an entity other than the estate."  11 U.S.C. 363(f).

Health Benefit Act).

The Trust contends that these cases are distinguishable because neither considered successor liability claims like it has under ERISA and MPPAA.[4]  It argues that Congress expressed a strong public policy in the latter statutes to protect the rights of employees in multi-employer pension plans from the withdrawal of employers from those plans which leave them underfunded.  <u>SUPERVALU, Inc. v. Board of Trustees of Southwestern Pa. and Western Md. Area Teamsters and Employers Pension Fund</u>, 500 F.3d 334, 336 (3d Cir. 2007).  The Trust argues that "to vindicate [this] important federal statutory policy" Congress provided for successor liability of any buyer of substantially all the company's assets if the buyer had notice of the liability and there was a continuity of operations between the seller and the buyer.  <u>Einhorn v. M.L. Ruberton Constr. Co.</u>, 632 F.3d 89, 99 (3d Cir. 2011).

The Court disagrees with the Trust.  Although Congress has expressed a strong policy in favor of protecting multi-employer pension plans, it has also articulated a strong policy in favor of preventing sex and employment discrimination including the creation of successor liability for those claims.  <u>TWA</u>, 322 F.3d

---

[4]  ERISA is the Employee Retirement Income Security Act of 1974.  29 U.S.C. § 1001-1461, et seq.  MPPAA is the Multiemployer Pension Plan Amendments Act of 1980.  29 U.S.C. § 1381-1461.

at 292 ("We recognize that the claims of the EEOC and the Knox-Schillinger class of plaintiffs are based on congressional enactments addressing employment discrimination and are, therefore, not to be extinguished absent a compelling justification.")  Nonetheless, the Third Circuit in TWA held that a sale under section 363 can be free and clear of successor liability claims.  Id.

Similarly, Congress has expressed a strong interest in protecting the medical benefits of coal workers, including the imposition of successor liability.  Leckie, 99 F.3d at 576-77; 26 U.S.C. §§ 9711(g)(1) & 9712(d).  Nonetheless, the Fourth Circuit concluded that claims for successor liability for those benefits may also be extinguished by a sale of assets under section 363 of the Code.  Id. at 585.

The Trust contends, nonetheless, that TWA and Leckie are not controlling and that other cases, which emphasize the importance of ERISA and MPPAA, should be applied.  Einhorn, 632 F.3d at 89; Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc., 59 F.3d 48 (7th Cir. 1995); Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1327 (7th Cir. 1990).

The Court finds the cases cited by the Trust to be inapplicable.  None of them involved a sale of assets free and clear of all claims under section 363(f).  Einhorn, 632 F.3d at

89 (sale of assets outside of bankruptcy); Tasemkin, 59 F.3d at (transfer of assets to lender through a foreclosure action after debtor filed chapter 7); Artistic Furniture, 920 F.2d at 1327 (sale of assets by foreclosing secured creditor outside of bankruptcy). It is the express language of section 363(f) that allows the sale of these assets free and clear of the successor liability claim of the Trust, something that is not available outside of bankruptcy.

Rather, the Court finds that the instant case is controlled by the Third Circuit's decision in TWA (and supported by the Fourth Circuit's decision in Leckie) both of which actually involved sales of debtors' assets free and clear under the express language of section 363(f). Both Courts concluded that section 363(f) extinguished successor liability claims.

Further, both Courts expressed concern that making an exception to the provisions of section 363(f) for successor liability claims would depress the prices that parties bid for a debtor's assets. They noted the important policy inherent in the Bankruptcy Code to maximize the value of the debtor's assets for distribution to creditors in accordance with the priority scheme in the Code. TWA, 322 F.3d at 293 (noting that without the protection afforded by § 363 the buyer may have offered a lower price, particularly since the EEOC claims were not even estimated); Leckie, 99 F.3d at 586-87 (noting that the Coal Act

obligations were more than three times the purchase price and without the protections of § 363, the sale as a going concern would likely not have occurred resulting in a piecemeal sale of assets generating far fewer funds for creditors).

