# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | Chapter 11 |
| | Case No.  13-10334 (MFW) |
| **ORMET CORPORATION, _et al._**[1] | Jointly Administered |
| **Debtors.** | **Hearing: October 23, 2014 at 10:30 a.m. (ET)** |
| | **Obj. Due: October 16, 2014 at 4:00 p.n. (ET)** |

## DEBTORS' MOTION FOR ORDER (I) APPROVING SETTLEMENT AGREEMENTS AND (II) APPROVING THE SALE OF REMAINING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

The debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") hereby file this motion (the "<u>Motion</u>") to approve, pursuant to sections 105(a), 363(b), and 363(k), of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"): (A) those proposed settlements set forth in (i) that certain Settlement Agreement by and between the Debtors, Wayzata (as defined below), and Sunstone (as defined below) (the "<u>Sunstone Settlement Agreement</u>"), a substantially final form of which is attached as <u>Exhibit 1</u> to the proposed order attached hereto as <u>Exhibit A</u> (the "<u>Proposed Order</u>") and (ii) that certain Settlement Agreement by and between the Debtors and the Salaried VEBA (as defined below) (the "<u>Salaried VEBA Settlement Agreement</u>" and together with the Sunstone Settlement Agreement, the "<u>Settlement Agreements</u>"), a substantially final form of which is attached as <u>Exhibit 2</u> to the Proposed Order; and (B) the sale of the Remaining Assets (as defined below) to Smelter Liquidation LLC ("<u>Buyer</u>"), free and clear of all liens, claims and encumbrances

---

[1]  The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Ormet Corporation (2006); Ormet Primary Aluminum Corporation (9779); Ormet Aluminum Mill Products Corporation (9587); Specialty Blanks Holding Corporation (7019); and Ormet Railroad Corporation (0379).  The service address for all of the Debtors for purposes of these chapter 11 cases is:  43840 State Route 7, Hannibal, Ohio 43931.

pursuant to that certain asset purchase agreement, a substantially final form of which is attached

hereto as <u>Exhibit B</u> (the "<u>Asset Purchase Agreement</u>").  Subject to approval by this Court, the

Settlement Agreements provide for a settlement of substantially all outstanding disputes of the

Debtors, and establishes certain processes for the monetization of certain claims of the Debtors'

estate.  In support of the Motion, the Debtors state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and

this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for

the relief sought herein are sections 105(a), 363(b) and 363(k) of the Bankruptcy Code and

Bankruptcy Rule 9019.

## SUMMARY OF RELIEF REQUESTED[2]

2.      The Debtors seek entry of an order:

   a.      Approving the Sunstone Settlement wherein the Sunstone Escrow will be
           purchased by Buyer and, on the Closing Date (as defined in the Asset
           Purchase Agreement), Buyer will pay to Sunstone $473,388.16.

   b.      Approving the Salaried VEBA Settlement wherein on the Closing Date,
           the Debtors will pay the sum of $112,500.00 to the Salaried VEBA as a
           settlement of all claims of the Salaried VEBA under section 1114 of the
           Bankruptcy Code.

   c.      Authorizing the sale of the Remaining Assets to Buyer pursuant to the
           Asset Purchase Agreement in exchange for the Consideration, which shall
           include a credit bid under section 363(k) of the Bankruptcy Code, the
           waiver of any deficiency claim, and a Cash Component, which shall also
           clarify that all amounts paid to professionals in these cases pursuant to the
           Budget are included within the Professional Fee Carve Out (as defined in
           the DIP Order).

---

[2]     Undefined capitalized terms used in this section shall have the meanings ascribed herein.

## BACKGROUND

3.     On February 25, 2013 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their operations as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 7, 2013, the Office of the United State Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.     Headquartered along the Ohio River, in Hannibal, Ohio (the "Hannibal Facility"), the Debtors were a major producer of aluminum in the United States.  The Debtors historically operated two primary business units: (i) an alumina refinery in Burnside, Louisiana (the "Burnside Refinery"), capable of producing up to 540,000 tonnes of smelter grade alumina per year when operating at full capacity, and (ii) an aluminum smelter at the Hannibal Facility (the "Hannibal Smelter"), capable of producing up to 270,000 tonnes of primary aluminum per year when operating at full capacity.  As of the Petition Date, the Debtors had a roster force in the aggregate of 1,188 employees (the "Employees") between the Burnside Refinery and the Hannibal Smelter, of which 1,107 were scheduled to work.  Of the Employees, 977 were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "Steelworkers").

## A.    The Debtors' Financing[3]

### i.    The Pre-Petition Financing Facilities

5.    On March 1, 2010, the Debtors entered into that certain Amended and Restated Loan and Security Agreement (as amended, the "Pre-Petition Revolving Loan Agreement"), with Wells Fargo Capital Finance, as agent and lender ("Wells Fargo").  Pursuant thereto, Wells Fargo made loans, advances and provided other financial accommodations to the Debtors (the "Pre-Petition Revolving Loans").  The Pre-Petition Revolving Loan Agreement was an asset backed loan facility with a maximum credit limit of $60 million, with borrowings subject to commercially standard borrowing base and other restrictions.

6.    As of the Petition Date, the Debtors were indebted to Wells Fargo under the Pre-Petition Revolving Loan Agreement in an aggregate outstanding principal amount of approximately $39,761,755.32 (the "Pre-Petition Revolving Loan Obligations").  The Pre-Petition Revolving Loan Obligations were secured by first (or, solely to the extent provided in the Intercreditor Agreement, second) priority secured interests and liens granted upon all the Pre-Petition Collateral (as defined in the Revolving Loan DIP Credit Agreement).

7.    On March 1, 2010, the Debtors also entered into the Term Loan and Security Agreement (as amended, the "Pre-Petition Term Loan Agreement"), with the Bank of New York Mellon as Agent (the "Pre-Petition Term Loan Agent"), and Wayzata Opportunities Fund II, L.P. and Wayzata Opportunities Fund, LLC as lenders (collectively in such capacities, the "Pre-Petition Term Loan Secured Parties").

8.    As of the Petition Date, the Debtors were indebted to the Pre-Petition Term Loan Secured Parties under the Pre-Petition Term Loan Agreement in an aggregate outstanding

---

[3] Capitalized terms in the section that are not otherwise defined shall have the meaning ascribed to them in the DIP Order (as defined herein).

principal amount of not less than $139,518,196.57 (the "Pre-Petition Term Loan Obligations"). The Pre-Petition Term Loan Obligations were secured by first (or, solely to the extent provided in the Intercreditor Agreement, second) priority secured interests and liens granted upon all the Pre-Petition Collateral (as defined in the Term Loan DIP Credit Agreement).

9.      Prior to the Petition Date, Wells Fargo and the Pre-Petition Term Loan Agent entered into that certain intercreditor agreement, dated as of March 1, 2010 (as amended, the "Intercreditor Agreement"), which sets forth the respective rights, obligations and priorities of the liens and security interests of Wells Fargo, on the one hand, and the Pre-Petition Term Loan Agent and Pre-Petition Term Loan Secured Parties, on the other hand, with respect to the Revolving Loan Pre-Petition Collateral and the Term Loan Pre-Petition Collateral.

