# EXHIBIT B

**PURCHASE AGREEMENT**

dated as of

**September 30, 2014**

by and among

**ORMET CORPORATION**
**ORMET PRIMARY ALUMINUM CORPORATION**
**ORMET ALUMINUM MILL PRODUCTS CORPORATION**
**ORMET RAILROAD CORPORATION**
**SPECIALTY BLANKS HOLDING CORPORATION**

**as the Sellers**

and

**SMELTER LIQUIDATION, LLC**

**as the Buyer**

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT dated as of September 30, 2014 (the **"Agreement"**) by and among Ormet Corporation, a Delaware corporation (**"Ormet"**), Ormet Primary Aluminum Corporation, a Delaware corporation (**"OPAC"**), Ormet Aluminum Mill Products Corporation, a Delaware corporation (**"OAMP"**), Ormet Railroad Corporation, a Delaware Corporation (**"Ormet Railroad"**) and Specialty Blanks Holding Corporation, a Delaware corporation (**"Specialty Blanks"** and, together with Ormet, OPAC, OAMP, and Ormet Railroad, the **"Sellers"**), to Smelter Liquidation, LLC, a Delaware Limited Liability Company (the **"Buyer"**) and, solely with respect to Section 2.05(a)(i), (ii), (iii) and (v) hereof, Wayzata Opportunities Fund II, L.P. and Wayzata Opportunities Fund, LLC (together, **"Wayzata"**).

**W I T N E S S E T H :**

WHEREAS, the Sellers own the Purchased Assets (as defined below);

WHEREAS, the Sellers have sought relief under Chapter 11 of Title 11, §§ 101 et seq. of the United States Code (as amended, the **"Bankruptcy Code"**) by filing cases (the **"Chapter 11 Cases"**) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**) on February 25, 2013 (the "**Petition Date**"); and

WHEREAS, subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Buyer desires to purchase the Purchased Assets and to assume the Assumed Liabilities (as defined below) in a transaction pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

**SECTION 1.01.**  *Definitions.*

The following terms, as used herein, have the following meanings:

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person; provided, however, that with respect to the Sellers, "Affiliate" shall mean only the other Sellers.

**"Assumption Agreement"** means an assignment and assumption agreement substantially in the form attached hereto as Exhibit A.

**"Avoidance Action"** means any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Purchased Assets.

**"Bill of Sale"** means a bill of sale substantially in the form attached hereto as Exhibit B.

**"Business Day"** means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

**"Causes of Action"** means any legal, governmental or regulatory actions, suits, proceedings, investigations, arbitrations or actions.

**"Claim"** means a claim as defined in Section 101 of the Bankruptcy Code.

**"Closing Date"** means the date of the Closing.

**"Creditors' Committee"** shall mean the Official Committee of Unsecured Creditors appointed in the chapter 11 cases.

**"DIP Order"** means the Final Order (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter into Agreements with Wells Fargo Capital Finance, LLC; and (D) Authorizing Debtors to Enter into Agreements with Wayzata Investment Partners, LLC [Docket No. 147].

**"DIP Term Loan Agreement"** means the Senior Secured Superpriority Debtor-in-Possession Term Loan and Security Agreement dated as of February 27, 2013 (as amended from time to time).

**"DIP Term Loan Obligations"** means all obligations of the Sellers arising under the DIP Term Loan Agreement.

**"Lien"** means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

**"Permitted Liens"** means Liens specifically contemplated by the Sale Order.

**"Person"** means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision, or an agency or instrumentality thereof.

**"Prepetition Term Loan Agreement"** means the Term Loan and Security Agreement, dated as of March 1, 2010, by and among the Sellers, the Bank of New York Mellon, as agent and the lenders thereunder.

**"Prepetition Term Loan Lenders"** means the lenders under the Prepetition Term Loan Agreement.

**"Prepetition Term Loan Obligations"** means all obligations of the Sellers arising under the Prepetition Term Loan Agreement.

"**Sale Order**" means a Final Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Sale Order shall be in the form attached hereto as Exhibit C with only such amendments and modifications thereto as may be mutually agreed between Sellers and Buyer.

"**Secured Diminution Claims**" means the claims granted in the DIP Order in favor of the Prepetition Term Loan Lenders as adequate protection for the diminution in value of their interests in the Term Loan Pre-Petition Collateral, including Cash Collateral (each as defined in the DIP Order) on account of the Sellers use of such Term Loan Pre-Petition Collateral, the imposition of the automatic stay and the subordination to the Carve-Out Expenses (as defined in the DIP Order), and secured by replacement liens upon and security interests in all Term Loan Collateral (as defined in the DIP Order).