That concern is present in this case as well. The Debtors were unable to obtain any bids for their assets that did not include the protections of section 363(f) including the sale of those assets free and clear of any successor liability claim held by the Trust.[5] Although the Trust contends that the bidders could have bid less if the successor liability claim were retained, the Court believes that is not practical. First, the Trust's claim, though estimated at $5 million, has not been determined. The very uncertainty of that potential exposure could result in bids which are discounted substantially more than the Trust's estimate.

In addition, as noted by the Third Circuit in TWA, accepting the Trust's position would result in the Trust's claim receiving more than other general unsecured claims, in violation of the Code's priority scheme. 322 F.3d at 292. Therefore, the Court concludes that the Congressional policy favoring multi-employer pension plans expressed in ERISA and MPPAA does not trump the

---

[5] In its argument for enforcement of Rule 6004, the Trust posits that even if the sale to Niagara does not close by the July 29 deadline, the Debtors could sell to the back-up bidder. However, even the back-up bidder required that the sale be free of any successor liability. (D.I. 1270 at Ex.B, ¶¶ O & X.)

express provisions of the Bankruptcy Code permitting the sale of the Debtor's assets free and clear of the Trust's successor liability claim.

The Trust argues, however, that the involuntary "release" of its successor liability claim is prohibited by the Third Circuit's decision in Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d 203 (3d Cir. 2000). The Continental Airlines case is easily distinguishable, however. That case involved releases of creditors' claims against third parties as part of a plan of reorganization of the debtor. The Third Circuit in Continental Airlines concluded that there was no provision of the Bankruptcy Code that permitted such a "discharge" of claims against a non-debtor. Id. at 211.[6]

Additionally, the Continental Airlines did not involve a sale of assets to a non-insider buyer under section 363(f) but rather the confirmation of a plan of reorganization. It is the express provisions of section 363(f) which allow the sale of the Debtors' assets free and clear of any claims, including successor liability claims as the Third Circuit specifically held in TWA.

B.   Waiver of Rule 6004

Rule 6004(h) stays "an order authorizing use, sale or lease of property, other than cash collateral" for fourteen days after

---

[6] Nonetheless the Court did not hold that releases of third party claims are per se invalid in plans of reorganization. 203 F.3d at 213-14.

entry of the order, unless the Court orders otherwise.  Fed. R. Bankr. P. 6006(h).  Similarly, Rule 6006(4) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

The Debtors request that the Court waive these Rules because the Buyer requires the closing to occur on or before July 29, 2014.  The Trust argues that a waiver of the stay is not appropriate because the parties to the sale can change the closing date, and if the Buyer does not close the sale, the Debtors can sell to the back-up bidder, the Stalking Horse.

Waiver of a stay has been held appropriate in cases where, as here, "immediate closing is required to remedy the Debtors' precarious financial and business position."  In re Decora Indus., Inc., 00-4459 JJF, 2002 WL 32332749 (D. Del. May 20, 2002); In re Los Angeles Dodgers LLC, 468 B.R. 652, 662 (Bankr. D. Del. 2011) (waiving the Rule 6006(h) stay because the debtors were "operating within a small time frame").

In this case, the Debtors have already had one failed sale of their assets early in this case.  It was only after extensive marketing efforts were renewed that the Debtors were able to find additional bidders and hold an auction for the sale of these assets.  In the interim, the Debtors defaulted on their DIP loan

11

and were required to idle their plants. Delay will not make the situation any better. Accordingly, the Court finds that there is ample cause to waive the stay requirements of Rules 6004(h) and 6006(d) to allow the parties to close immediately.

IV. **CONCLUSION**

    For the foregoing reasons, the Court will overrule the objection of the Trust to the sale of the Debtors' Hannibal assets to the Buyer.

    An appropriate Order is attached.

Dated: July 17, 2014                      BY THE COURT:

                                                Mary F. Walrath
                                                United States Bankruptcy Judge