## ii.      *The Debtor in Possession Financing Facilities*

10.      On the Petition Date, the Debtors filed a motion seeking approval of debtor in possession financing, and on March 22, 2013, the Court entered the *Final Order (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter Into Agreement with Wells Fargo Capital Finance, LLC; and (D) Authorizing Debtors to Enter into Agreements With Wayzata Investment Partners, LLC* (as amended or supplemented, the "DIP Order") [D.I. 147].[4]

11.      Pursuant to the DIP Order, the Debtors were authorized to enter into that certain Revolving Loan DIP Credit Agreement with Wells Fargo, pursuant to which the Debtors were

---

[4] The deadline set in the DIP Order for parties in interest to file any challenges with respect to the Pre-Petition Financing Facilities, including the liens granted and claims arising thereunder has passed and no such challenges were filed.  Accordingly, the stipulations and waivers with respect thereto are binding on the Debtors and all parties in interest in these chapter 11 cases.

authorized to borrow up to a maximum of $60 million, subject to the borrowing base and other limitations as set forth in the Revolving Loan DIP Credit Agreement.  As funds were borrowed and repaid in accordance with the Revolving Loan DIP Credit Agreement, the obligations outstanding under the Pre-Petition Revolving Loan Agreement were "rolled up," such that the outstanding Pre-Petition Revolving Loan Obligations became post-petition obligations (the "Revolving DIP Obligations").

12.     The Revolving DIP Obligations were secured by valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' estates may have (but subject to the Intercreditor Agreement and certain claims entitled to priority) in and upon the Revolving Loan Pre-Petition Collateral and the Post-Petition Collateral (as defined in the Revolving Loan DIP Credit Agreement and referred to herein as the "Revolving Loan Post-Petition Collateral") excluding, any lien on property and/or proceeds recovered as a result of transfers or obligations avoided or actions maintained  or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (the "Avoidance Actions").

13.     Pursuant to the DIP Order, the Debtors were also authorized to enter into that certain Term Loan DIP Credit Agreement (together with the Revolving Loan DIP Credit Agreement, the "DIP Agreements") with the Pre-Petition Term Loan Secured Parties in their capacity as lenders under the Term Loan DIP Credit Agreement, pursuant to which the Debtors were authorized to borrow up to a maximum of $30 million, which amount was increased to $55 million through a series of amendments.  The amounts drawn pursuant to the Term Loan DIP Credit Agreement are referred to herein as Term DIP Obligations.[5]

---

[5] On August 7, 2014, the Debtors filed a Motion and on August 27, 2014, the Court entered the Order (A) Authorizing the Debtors to Enter into the Eleventh Amendment to the Term Loan DIP Credit Agreement and

14.     The Term DIP Obligations are secured by valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' estates may have (but subject to the Intercreditor Agreement and certain other claims entitled to priority), in and upon all of the Collateral (as defined in the Term Loan DIP Credit Agreement and referred to herein as the "Term Loan Collateral"), excluding any lien on property and/or proceeds recovered as a result of transfers of obligations avoided or actions maintained or taken pursuant to the Avoidance Actions.

15.     In addition to the grant of post-petition liens upon the Term Loan Collateral, as adequate protection for the diminution in value of their interest in the Pre-Petition Collateral (including the Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out Expenses, the Pre-Petition Term Loan Agent for the benefit of itself and the Pre-Petition Term Loan Secured Parties, was granted: (i) valid, binding, enforceable and perfected replacement liens upon and security interests in all Term Loan Collateral (the "Term Loan A/L Replacement Lien"), and (ii) an allowed superpriority administrative expense claim to the extent provided by Section 507(b) of the Bankruptcy Code (the "Term Loan A/L Adequate Protection Superpriority Claim"). Pursuant to paragraph 2.1.6 of the Final DIP Order, the obligations funded through the Term Loan A/L Adequate Protection Superpriority claim include proceeds of Avoidance Actions.

16.     The Term Loan A/L Replacement Lien is (i) subject to the Intercreditor Agreement and (ii) junior and subordinate only to (A) the Carve-Out Expenses, (B) the liens and security interests granted to the DIP Term Loan Agent and DIP Term Loan Secured Parties in the Pre-Petition Collateral securing the Term DIP Obligations, (C) the liens and security interests

---

(B) Granting Related Relief (the "Eleventh Amendment DIP Order") [D.I. 1451]. Pursuant to the Eleventh Amendment DIP Order, the Debtors are authorized to borrow an additional $1.5 million to total borrowing ability.

granted to Wells Fargo in the Term Loan Collateral securing the Revolving DIP Obligations, and (D) the Term Loan Permitted Encumbrances and Term Loan Permitted Liens and Claims (each as defined in the DIP Order).

17.     The Term Loan A/L Adequate Protection Superpriority Claim is (i) subject to the Intercreditor Agreement, and (ii) junior only to (A) the Carve-Out Expenses, (B) the Term Loan Superpriority Claim and (C) the Revolving Loan Superpriority Claim. and otherwise has priority over all administrative expense claims and unsecured claims against Debtors and their estates.

### B.     The Original Marketing of the Assets and Winddown of the Debtors Business Operations

18.     Prior to the Petition Date, the Debtors, in conjunction with Evercore Partners ("Evercore"), their initial investment banker, conducted a full marketing process in order to identify parties interested in purchasing the assets or equity of the Debtors, either in-court (if necessary) or out of court.  The only firm offer received was the offer for substantially all of the Debtors' assets by an affiliate of Wayzata Investment Partners LLC, Smelter Acquisition, LLC ("Smelter Acquisition") pursuant to the terms of a stalking horse agreement (the "Initial Stalking Horse Agreement").

19.     Following the Petition Date, Evercore continued and expanded their marketing efforts to identify interested financial or strategic buyers but, ultimately, the Debtors did not receive any additional bids.  Accordingly, on May 9, 2013, the Debtors filed the *Notice of Auction Cancellation and Identifying Smelter Acquisition LLC as the Successful Bidder in Accordance with the Bidding Procedures* [D.I. 288].  On June 10, this Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief* (the "Smelter Acquisition Sale Order") [D.I. 368].

20.     While the Smelter Acquisition Sale Order authorized the Debtors to execute the Initial Stalking Horse Agreement and close upon the sale to Smelter Acquisition, as a result of substantial increases in the cost of electricity over the prior four years, the Debtors were required to satisfy a condition precedent (the "Condition Precedent") improving upon the terms of the Unique Arrangement (as defined below) as a condition to Smelter Acquisition's obligation to close.

21.     Pursuant to section 4905.31 of the Ohio Revised Code, electricity customers in the state of Ohio are eligible to petition the Public Utilities Commission of Ohio (the "PUCO") for modifications to the terms by which they purchase electricity for the benefit of economic development within the state.  As the largest user of electricity in the state of Ohio, the Debtors availed themselves of this process and, in 2009, the Debtors entered into an arrangement (the "Unique Arrangement") by which they purchased electricity from Ohio Power Company and Columbus Southern Power Company (n/k/a "AEP-Ohio").

22.     Following entry into the Initial Stalking Horse Agreement and in an effort to satisfy the Condition Precedent, the Debtors sought emergency relief from the PUCO to modify the Unique Arrangement.  On July 11, 2013, the PUCO docketed an Entry (the "PUCO Denial Entry") denying the Debtors' request for emergency relief, and setting a schedule for a full hearing process.  Ultimately, on October 2, 2013, the PUCO issued its Opinion and Order (the "PUCO Order") providing limited relief.  Upon entry of the PUCO Order the Debtors were unable to satisfy the Condition Precedent, and, accordingly, the transaction with Smelter Acquisition did not close.