"**Wind Down Expenses**" means the out of pocket administrative costs and expenses, up to an aggregate amount of $[___], that Sellers expect to incur in connection with winding down their bankruptcy estates from and after the Closing Date as set forth and solely in accordance with the budget to be agreed among the Buyer and the Sellers no later than five (5) days before the hearing before the Bankruptcy Court to consider approval of this Agreement and entry of the Sale Order, which budget shall be acceptable to the Buyer in all respects, and which may be amended and modified by mutual agreement between Sellers and Buyer.

"**Wind Down Expense Escrow**" means the escrow account established pursuant to the Wind Down Expense Escrow Agreement.

"**Wind Down Expense Escrow Agreement**" means an escrow agreement reasonably acceptable to the Sellers and Buyer by and among Buyer, Sellers and an escrow agent for the disbursement of the amount payable by Buyer pursuant to Section 2.05 in connection with the Wind Down Expenses, and which shall provide that any amount not so used to satisfy such Wind Down Expenses shall be returned to Buyer.

## ARTICLE 2

## PURCHASE AND SALE

**SECTION 2.01.**  *Purchase and Sale.*  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, subject to the entry of the Sale Order, Buyer agrees to purchase from the Sellers and each Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Buyer at the Closing, free and clear of all Liens and Claims, other than Assumed Liabilities, all of Sellers' direct or indirect right, title and interest in, to and under all of Sellers' assets, rights, claims and properties, of every kind and nature, whether real, personal or mixed, tangible or intangible, whether identifiable or contingent, wherever situated or located, whether or not reflected on the books and records of Sellers, other than the Excluded Assets (collectively, the "**Purchased Assets**"), which Purchased Assets shall include, without limitation, the following:

(a) all Claims, Causes of Action, Avoidance Actions, goodwill, customer and referral relationships, other intangible, property and all privileges, set-offs, indemnification rights and demands and rights of any kind as against others (whether by contract or otherwise);

(b) the assets listed or described on Schedule 2.01(a);

(c) to the extent not previously purchased by Niagara Worldwide, LLC or Almatis, Inc. under the terms of their respective asset purchase agreements with the Sellers, all documents and other books and records (financial, accounting, personnel files and other), and correspondence, drawings, engineering and manufacturing data and other technical information and data, and all other business and other records (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), in each case arising under or relating to the Purchased Assets;

(d) all cash and cash equivalents, including checks, refunds, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers; and

(e) the Sellers' rights and title to any refund of any cash paid or pre-paid by the Sellers on account of the DIP Term Loan Obligations in accordance with the DIP Term Loan Agreement.

**SECTION 2.02.** *Excluded Assets*. Notwithstanding any provision to the contrary set forth in this Agreement, Sellers shall not sell, assign, convey or deliver to Buyer, and Buyer shall not purchase from Sellers, and the Purchased Assets shall not include, any of the following (the "**Excluded Assets**"):

(a) the equity interests of each of OPAC, OAMP, Ormet Railroad and Specialty Blanks owned by the applicable Seller; and

(b) the interests of the Debtors under the terms of this Agreement.

**SECTION 2.03.** *Assumed Liabilities*. Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume solely the following liabilities (the "**Assumed Liabilities**"):

(a) all liabilities and obligations arising from the Purchased Assets solely to the extent arising after the Closing; and

(b) the Sellers obligations to make "Hourly Subsequent Prepayments" (as defined in the ASA (defined below)) under paragraph (2)(B)(a) of the Administrative Services Agreement evidenced by a certain letter agreement between Highmark West Viginia and the Sellers, dated as of February 17, 2014 (the "**ASA**") and approved pursuant to the *Order Granting Debtors' Motion For Order Approving Settlement Agreement with Highmark West Virginia Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019* [Docket No. 1134]; *provided*, *however*, that the Buyer's obligation to make Hourly Subsequent Prepayments shall be capped at $638,320.00.

**SECTION 2.04.**  *Excluded Liabilities*.   Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Sellers (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**").

**SECTION 2.05.**   *Purchase Price*.

(a)     On the terms and subject to the conditions contained herein, the purchase price (the "**Consideration**") for the Purchased Assets shall consist of:

> (i)     the release under section 363(k) of the Bankruptcy Code of Sellers and any guarantors under the DIP Term Loan Agreement of all of the DIP Term Loan Obligations;

> (ii)    the release under section 363(k) of the Bankruptcy Code of Sellers and any guarantors under the Prepetition Term Loan Agreement of the Prepetition Term Loan Obligations in an aggregate amount equal to $7,500,000.00;

> (iii)   the release under section 363(k) of the Bankruptcy Code of Sellers and any guarantors under the DIP Order and Prepetition Term Loan Agreement of all of the Secured Diminution Claims;

> (iv)    cash in an aggregate amount equal to the Wind Down Expenses (the "**Wind Down Cash**"), which, for the avoidance of doubt, shall include the cash necessary for the Debtors to fund their obligations under the terms of the Settlement Agreement with the Ormet Salaried VEBA Trust;

> (v)     the performance of the Buyer's obligations under that certain Settlement Agreement with Sunstone Development, LLP;

> (vi)    the waiver and release of any and all (a) remaining claims Buyer and its Affiliates may have against the Sellers, their estates, their directors and officers, and the professionals retained in the Chapter 11 cases, including for the avoidance of doubt, any deficiency claim with respect to the Pre-Petition Term Loan Obligations and (b) Avoidance Actions; and

> (vii)   the assumption of the Assumed Liabilities.