23.    Upon the entry of the PUCO Denial Entry, the Debtors began to take all appropriate efforts to reduce the continued cash drain and preserve assets for the benefit of the stakeholders.  On August 1, 2013, the Debtors began the initial process of reducing operations, including reducing the number of operating potlines at the Hannibal Smelter from four to two and reducing operations at the Burnside Refinery.  Upon entry of the PUCO Order and the Debtors' inability to satisfy the Condition Precedent, the decision was made to curtail all remaining operations at the Hannibal Smelter and as of October 7, 2013, the Debtors ceased production of aluminum in Hannibal.  The Burnside Refinery remained in a "hot idle" status, such that it could be sold as a going concern and brought back to operational status in the near term.

24.    On October 8, 2013, the Debtors received a letter from Wells Fargo notifying the Debtors of existing events of default under the terms of the Revolving Loan DIP Credit Agreement and on October 10, 2013 then received a letter from the DIP Term Loan Agent notifying the Debtors of existing events of default under the terms of the Term Loan DIP Credit Agreement (the "Notices of Event of Default").

### C.    The Post-Default Winddown Process

25.    Following the receipt of the Notices of Event of Default, Wells Fargo placed an individual on-site at the Hannibal Facility to oversee all disbursements by the Debtors, and Wells Fargo coordinated with the Debtors, on a daily basis, with respect to each and every disbursement that was made.  The Debtors, Wells Fargo, and the DIP Term Loan Agent agreed on the terms of a budget (as amended or supplemented the "Budget")[6], which provided for the

---

[6] Pursuant to the Budget, the Debtors have paid post-default obligations on a pay as you go basis. With the exception of employee claims and professional fees subject to the carve-out, outstanding claims as of the Debtors' receipt of the Notices of Event of Default have not been paid.  Accordingly, the Debtors have outstanding pre-default administrative claims in excess of $25,000,000.00.

continued funding of certain of the Debtors' obligations, as detailed within the Budget, subject to certain terms and conditions.[7]

26.    The Debtors then had numerous conversations with Wells Fargo, the DIP Term Loan Agent, the Steelworkers, the Creditors' Committee and others regarding the strategy to wind down, liquidate assets, and maximize value for the benefit of the stakeholders.  On October 16, 2013, the Debtors filed the *Emergency Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105, 363, 365 and 503(c) of the Bankruptcy Code:  (A) Approving (I) a Plan to Wind Down the Debtors' Businesses and (II) Protections for Certain Employees Implementing the Wind Down of the Debtors' Businesses; (B) Authorizing the Debtors' to Modify Employee Benefit Plans Consistent with the Wind Down Plan; and (C) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind Down Plan* (the "Wind Down Plan Motion") [D.I. 677].  Over the subsequent ten months, the Court has entered eleven interim Orders with respect to the Wind Down Plan Motion (individually and collectively, the "Wind Down Orders"); each with a budget attached that has been approved by the Debtors' then applicable post-petition lenders.

27.    As part of the winddown process, the Debtors have sold assets to maximize recoveries for the benefit of their estates and constituents.  The initial priority was to pursue a transaction for the Burnside Refinery, which could be sold as a going concern and for which there was a party that had expressed interest in the facility on a stand-alone basis.  Accordingly, on October 26, 2013, the Debtors filed a motion and on November 12, 2013, the Court entered the *Order Authorizing (A) The Sale of Certain Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances; (B) The Debtors to Enter Into*

---

[7] As further detailed below, the Debtors have paid the Debtors' revolving DIP loan in full and entered into a payoff letter with the DIP Revolving DIP Agent on May 1, 2014.  With the payoff of the revolving DIP loan, the Debtors are coordinating all budgets with the DIP Term Loan Agent.

*and Perform their Obligations Under the Asset Purchase Agreement; (C) The Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases (D) The Guaranty and the Guaranty Dip Funding; and (E) Granting Related Relief* (the "Burnside Sale Order") [D.I. 832], authorizing the sale of the Burnside Refinery to Almatis, Inc. ("Almatis").  On December 12, 2013, the transaction authorized pursuant to the Burnside Sale Order (the "Burnside Sale") was consummated.

28.    Concurrent with pursuing a sale of the Burnside Refinery as a going concern, the Debtors sought to maximize value by selling raw materials pursuant to a Court-approved process.  Accordingly, on October 16, 2013, the Debtors filed a motion and on November 4, 2013, the Court entered the *Order Establishing Procedures for the Sale of Excess Assets* (the "Excess Sale Order") [D.I. 783].  Pursuant to the Excess Sale Order, the Debtors entered into ten agreements to sell various raw materials, including without limitation, alumina, anodes, copper, scrap steel and aluminum fluoride.  The total proceeds from the sales of raw materials (the "Raw Material Sales") exceeded $32,500,000.

29.    Throughout the winddown process, the Debtors sought to maintain a positive relationship with the Steelworkers.  Recognizing, however, that the curtailment of operations would necessarily require substantial modifications to the collective bargaining agreement, on October 27, 2013 the Debtors filed a motion, and on November 7, 2013, the Court entered the *Order Authorizing and Approving, Effective as of October 15, 2013, the Employment and Retention of Industrial Investment Banking Group, as Part of Sea Port Group Securities, LLC as Investment Banker* (the "Sea Port Retention Order") [D.I. 827].    Following successful negotiations with the Steelworkers and with the help of Sea Port Group Securities, LLC ("Sea Port"), on November 15, 2013, the Court entered the *Order, Pursuant to Sections 105(A),*

*363(B), 1113 and 1114 of the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing and Approving the Settlement Agreement By and Among the Debtors and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union* (the "Steelworkers Settlement Order") [D.I. 862].  Throughout this winddown and sales process, the Debtors have sought to maintain open communication with the Steelworkers and to seek their input on efforts to preserve jobs, or the opportunity for jobs, with respect to the Hannibal Facility.

30.     As a result of Sea Port's efforts in obtaining the Steelworkers Settlement Order and their familiarity with the Debtors, the Debtors sought to retain the same individuals from Sea Port that assisted in the union negotiations to assist in pursuing sales of the Debtors' remaining assets, including the mineral rights assets and the property, plant and equipment at the facility in Hannibal, Ohio.  During this time, these individuals started a new firm, and on January 28, 2014, the Debtors filed an application and on February 21, 2014 the Court entered the *Order Authorizing and Approving, Effective as of January 28, 2014, the Employment and Retention of Calibre Group, LLC as Financial Advisor and Investment Banker* (the "Calibre Retention Order") [D.I. 1108].  Upon their retention, Calibre actively marketed all remaining assets of the Debtors as a single transaction or through multiple transactions.

31.     Calibre reached out to more than 125 parties, including financial and strategic operators, redevelopers, and parties with specialty interests including interest solely in the mineral rights contained within the property.  Following receipt of initial indications of interest, the Debtors identified two parties with combined bids representing the highest or otherwise best bid for the Debtors' remaining assets.

32.     The Debtors identified Triad Hunter, LLC ("Triad Hunter") as the party submitting the highest and best bid for the subsurface oil and gas assets (the "Mineral Rights Assets").  Through the negotiations with Triad Hunter, and upon a commitment to increase the consideration paid for the Mineral Rights Assets (by in excess of 10% over their prior bid), the Debtors agreed to seek a sale of the Mineral Rights Assets without a formal auction process. After an objection to the sale was lodged, Triad Hunter agreed to further increase its bid for the Mineral Rights Assets.