(b)     At the Closing, Buyer shall pay to the Sellers the Wind Down Cash by wire transfer of immediately available funds to the Wind Down Expense Escrow.

**SECTION 2.06.**   *Closing*.  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036, and shall not take place until the later to occur of (1) the first Business Day that is 15 days after the entry of the Sale Order unless such Sale Order is subject to a present

5

stay and (2) the first Business Day following the receipt of all necessary or applicble consents, amendments and assignments with respect to the purchase and sale of the Purchased Assets, including consent from Almatis Inc. with respect to Sellers' rights under the Burnside APA and Escrow Agreement (as defined below), or at such other time or place as Buyer and the Sellers may agree. At the Closing:

(a) Buyer shall deliver to the Sellers:

(i) the Consideration as described in Section 2.05(b); and

(ii) the Assumption Agreement duly executed by Buyer.

(b) Sellers shall deliver to Buyer:

(i) possession of the Purchased Assets;

(ii) the Bill of Sale and the Assumption Agreement, in each case duly executed by each applicable Seller;

(iii) duly executed consents, amendments and assignments by each of the applicable counterparties thereto required to consummate the purchase and sale of the Purchased Assets to Buyer, in each case in form and substance acceptable to Buyer; and

(iv) a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal income tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b).

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer:

**SECTION 3.01.** *Organization and Qualification*. Each Seller has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted. Each Seller, as applicable, has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification.

**SECTION 3.02.** *Corporate Authorization*. The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the Sellers' corporate powers and have been duly authorized by all necessary corporate action on the part of each Seller.

**SECTION 3.03.** *Execution and Delivery; Enforceability*. This Agreement has been duly and validly executed and delivered by the Sellers, and, subject to the Bankruptcy Court's entry of the Approval Order will constitute the valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.

**SECTION 3.04.** *Title to Purchased Assets*. Sellers have good, valid and marketable title to all the Purchased Assets free and clear of all Liens (except for those the Permitted Liens), and at the Closing will convey good, valid and marketable title to all of the Purchased Assets to Buyer, free and clear of all Liens except for the Assumed Liabilities and Permitted Liens.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

**SECTION 4.01.** *Corporate Existence and Power*. Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

**SECTION 4.02.** *Corporate Authorization*. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part Buyer.

**SECTION 4.03.** *Execution and Delivery; Enforceability*. This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

## ARTICLE 5

## COVENANTS OF BUYER AND SELLERS

Buyer and the Sellers agree that:

**SECTION 5.01.** *Reasonable Best Efforts; Further Assurances; Access*.

(a) Subject to the terms and conditions of this Agreement, Buyer and the Sellers will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.

(b) After the Closing, Buyer shall permit Sellers and their representatives to have reasonable access, during normal business hours, following reasonable advance notice and at Sellers' sole expense, to the books and records described in Section 2.01(c), as is reasonably necessary for the wind down of the Sellers' estates.

**SECTION 5.02.** *Bankruptcy Court Approval*.  Promptly upon the execution of this Agreement, the Sellers shall seek as promptly as practicable entry of the Sale Order which, among other things, (i) approves this Agreement, (ii) authorizes the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, and (iii) authorizes the other transactions contemplated by this Agreement.

Sellers hereby covenant and warrant that:

**SECTION 5.03.** *Assignments, Consents and Approvals*.  Sellers shall obtain as promptly as practicable, but in no event later than the Closing Date, all consents, amendments or approvals from third-parties necessary to complete the transactions contemplated by this Agreement, including all necessary consents and amendments from Almatis, Inc. to transfer or assign Sellers' rights under the Asset Purchase Agreement and Escrow Agreement related to the sale of the Burnside assets (the "**Burnside APA and Escrow Agreement**").

## ARTICLE 6

## MISCELLANEOUS

**SECTION 6.01.**  Notices.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or email transmission with delivery confirmation) and shall be given,

if to Buyer:

> Smelter Liquidation LLC
> 701 East Lake Street
> Suite 300
> Wayzata, MN 55391
> Attention: Ray Wallander
> Email: rwallander@wayzpartners.com

with a copy to:

> Akin Gump Strauss Hauer & Feld LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, DC 20036-1564
> Attention:  Scott Alberino
> Fax: (202) 887-4288
> Email: salberino@akingump.com

if to the Sellers, to:

> Ormet Corporation
> State Route 7
> Hannibal, OH 43931
> Attention: President

8

   Fax: 740-483-2622

   with a copy to:

   Dinsmore & Shohl LLP
   East Fifth Street, Suite 1900
   Cincinnati, OH 45202
   Attention: Kim Martin Lewis
   Fax: 513-977-8141
   Email: kim.lewis@dinsmore.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day at the place of receipt.