33.     On July 1, 2014, the Court entered the *Order (A) Authorizing and Approving the Sale of Mineral Rights Assets Free and Clear of all Liens, Claims, Encumbrances and Interests; and (B) Granting Related Relief* (the "Mineral Rights Sale Order") [D.I. 1355].  The transaction (the "Mineral Rights Sale") closed on July 24, 2014.

34.     Through the marketing process, the Debtors identified CCP ORMT Acquisition LLC (the "PPE Stalking Horse Bidder") as the party that submitted the highest and otherwise best bid for certain property, plant and equipment assets of the Debtors (the "PPE Assets"). Accordingly, on June 9, 2014, the Debtors entered into a stalking horse agreement with the PPE Stalking Horse Bidder and filed the *Debtors' Motion For Orders (A)(I) Approving the Bidding Procedures, (II) Scheduling Hearing to Consider Sale; (III) Approving Form and Manner of Notice Thereof; and (IV) Authorizing Bid Protections, (B) (I) Authorizing and Approving Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "PPE Sale Motion") [D.I. 1270] to establish an auction process designed to maximize recoveries for the parties in interest in these bankruptcy proceedings.  On June 19,

2014, the Court entered an Order approving certain bidding procedures and establishing an auction process (the "Bidding Procedures Order") [D.I. 1294].

35.     Pursuant to the bidding procedures approved by such Order (as modified by the Debtors), the Debtors received three (3) qualified bids and on June 26, 2014, the Debtors conducted an auction. Following numerous rounds of bidding, the Debtors identified Niagara Worldwide LLC ("Niagara") as submitting the highest and best bid for the PPE Assets.  On July 17, 2014, the Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief* (the "PPE Sale Order") [D.I. 1391].  The transaction (the "PPE Sale") closed on July 30, 2014.

**D.     The Post-Sale Obligations Under the Debtor in Possession Financing Agreements**

36.     Through the Burnside Sale and the Raw Material Sales, the Debtors recovered enough proceeds with respect to the Revolving Loan Post-Petition Collateral to allow the Debtors to pay in full the Revolving DIP Obligations.  Accordingly, the Debtors filed a motion, and on April 30, 2014, the Court entered the *Order Authorizing the Debtors to Enter into a Payoff Letter with Respect to the Revolving Loan Credit Agreement* (the "Payoff Order") [D.I. 1229].  The Debtors executed the payoff letter on May 1, 2014.

37.     Through the proceeds from the Burnside Sale, the Mineral Rights Sale, and the PPE Sale, on July 30, 2014, the outstanding balance of the Term DIP Obligations was reduced to $0.  However, certain accrued and unpaid expenses remain, and the DIP Term Loan Agent has agreed to continue to fund in accordance with a budget as agreed upon by and between the Debtors and the DIP Term Loan Agent.  Accordingly, on August 7, 2014, the Debtors filed a

Motion and on August 27, 2014, the Court entered an Order authorizing the Debtors to execute the Eleventh Amendment to the Term Loan DIP Agreement wherein the Debtors are authorized to borrow an additional $1,500,000 to fund the remaining expenses through the winddown of these bankruptcy proceedings.  It is anticipated that as of October 23, 2014, the Debtors will have an outstanding balance under the Term DIP Loan Agreement of $180,000.00.  In addition to the pay down of the Term DIP Obligations, the proceeds from the PPE Sale resulted in a payment to the Pre-Petition Term Loan Agent on account of the Pre-Petition Term Loan Obligations of approximately $6,815,000.

### E.    The Remaining Assets

38.    While the Debtors have sold substantially all of their assets, certain assets remain property of the Debtors' estates.  As further defined below, the "Remaining Assets" include: (i) the Sunstone Escrow, (ii) the Burnside Escrow, (iii) the Quality Jobs Rebate, (iv) the IBNR Funds, (v) the Deposit Assets, and (vi) the estate causes of action, including any Avoidance Actions.  In total, the Remaining Assets represent additional value of between $5,500,000.00 and $7,500,000.00.

### (i)    The Sunstone Escrow

39.    Sunstone Development Co., Ltd. ("Sunstone") supplied carbon anodes, one of the raw materials used in the production of primary aluminum to the Debtors.  On March 15, 2013, the Debtors submitted a purchase order to buy 14,497.80 MT of second quality carbon baked anodes (the "Anodes") from Sunstone at a total cost of $8,698,680.  The Anodes were to be shipped on or before June 24, 2013 and the related invoice was due and payable no later than December 20, 2013.  In short, the order was made post-petition, the Anodes were shipped and delivered post-petition (but pre-default), and the payment was due post-default.  Without

authorized funding to pay pre-default claims, this payment remains unpaid. Accordingly, Sunstone has alleged an administrative priority claim for $8,698,680 (the "Sunstone Claim").

40.     In view of its asserted Claim, Sunstone filed an objection to, *inter alia*, the Debtors' post-default Motion to modify the terms of the DIP Agreements. In connection with this objection, the Court required the proceeds attributable to the Anodes that were sold pursuant to the Excess Sale Order to be set aside pending further order of the Court. Accordingly, the Debtors set aside $2,956,156 with respect to the proceeds from the sale of the Anodes (the "Sunstone Escrow"). Through the Sunstone Settlement, the parties have agreed to a settlement of the issues attendant to the Sunstone Claim and the distribution of the Sunstone Escrow whereby, subject to Bankruptcy Court approval, the entire Sunstone Escrow shall constitute a Remaining Asset to be sold to Buyer and, on the Closing Date, Buyer shall pay to Sunstone $473,388.16. Additionally, Sunstone shall be entitled to an administrative claim in the amount of $8,225,291.84 (the "Allowed Claim"). Sunstone acknowledges, however, that it is unlikely to receive any payment on account of the Allowed Claim. Further, in view of the settlement, Sunstone supports the relief sought in this Motion and in the Dismissal Motion (as defined below).

### (ii)     The Burnside Escrow and Related Funds

41.     As a part of the Burnside Sale, $2,100,000 of the purchase price was placed into an escrow account (the "Burnside Escrow") to be held as a reserve account from which Almatis would be able to recover for obligations owed by the Debtors under the terms of the purchase agreement. The Burnside Escrow is to be held for a year from closing, until December 12, 2014, with any funds remaining in the Burnside Escrow then released to the Debtors. To date, no funds have been drawn upon the Burnside Escrow, and the Debtors are not aware of any claims being asserted or likely to be asserted against the Burnside Escrow.

42.     Additionally, there was a prepayment of certain funds owed under an agreement with Impala Warehousing under a Terminal Services Agreement at the Burnside Facility.  Upon finalization of the amount due, it is expected that the prepayment was in excess of the amount required to be paid by the Debtors, and as such, the Debtors would be entitled to a rebate of approximately $100,000.00-200,000.00 (the "Impala Refund").

### (iii)     The Quality Jobs Rebate

43.     The Debtors and State of Louisiana were party to a Contract for the Louisiana Quality Jobs Program for Rebates, pursuant to which the Debtors are entitled to certain rebates for jobs created and maintained at the Burnside Refinery, (the "Quality Jobs Rebate").  As part of the Burnside Sale, the proceeds related to the jobs created and maintained through the closing of the Burnside Sale remained assets of the Debtors.  The application for the Quality Jobs Rebate was recently filed by Almatis, as the current owner of the Burnside Refinery, with payment to follow within a few months.  The total value of the Debtors' interest in the Quality Jobs Rebate may be as much as $700,000.