  **SECTION 6.02.** *Amendments and Waivers*.

  (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

  (b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

  **SECTION 6.03.** *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

  **SECTION 6.04.** *Governing Law*. This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

  **SECTION 6.05.** *Jurisdiction*. The parties hereto agree that, during the period from the date hereof until the date on which Sellers' the Chapter 11 Case is closed or dismissed (the "Bankruptcy Period"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court. The Parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or

any state court of the State of New York located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the Southern District of New York or any state court of the State of New York.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section shall be deemed effective service of process on such party.

SECTION 6.06.  *WAIVER OF JURY TRIAL*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 6.07.  *Counterparts; Third Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 6.08.  *Specific Performance*.  It is understood and agreed by Buyer that money damages would be an insufficient remedy for any breach of this Agreement by Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Sellers shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer to comply promptly with any of its obligations hereunder.  Sellers shall be entitled to an injunction to enforce specifically the consummation of the transactions contemplated herein in a proceeding instituted in any court in the State of New York having jurisdiction over the parties and the matter.

SECTION 6.09.  *Entire Agreement*.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 6.10.  *No Strict Construction*.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

**SECTION 6.11.** *Non-Recourse*.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants not to sue any past, present or future director, manager, officer, employee, incorporator, member, partner or equityholder of any other Party for any such claim.

**SECTION 6.12.** *Severability*.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

ORMET CORPORATION

By: _____
     Name:
     Title:

ORMET PRIMARY ALUMINUM CORPORATION

By: _____
     Name:
     Title:

ORMET ALUMINUM MILL PRODUCTS CORPORATION

By: _____
     Name:
     Title:

ORMET RAILROAD CORPORATION

By: _____
     Name:
     Title:

SPECIALTY BLANKS HOLDING CORPORATION

By: _____
     Name:
     Title:

[*Signature Page to Purchase Agreement*]

**BUYER:**

Smelter Liquidation, LLC


By: _____
    Name:
    Title:

[*Signature Page to Purchase Agreement*]

**Solely with respect to Section 2.05(a)(i), (ii), (iii) and (vi):**

WAYZATA OPPORTUNITIES FUND II, L.P.

By: WOF II GP, L.P., its General Partner

By: WOF II GP, LLC, its General Partner

By:_____
Name:
Title

WAYZATA OPPORTUNITIES FUND, LLC

By: Wayzata Investment Partners LLC, its Manager

By:_____
Name:
Title

[*Signature Page to Purchase Agreement*]

**Exhibit A**

Form of Assignment and Assumption Agreement

[Attached.]

## **Exhibit B**

Form of Bill of Sale

[Attached.]

## **Exhibit C**

Form of Sale Order

[Attached.]

## Schedule 2.01(b)

Purchased Assets

All of the Sellers' right and title to the:

1. Subject to the terms of the Settlement Agreement with Sunstone Development Co., Ltd., funds held in escrow related to sale of anodes.

2. Funds held by Highmark - Hourly COBRA, as provided in the Settlement Agreements with Highmark and approved by the Order Granting Debtors' Motion for Order Approving Settlement with Highmark West Virginia pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019.

3. Funds held by Highmark - IBNR & COBRA, as provided in the Settlement Agreements with Highmark and approved by the Order Granting Debtors' Motion for Order Approving Settlement with Highmark West Virginia pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019.

4. Funds held by Highmark - Hourly IBNR, as provided in the Settlement Agreements with Highmark and approved by the Order Granting Debtors' Motion for Order Approving Settlement with Highmark West Virginia pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019.

5. Funds held in escrow under the terms of the Asset Purchase Agreement with Almatis, Inc. (the "**Burnside APA**") related to the sale of the Burnside assets.

6. Funds payable from Almatis under the terms of the Burnside APA related to funding for IBNR and any refund of overpayment to Impala Warehousing.

7. Rebate under the contract for the Louisiana Quality Jobs Program for rebates pursuant to LA R.S. 51:2451-2462, as Amended, Hereinafter Referred to as the Quality Jobs Act between the State of Louisiana and Ormet Primary Aluminum Corporation.

8. Cash collateral supporting any remaining outstanding Letters of Credit, including on account of any remaining insurance policies.

9. Rebates from cancellation of Insurance.

10. Healthcare premium rebates.

11. Other deposits held on account, including retainers held by professionals and deposits held by (or on behalf of) utilities.