### (iv)     The IBNR Funds

44.     Throughout the winddown process, the Debtors have sought to ensure that health care costs incurred during an employee's term of active employment with the Debtors are paid in accordance with the Debtors' obligations as a self-insured employer.  Accordingly, the Debtors have established various accounts to fund incurred but not reported health care claims of employees ("IBNR Claims"), as well as claims that arose under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

45.     Pursuant to the Burnside Sale, the Debtors and Almatis agreed to a purchase price adjustment of $199,481 to fund IBNR Claims related to the employees at the Burnside Refinery (the "Burnside IBNR").  To the extent such funds are not used by the date that is one year from

the date of closing of the Burnside Sale, any remaining funds shall be payable to the Debtors within thirty (30) days thereof.

46.     Pursuant to the settlement agreement that was approved by the Steelworkers Settlement Order, the Debtors deposited $1,400,000 into an account to fund IBNR Claims for hourly employees at the Hannibal Facility (the "Hourly IBNR Claims").  Following the entry into an agreement with Highmark West Virginia ("Highmark") with respect to the administration of the Hourly IBNR Claims and COBRA Claims, dated as of February 17, 2014 and approved pursuant to the *Order Granting Debtors' Motion For Order Approving Settlement Agreement with Highmark West Virginia Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019* [Docket No. 1134] (the "Highmark Agreements"), the Debtors deposited $300,000 with Highmark in March 2014 and retained $637,000 at PNC Bank.  As of September 20, 2014, the balance held by Highmark has grown through refunds of overpayments to $425,000 (the "Hourly IBNR Escrow").  In addition, although the funds held by PNC Bank have been released to Wayzata, as set forth in the Asset Purchase Agreement, the Buyer has agreed to honor the Debtors' obligations to make "Hourly Subsequent Prepayments" under paragraph (2)(B)(a) the Highmark Agreement, up to the amount of funding released to Wayzata.  At such time as three months pass without any claim being filed against the Hourly IBNR Escrow, the remaining funds are to be returned to the Debtors' estates.

### *(v)     The Deposit Assets*

47.     The "Deposit Assets" include the remaining interests of the Debtors in cash equivalents including (i) existing cash, (ii) cash collateral supporting existing insurance policies, (iii) any rebates that may be available with the cancellation of insurance policies that were pre-paid, (iv) rebates of healthcare premiums and (v) balances owed to the Debtors on account of

retainers maintained by certain law firm employed by the Debtors.  In total, these Deposit Assets have a potential value to the Debtors' estates of between $325,000 and $425,000.

### *(vi)*      *Estate Causes of Action*

48.      "Causes of Action" include any legal claims the Debtors' estates may have against any person or entity, including without limitation, any Avoidance Actions and any actions against the Debtors' officers and directors, court approved professionals, members of the Creditors' Committee (in such capacity), and professionals employed by the Creditors' Committee.  The Debtors, in consultation with Buyer and the Creditors' Committee, have determined that, given the exigencies of these cases and the lack of any return to claimants other than the Debtors pre and post-petition term loan lenders, pursuit of the Causes of Action is not appropriate.  Accordingly, as part of the purchase of the Remaining Assets, the Buyer has agreed not to pursue the Causes of Action and to release all parties that may be subject to a Cause of Action with respect to such Cause of Action.

### F.      *The Final Winddown*

49.      Concurrent with filing this Motion, the Debtors are filing the [Debtors' Motion to Dismiss Chapter 11 Cases and For Authority to Dissolve the Debtors] (the "Dismissal Motion").  Upon the consummation of the Settlement Agreements and the sale of all Remaining Assets to the Buyer, the Debtors will have no assets remaining.  Under the circumstances of these cases, the Debtors believe it is appropriate to dismiss the bankruptcy cases and to dissolve the Debtor entities in accordance with the Delaware General Corporate Laws.

### **RELIEF REQUESTED**

50.      By this Motion, the Debtors request the entry of an order: (i) approving the Debtors entry into the Settlement Agreements pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, and (ii) authorizing the sale of the Debtors' interest in the Remaining

Assets to the Buyer, free and clear of all liens, claims and encumbrances pursuant to sections 105(a), 363(b), and 363(k) of the Bankruptcy Code.

### A.    The Settlement Agreements

51.    The Debtors have agreed on the terms of the Settlement Agreements including the Sunstone Settlement Agreement and the Salaried VEBA Settlement Agreement.

### (i)    The Sunstone Settlement Agreement

52.    As further detailed above, under the terms of the Wind Down Orders, the Debtors have set aside nearly $3,000,000 related to the sale of Anodes.  Based upon conversations between the Debtors' pre and post-petition lenders, the Buyer, Sunstone and the Debtors, it is apparent that such parties each believe they have valid claims with respect to the Sunstone Escrow.  To prevent litigation and in recognition of the costs and uncertainties of further disputes regarding each party's rights to the Sunstone Escrow, the parties have agreed to the terms of the Sunstone Settlement Agreement.  Under the terms of the Sunstone Settlement Agreement, the entire Sunstone Escrow shall constitute a Remaining Asset to be sold to Buyer and, on the Closing Date, Buyer shall pay to Sunstone $473,388.16 (the "Sunstone Settlement Payment"). Additionally, Sunstone shall be entitled to an administrative claim in the amount of $8,225,291.84 (the "Allowed Claim"), which Sunstone acknowledges it is unlikely to receive any payment thereon.

### (ii)    The Salaried VEBA Settlement

53.    Historically, the Debtors funded $75,000 on a monthly basis to a trust (the "Salaried VEBA Trust") to fund ongoing health care benefits for salaried retirees (the "Salaried VEBA").  With the curtailment of operations, the Debtors were unable to continue to fund this obligation and have negotiated with the trustee under the Salaried VEBA Trust, as the authorized representative of the Salaried VEBA Trust.  To avoid the prohibitive costs of an action under

section 1114 of the Bankruptcy Code, the Debtors and the Salaried VEBA have agreed to a series of deferrals wherein the Debtors have not funded the Salaried VEBA for the last eleven months.  To settle all remaining issues in connection with the Debtors' obligations to the Salaried VEBA Trust and claims attendant thereto and to avoid the cost expense and uncertainty with respect to a proceeding under section 1114 of the Bankruptcy Code, and in exchange for a complete waiver of any claims against the Debtors or their estates related to funding obligations to the Salaried VEBA Trust from and after October 9, 2013, on the Closing Date, the Debtors will pay or cause to be paid to the Salaried VEBA Trust a one-time payment of $112,500 (the "Salaried VEBA Settlement Payment" and, together with the Sunstone Settlement Payment, the "Settlement Payments").  The general unsecured claim of the Salaried VEBA Trust (the "VEBA Unsecured Claim") shall be unaffected by this Settlement, and the Salaried VEBA Trust shall retain any rights it may have with respect thereto.  The Salaried VEBA Trust acknowledges that it is unlikely to receive any payment on account of the VEBA Unsecured Claim.

### B.      The Sale of the Remaining Assets

54.      After the payment of the obligations under the Settlement Agreements, the Debtors believe the Remaining Assets have a realizable value of between $5,500,000 and $7,500,000.  These assets are subject to either (i) validly existing security interests held by the DIP Term Loan Agent under the terms of the Term Loan DIP Credit Agreement and by the Pre-Petition Term Loan Agent under the Pre-Petition Term Loan Agreement, and constitute Pre-Petition Collateral or Term Loan Collateral, respectively, or (ii) the Term Loan A/L Adequate Protection Superpriority Claim of the Pre-Petition Term Loan Agent to the extent of the diminution in the value of the Pre-Petition Collateral.  In an effort to fully wind down their estates and to reach a resolution with respect to the Remaining Assets, the Debtors have agreed to sell their interest in the Remaining Assets to the Buyer and to grant Wayzata Investment

Partners, LLC, Wayzata Opportunities Fund II, L.P., Wayzata Opportunities Fund, LLC (in all relevant capacities and collectively with their affiliated or managed funds, "Wayzata") a release of any claims of the estate against Wayzata in exchange for: (i) a credit bid of the full amount of the Term DIP Obligations, (ii) a credit bid of $7,500,000, with respect to the Pre-Petition Term Loan Agreement, (iii) a credit bid of the full amount of the Secured Diminution Claims, (iv) a waiver of any deficiency claim on account of the Pre-Petition Term Loan, (v) Buyer's agreement to fund costs and expenses necessary for the winddown of the estate, which amount shall be set forth in the winddown budget (the "Final Budget"), a copy of which will be agreed to by and between the Buyer and the Sellers no later than five (5) days before the hearing before the Bankruptcy Court to consider approval of this Motion and entry of the Sale Order, (vi) Buyer's assumption of the Assumed Liabilities and (vii) the release, by Wayzata, of any Causes of Action, including for the avoidance of doubt, any causes of action against the Debtors, their officers and directors, their court approved professionals, the member of the Creditors' Committee (in their capacity as a member of the Creditors' Committee), and the professionals engaged by the Creditors' Committee, and all Avoidance Actions (collectively the "Consideration").  Wayzata, in its capacity as DIP Term Loan Agent, has further agreed to amend the DIP Order and DIP Agreements to clarify that all amounts paid to professionals in these cases pursuant to the Budget are included within the Professional Fee Carve Out (as defined in the DIP Order).

## BASIS FOR THE RELIEF REQUESTED

### A.    The Settlement Agreements Are Appropriate Under Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019

55.    Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a). In addition, Bankruptcy Rule 9019(a) expressly

provides that "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

56.     In fact, compromises are favored in the bankruptcy context "[t]o minimize

litigation and expedite the administration of a bankruptcy estate." *Martin v. Myers (In re*

*Martin),* 91 F. 3d 389, 393 (3d Cir. 1996); *see also*, *In re Nutraquest, Inc*., 434 F.3d 639, 644 (3d

Cir. 2006). The Supreme Court has recognized that "in administering reorganization proceedings

in an economical and practical manner it will often be wise to arrange the settlement of claims in

which there are substantial and reasonable doubts." *Protective Committee for Independent*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) (applying the

former Bankruptcy Act).

57.     In determining the fairness of a proposed compromise, the court should form an

educated estimate of the complexity, expense and likely duration of such litigation, the possible

difficulties of collecting on any judgment which might be obtained, and all other factors relevant

to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in

every instance, of course, is the need to compare the terms of the compromise with the likely

rewards of the litigation. *Protective Comm.,* 390 U.S. at 414, 424-25.

58.     In the *Martin* decision, the Third Circuit, applying *Protective Committee* in the

context of a settlement pursuant to Bankruptcy Rule 9019(a), set forth four factors to be

considered:

> (i)     the probability of success in litigation;
> (ii)    the likely difficulties of collection;
> (iii)   the complexity of the litigation involved and the expense, inconvenience
>          and delay necessarily attending it; and
> (iv)    the paramount interest of the creditors.

*Martin,* 91 F. 3d at 393; *see also In re Marvel Entertainment Group, Inc.,* 222 B.R. 243, 249 (D. Del. 1998); *In re Geller,* 74 B.R. 685, 688 (Bankr. E.D. Pa. 1987) (generally, a settlement will be approved as long as it clears a threshold of reasonableness); *Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.),* 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd without opinion,* 8 F.3d 812 (3d Cir. 1993) (settlement must not fall below the lowest level in the range of reasonableness).

59.     Ultimately, approval of a settlement or compromise is within the "sound discretion" of the bankruptcy court.  *In re Nutraquest,* 434 F.3d at 644.  The bankruptcy court should not substitute its judgment for that of a trustee or debtor in possession so long as there is a legitimate business justification for the decision to enter in to a settlement.  *Martin,* 91 F.3d at 395.  The bankruptcy court is not to decide the numerous questions of law or fact raised in the dispute, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  *See In re Penn Trans. Co.,* 596 F.2d 1102, 1114 (3d Cir. 1979); *Cosoff v. Rodman (In re W.T. Grant Co),* 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied,* 464 U.S. 822 (1983).

60.     A balancing of all the *Martin* factors supports approval of the Settlement Agreements.  With respect to each respective Settlement Agreement, the Debtors face significant risks and lack the funds to adequately litigate.  The failure to reach appropriate settlements with each of Sunstone and the Salaried VEBA could result in expensive, complex litigations and, given the facts and circumstances of the relevant issues, uncertain outcomes.  The Debtors have been in bankruptcy for over 18 months and have been in default under the terms of their Term DIP Loan Credit Agreement for more than 10 months.  As a result, the Debtors lack resources to engage in prolonged litigation that may be required to resolve the matters that are settled in the

Settlement Agreements.  Moreover, absent agreements among the parties on the instant issues, the Debtors lack a clear path to conclude these chapter 11 cases without further depleting their minimal Remaining Assets or materially increasing the amount of the Term DIP Obligations.

61.    Specifically, each of Sunstone and the Salaried VEBA asserts or may assert rights to funds apart from an administrative claim against the Debtors, the resolution of which could necessitate prolonged discovery processes and resultant litigation.  As such, the Sunstone Settlement takes into account, *inter alia*, the time and expense associated with any argument that the funds in the Sunstone Escrow are not property of the Debtors' estates and the risks in connection with the outcome of such a litigation.  Similarly, the settlement with the Salaried VEBA acknowledges the uncertainties surrounding and time and costs in connection with a proceeding under section 1114 of the Bankruptcy Code.  Further, the terms of both of the Settlement Agreements take into consideration that Wayzata, in its capacity as pre and post-petition term loan lenders, has numerous secured, superpriority and administrative claims as well as deficiency claims against the Debtors' property.  In the event these cases conclude without the relief requested in this Motion with respect to the Settlement Agreements and the sale of the Remaining Assets, it is unlikely Wayzata would waive any of such claims, and any funds available for recoveries to creditors would likely be payable solely to Wayzata on account of its secured debt or its superpriority administrative claims.

62.    In view of the foregoing and the history of these chapter 11 cases, the parties' decision to enter into and the terms of the Settlement Agreements fall well above the lowest point in the range of reasonableness.  As noted above, the terms of the Settlement Agreements are reasonable and adequately reflect the uncertainties of litigation attendant to the issues settled therein.  Importantly, by resolving the existing disputes with Wayzata, Sunstone, and the

Salaried VEBA, the Debtors avoid (i) further litigation or costs associated with such issues and related potential claims against estate assets, (ii) uncertainty regarding the outcome of such potential litigation, and (ii) risk of further erosion of estate assets attendant to such litigation or the potential adverse resolution of the claims asserted by Sunstone or the Salaried VEBA.

63.     Finally, approval of the Settlement Agreements will allow the Debtors to transition these cases to their next stage.  Accordingly, entry into the Settlement Agreements is in the best interests of the Debtors, their estates and creditors as the settlements will provide the Debtors with the ability to provide closure to these chapter 11 cases.  In sum, for all of the reasons set forth above, the Settlement Agreements satisfy the *Martin* factors and should be approved.

**B.     The Sale to Buyer Is Appropriate Under the Circumstances**

**i.     Provisions Highlighted Pursuant To Local Rule 6004-1(B)(IV)**

64.     Pursuant to Local Rule 6004-1(b)(iv), the Debtors are required to highlight certain provisions of the proposed Order and Asset Purchase Agreement, including:

(a)     <u>Sale to Insider</u>.  Certain affiliates of Buyer are substantial holders of Ormet Corporation's common stock, such that these affiliates collectively hold approximately 47% of Ormet Corporation's equity, and are the pre-petition term loan lenders and debtor-in-possession term loan lenders.  No employees, officers, directors or agents of Buyer sit on any of the Debtors' boards of directors and Buyer does not exercise control over the Debtors, <u>provided</u>, <u>however</u>, that Wayzata, in its capacity as the Term DIP Loan Lender has authorized all disbursements of funds after the Debtors' receipt of the Notices of Events of Default under the Debtors' Term DIP Loan Agreement.  The Debtors assert that the Asset Purchase Agreement was negotiated in good faith and at arm's length.

(b)     <u>Agreements with Management</u>.  Management will receive releases, as further noted in paragraph 64(c), below.

(c)     <u>Releases</u>.  The proposed order contains certain releases of claims or potential claims against Wayzata, in all relevant capacities at paragraph 24[8].  In addition,

---

[8] The release of Wayzata contained in the Order is substantially similar to prior releases of Wayzata under the Term Loan DIP Credit Agreements, as amended.

Wayzata has agreed to release the Debtors, their officers and directors, the professionals of the estate, the members of the Creditors' Committee (in such capacity) and the professionals retained by the Creditors' Committee under the terms of the Asset Purchase Agreement at Section 2.05(a)(vi). In addition, the Settlement Agreements contain mutual releases wherein Wayzata and the settlement parties (both Sunstone and the Salaried VEBA) agree to release each other from any remaining liabilities or causes of action, and the settlement parties affirmatively agree to support the sale and dismissal of the Debtors' bankruptcy cases.

(d)  <u>Private Sale/No Competitive Bidding</u>.  The sale of the Remaining Assets is contemplated as a private sale.

(e)  <u>Closing Deadlines</u>.  None.

(f)  <u>Good-Faith Deposit and Conditions for Forfeiture</u>.  None.

(g)  <u>Interim Arrangements with Proposed Buyer</u>.  None.

(h)  <u>Use of Proceeds</u>.  The Asset Purchase Agreement is for all assets, including all cash, and there are no proceeds for use by the Sellers.  Under the terms of the Asset Purchase Agreement, the Buyer will then provide necessary funding, as agreed to pursuant to a budget, for the winddown of the Debtors' estates.  *See APA at Section 2.05(a)(iv).*

(i)  <u>Tax Exemption</u>.  N/A

(j)  <u>Record Retention</u>.  Buyer shall permit Sellers reasonable access to records to the extent necessary for winddown of the estates.  *See APA at Section 5.01(b).*

(k)  <u>Sale of Avoidance Actions</u>.  The Sale contemplates a transfer of all Avoidance Actions to Buyer, and Buyer's contemporaneous release with respect to such Avoidance Actions.  *See APA at Sections 2.01(a); 2.05(a)(vi).*

(l)  <u>Requested Findings as to Successor Liability</u>.  Upon consummation of the Sale Transaction, Buyer shall not be deemed to (a) be the successor to the Debtors, (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors.  *See Sale Order at paragraphs 20-21.*

(m)  <u>Sale Free and Clear of Possessory Leasehold Interests, Licenses or Other Rights</u>.  Sale is to be free and clear.  *Sale Order at paragraphs 13-19.*

(n)  <u>Credit Bid</u>.  Buyer will credit bid (i) the full amount of outstanding obligations under the Term DIP Loan Credit Agreement, (ii) up to $7,500,000 with respect to the Pre-Petition Term Loan Agreement and (iii) the full amount of the Secured Diminution Claims, under section 363(k) of the Bankruptcy Code with respect to all of the aggregate obligations then outstanding Pre-Petition Term Loan

Obligations and Term DIP Loan Obligations. *Asset Purchase Agreement at § 2.05(a)(i)-(iii); Sale Order at paragraphs N-O.*

(o)   <u>Relief from Bankruptcy Rule 6004(h).</u>  The proposed Order seeks relief from the stay imposed by Bankruptcy Rule 6004(h) at paragraph 3.

**C.**   ***The Debtors Have Articulated a Reasonable Business Justification for the Sale of the Assets.***

65.   Ample justification exists for approval of the proposed sale of the Remaining Assets.  Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

66.   A sale of a debtor's assets outside of the ordinary course of business should be approved if supported by a sound business purpose. *See, e.g., In re Martin*, 91 F.3d  at 395; *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

67.   Courts typically consider the following factors in determining whether to approve a sale under Section 363: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Del. & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.,* No. 97¬1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

68.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the value received by the estate. *See Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (In bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

69.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos Related Litigants and/or Creditors v. Johns Manville Corp. (In re Johns Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Section

363(b)(1).    Indeed, when applying the "business judgment" standard, courts show great

deference to a debtor's business decisions.  *See Pitt v. First Wellington Canyon Assocs. (In re*

*First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8,

1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless

shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's

retained discretion.").

### *(i)    A Sound Business Justification Exists.*

70.    The Debtors have determined that selling the Remaining Assets, in conjunction

with entry into the Settlement Agreements, under the terms of the Asset Purchase Agreement

with Buyer is the best way to bring these chapter 11 cases to a conclusion.  The Debtors have

marketed all of their assets and have entered into multiple agreements for the sale of assets,

deriving significant value under the circumstances.  The Remaining Assets consist of cash and

cash equivalents that are proceeds the collateral, and subject to valid security interests, of

Wayzata in its capacity as Pre-Petition Secured Parties and DIP Term Loan Lenders, or causes of

action, the proceeds of which Wayzata is entitled in its capacity as a Pre-Petition Secured Party

on account of the superpriority administrative claims granted pursuant to the DIP Order.  Under

the terms of the Asset Purchase Agreement, the Debtors are able to provide closure for the

benefit of their estates and all creditors in these matters.  Additionally, should any party submit a

bid that would realize greater value for the estate than the bid of Buyer, the Debtors would

entertain such offers.

71.    A debtor should be authorized to sell assets out of the ordinary course of business

pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of

reorganization if it demonstrates a sound business purposes for doing so.  *See In re Abbotts*

*Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the

"sound business judgment" test of *Lionel*); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purposes and justification for the Sale prior to, and outside of, a plan of reorganization."); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Com. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions"); *Delaware & Hudson Ry. Co.*, 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); *see also Comm. of Equity Sec. Holders v. Lionel*, Corp. (In re Lionel Corp.), 722 F.2d I 063, I 070 (2d Cir. 1983); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate); *In re Mid-American Waste System*, Case No. 97-I 04 (PJW) (Bankr. D. Del. Mar. 7, 1997).

72.     The Debtors submit that the sale of the Remaining Assets under the terms of the Asset Purchase Agreement is based upon the sound business judgment of the Debtors. All Remaining Assets would ultimately be turned over to Wayzata by virtue of their pre and post-petition liens and superpriority claims on such Assets.  By finalizing a sale under the terms of the Asset Purchase Agreement, the Debtors avoid the incurrence of further administrative claims and bring closure to the administration of the estate.  As such, the Debtors have determined that the Sale is in the best interest of their estates and creditors in these matters.

### (ii) *The Sales Price is Fair and Reasonable and the Proposed Sale of the Assets was Proposed and Negotiated in Good Faith.*

73.     Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the interested parties have been provided adequate and reasonable notice of the proposed sale, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Delaware & Hudson*, 124 B.R. at 176. As further described below, each of these factors have been satisfied.

74.     The Debtors have served notice of this Motion on all creditors and other parties in interest in these proceedings and such notice was provided more than thirty (30) days in advance of the hearing on this Motion, which is more than that required under applicable Bankruptcy Rules or local rules in this District. Under the circumstances, the Debtors believe notice is adequate and reasonable.

75.     The consideration provided by Buyer includes a credit bid under section 363(k) of the Bankruptcy Code, a release of all parties with respect to estate Causes of Action, agreement to the terms of the Settlement Agreements, and cash sufficient to fully winddown and dissolve the Debtor entities. As detailed above, Wayzata (as both the Pre-Petition Secured Parties and Term Loan DIP Lender) have a perfected security interest in substantially all assets of the Debtors', and to the extent Wayzata does not have a security interest, it has a superpriority administrative claim in its capacity as a Pre-Petition Secured Party to the extent of any diminution in the value of its Pre-Petition Collateral.

76.     While a diminution claim is challenging to value, it is clear that the Wayzata's diminution claim far exceeds the value of the Remaining Assets. Diminution claims are generally analyzed by evaluating the difference in the value of the collateral on the petition date against the value as of the time of the assertion of such claim. See, e.g. In re Residential Capital,

LLC, 501 B.R. 549, 590-595 (Bankr. S.D.N.Y. 2013).  The present case presents a unique opportunity to value this claim, as the Debtors entered bankruptcy with an asset purchase agreement that included a credit bid of $100,000,000 for the post-petition and pre-petition term loan debt.  Assuming the full amount of the Term Loan DIP Credit Agreement, $30,000,000 was to be drawn by the closing of the transaction, this would represent at least $70,000,000 in value attributed to the Pre-Petition Collateral (not including the value of the assumed liabilities and other consideration that would have been subject to the Pre-Petition Term Loan Lender's collateral).  As a result of actions that were unforeseen on the Petition Date, the Debtors were forced to liquidate their assets, netting Wayzata with recoveries of less than $10,000,000 on its Pre-Petition Collateral before entry into the Asset Purchase Agreement.  While the Remaining Assets have the potential of adding an additional $7,500,000 in direct proceeds, this results in one evaluation that would provide at least $52,500,000 in a diminution claim.

77.    Indeed, at a minimum, Wayzata, in its capacity as a Pre-Petition Secured Party has a diminution claim equal to the proceeds of the DIP Term Loan that were paid to the Debtors following their default.  Since the Debtors' default, they have incurred approximately $25,000,000 in additional indebtedness under the DIP Term Loan.  An analysis of the assets that may not be subject to the security interest of the Pre-Petition Term Loan Lender, primarily the Avoidance Actions, indicates that the value of such causes of action, before accounting for any defenses, including contemporaneous exchange of value, new value or ordinary course defenses, or the costs of recovery on such causes of action, is approximately $18,700,000.  Even assuming a very favorable recovery rate of 50% (and the Debtors' believe the recovery rate would be substantially less), the value of such causes of action is $9,350,000.  Accordingly, the analysis shows the value of the diminution claim far exceeds the value of the Remaining Assets.

78.     The unfortunate reality of these cases is that, under the statutory framework of the Bankruptcy Code, and in accordance with the Final DIP Order, the assets of the Debtors are insufficient to pay in full the claim of the Pre-Petition Term Loan Agent for the diminution in the value of its Pre-Petition Term Loan Collateral that resulted from the Debtors' use of cash throughout these proceedings, and the enforcement of the automatic stay of section 362 of the Bankruptcy Code.  The only party with a remaining, direct, financial interest in these proceeds is Wayzata.  In exchange for the purchase of all remaining assets, Wayzata has agreed to credit bid its pre- and post-petition secured indebtedness to the extent applicable under section 363(k) of the Bankruptcy Code, to agree to the terms of the Settlement Agreements, fund all expenses necessary with the final winddown, dismissal of the Bankruptcy Cases, and dissolution of the Debtor entities, and to agree not to pursue any Causes of Action and to release all parties that may otherwise be subject to a Cause of Action.  Such consideration is fair and reasonable, and provides maximum value for the benefit of the estate and the various parties in interest in these bankruptcy proceedings.

79.     Although section 363(b) of the Bankruptcy Code does not explicitly require good faith, courts have also required that a sale be made in good faith.  *See id.*; *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992).  Whether a proposed sale is in "good faith" focuses principally on the element of special treatment of the debtor's insiders in the sale transaction.  *Id.*; *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

80.     The sale of the Remaining Assets is based upon the expected value of recoveries and provides for funds to be available to the estates for funding of all necessary winddown expenses.  All parties are represented by practical and experienced advisors in the arm's-length

negotiations of the sale.  As such, the Debtors submit that the sale of the Remaining Assets is the product of good faith.

81.     The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code – specifically, that there be adequate notice and that the sale price be fair and reasonable.  The Debtors have provided adequate notice of the Sale to interested parties.  Accordingly, the relief requested by this Motion should be approved.

## NOTICE

82.     Notice of this Motion has been provided to: (i) counsel for the Debtors' post-petition lenders; (ii) the Office of the United States Trustee; (iii) non-Debtor parties to the Settlements; and (iv) those persons who are required to be noticed in accordance with Bankruptcy Rule 2002.  A copy of the Notice is attached hereto as Exhibit C, and the Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

83.     The Debtors believe that, given the circumstances of these chapter 11 cases, the terms of the Settlement Agreements represent fair and reasonable compromises and are in the best interests of creditors and the estates as a whole.  Further, the terms of the Asset Purchase Agreement, and the sale of the Remaining Assets to Buyer, including the consent of Wayzata to the Settlement Agreements represent fair and reasonable value in exchange for the Remaining Assets, and are in the best interest of creditors and the estate as a whole.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion, and grant such other and further relief as the Court may deem just and proper.

Dated: September 30, 2014
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Daniel B. Butz*
Robert J. Dehney (No. 3578)
Daniel B. Butz (No. 4227)
Erin R. Fay (No. 5268)
1201 N. Market St., 16th Flr.
PO Box 1347
Wilmington, DE  19899-1347
Telephone:  302-658-9200
Facsimile:  302-658-3989

-and-

DINSMORE & SHOHL LLP
Kim Martin Lewis, Esq. (OH Bar #0043533)
Patrick D. Burns, Esq. (OH Bar #0081111)
255 E. 5th St., Ste. 1900
Cincinnati, OH  45202
Telephone:  513-977-8200
Facsimile:  513-977-8141

*Counsel to Debtors and Debtors In Possession*