# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | Chapter 11 |
| | |
| **ORMET CORPORATION, _et al._**[1] | Case No.  13-10334 (MFW) |
| | |
| | Jointly Administered |
| **Debtors.** | |
| | **Hearing: October 23, 2014 at 10:30 a.m. (ET)** |
| | **Obj. Due: October 16, 2014 at 4:00 p.m (ET)** |

## DEBTORS' MOTION FOR ORDER DISMISSING THE BANKRUPTCY CASES AND GRANTING RELATED RELIEF

The debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") hereby file this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as Exhibit A: (i) dismissing the Bankruptcy Cases, (ii) authorizing the dissolution of the Debtor entities and resignation of their officers and directors, (iii) terminating KCC as the Claims and Noticing Agent, and (iv) granting such other relief as is appropriate.  In support of the Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

On February 25, 2013 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtors were optimistic that they would be able to consummate a sale of substantially all of their assets pursuant to a Court approved sales process, as a going concern,

---

[1]  The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Ormet Corporation (2006); Ormet Primary Aluminum Corporation (9779); Ormet Aluminum Mill Products Corporation (9587); Specialty Blanks Holding Corporation (7019); and Ormet Railroad Corporation (0379).  The service address for all of the Debtors for purposes of these chapter 11 cases is:  43840 State Route 7, Hannibal, Ohio 43931.

and emerge as a stronger, more financially secure entity. The unfortunate reality of these cases is that the expected outcome did not occur.

As further detailed below, in October 2013, the Public Utility Commission of Ohio issued a ruling that eliminated the ability of the Debtors to close upon the Court approved sale, caused the complete curtailment of operations, and resulted in defaults under the Debtors' post-petition financing facilities. Over the last year, the Debtors have worked cooperatively with their secured lenders to make the best of a bad situation. With continued funding by the secured lenders, the Debtors pursued a series of asset sales to fully divest the estate of all assets, while maximizing recoveries for the benefit of the estates.

Through the sales, the Debtors have sold (or are in the process of selling[2]) all assets, with distributions, if any, to be made in accordance with orders of this Court. Accordingly, upon the consummation of the final sale, the Debtors will have no remaining assets and all proceeds of Court-approved asset sales will have been distributed. While the Debtors believe that they have fully maximized the value of their assets under the circumstances, the various sales did not yield sufficient proceeds to fully repay their prepetition secured creditors, including in satisfaction of their claims for the diminution in value of their prepetition secured indebtedness, nor were the Debtors able to pay administrative claims that were outstanding as of the date they went into default under their post-petition financing agreements. Consequently, the Debtors do not have sufficient funds to confirm a chapter 11 plan in these cases. As such, the Debtors believe that the dismissal of their cases is the appropriate mechanism to resolve these cases, and the Debtors seek approval of the Court dismissing the case, with such Order to be entered upon certification of

---

[2] Contemporaneous herewith, the Debtors filed their Motion for Order (I) Approving Settlement Agreements and (II) Approving the Sale of Remaining Assets Free and Clear of All Liens, Claims, Encumbrances and Interests pursuant to which the Debtors seek authority, *inter alia*, to sell their remaining assets to certain affiliates of Wayzata Investment Partners LLC (the "Remaining Asset Sale Motion").

counsel, including the Creditors' Committee and United States Trustee, noting that the sales have closed, all fees payable to the Office of the United States Trustee (or agreed upon estimates thereof are paid), all fees under any order approving the final fee applications of professionals employed in these cases have been paid, and all other actions necessary to be taken within the bankruptcy case have been satisfied (the "Certification Events").

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are Sections 105(a), 363(b) and 363(k) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

2.      On the Petition Date, the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their operations as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 7, 2013, the Office of the United State Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      Headquartered along the Ohio River, in Hannibal, Ohio (the "Hannibal Facility"), the Debtors were a major producer of aluminum in the United States.  The Debtors historically operated two primary business units: (i) an alumina refinery in Burnside, Louisiana (the "Burnside Refinery"), capable of producing up to 540,000 tonnes of smelter grade alumina per year when operating at full capacity, and (ii) an aluminum smelter at the Hannibal Facility (the "Hannibal Smelter"), capable of producing up to 270,000 tonnes of primary aluminum per year

when operating at full capacity.  As of the Petition Date, the Debtors had a roster force in the aggregate of 1,188 employees (the "Employees") between the Burnside Refinery and the Hannibal Smelter, of which 1,107 were scheduled to work.  Of the Employees, 977 were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "Steelworkers").

4.    On the Petition Date, the Debtors filed an Application and on February 27, 2013 the Court entered an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent, Nunc Pro Tunc to the Petition Date, pursuant to 28 U.S.C. § 156(c) and section 105(a) of the Bankruptcy Code [D.I. 49] (the "KCC 156(c) Retention Order").  Pursuant to the KCC 156(c) Retention Order, Kurtzman Carson Consultants LLC ("KCC") has served as the Debtors Claims and Noticing Agent throughout these proceedings.

A.    *The Debtors' Financing*[3]

i.    *The Pre-Petition Financing Facilities*

5.    On March 1, 2010, the Debtors entered into that certain Amended and Restated Loan and Security Agreement (as amended, the "Pre-Petition Revolving Loan Agreement"), with Wells Fargo Capital Finance, as agent and lender ("Wells Fargo").  Pursuant thereto, Wells Fargo made loans, advances and provided other financial accommodations to the Debtors (the "Pre-Petition Revolving Loans").  The Pre-Petition Revolving Loan Agreement was an asset backed loan facility with a maximum credit limit of $60 million, with borrowings subject to commercially standard borrowing base and other restrictions.

6.    As of the Petition Date, the Debtors were indebted to Wells Fargo under the Pre-Petition Revolving Loan Agreement in an aggregate outstanding principal amount of

---

[3] Capitalized terms in the section that are not otherwise defined shall have the meaning ascribed to them in the DIP Order (as defined herein).

approximately $39,761,755.32 (the "Pre-Petition Revolving Loan Obligations").  The Pre-Petition Revolving Loan Obligations were secured by first (or, solely to the extent provided in the Intercreditor Agreement, second) priority secured interests and liens granted upon all the Pre-Petition Collateral (as defined in the Revolving Loan DIP Credit Agreement).

7.    On March 1, 2010, the Debtors also entered into the Term Loan and Security Agreement (as amended, the "Pre-Petition Term Loan Agreement"), with the Bank of New York Mellon as Agent (the "Pre-Petition Term Loan Agent"), and certain affiliates of Wayzata Investment Partners LLC (individually and collectively referred to herein as "Wayzata") as lender (collectively in such capacities, the "Pre-Petition Term Loan Secured Parties").

8.    As of the Petition Date, the Debtors were indebted to the Pre-Petition Term Loan Secured Parties under the Pre-Petition Term Loan Agreement in an aggregate outstanding principal amount of not less than $139,518,196.57 (the "Pre-Petition Term Loan Obligations"). The Pre-Petition Term Loan Obligations were secured by first (or, solely to the extent provided in the Intercreditor Agreement, second) priority secured interests and liens granted upon all the Pre-Petition Collateral (as defined in the Term Loan DIP Credit Agreement).

9.    Prior to the Petition Date, Wells Fargo and the Pre-Petition Term Loan Agent entered into that certain intercreditor agreement, dated as of March 1, 2010 (as amended, the "Intercreditor Agreement"), which sets forth the respective rights, obligations and priorities of the liens and security interests of Wells Fargo, on the one hand, and the Pre-Petition Term Loan Agent and Pre-Petition Term Loan Secured Parties, on the other hand, with respect to the Revolving Loan Pre-Petition Collateral and the Term Loan Pre-Petition Collateral.

*ii.*    ***The Debtor in Possession Financing Facilities***

10.    On the Petition Date, the Debtors filed a motion seeking approval of debtor in possession financing, and on March 22, 2013, the Court entered the *Final Order (A) Authorizing*

*Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter Into Agreement with Wells Fargo Capital Finance, LLC; and (D) Authorizing Debtors to Enter into Agreements With Wayzata Investment Partners, LLC* (as amended or supplemented, the "<u>DIP Order</u>") [D.I. 147].

11.     Pursuant to the DIP Order, the Debtors were authorized to enter into that certain Revolving Loan DIP Credit Agreement with Wells Fargo, pursuant to which the Debtors were authorized to borrow up to a maximum of $60 million, subject to the borrowing base and other limitations as set forth in the Revolving Loan DIP Credit Agreement.  As funds were borrowed and repaid in accordance with the Revolving Loan DIP Credit Agreement, the obligations outstanding under the Pre-Petition Revolving Loan Agreement were "rolled up," such that the outstanding Pre-Petition Revolving Loan Obligations became post-petition obligations (the "<u>Revolving DIP Obligations</u>").

12.     The Revolving DIP Obligations were secured by valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' estates may have (but subject to the Intercreditor Agreement and certain claims entitled to priority) in and upon the Revolving Loan Pre-Petition Collateral and the Post-Petition Collateral (as defined in the Revolving Loan DIP Credit Agreement and referred to herein as the "<u>Revolving Loan Post-Petition Collateral</u>") excluding, any lien on property and/or proceeds recovered as a result of transfers or obligations avoided or actions maintained  or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (the "<u>Avoidance Actions</u>").

13.     Pursuant to the DIP Order, the Debtors were also authorized to enter into that certain Term Loan DIP Credit Agreement (together with the Revolving Loan DIP Credit Agreement, the "DIP Agreements") with Wayzata, pursuant to which the Debtors were authorized to borrow up to a maximum of $30 million, which amount was increased to $55 million through a series of amendments.  The amounts drawn pursuant to the Term Loan DIP Credit Agreement are referred to herein as Term DIP Obligations.[4]

14.     The Term DIP Obligations are secured by valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' estates may have (but subject to the Intercreditor Agreement and certain other claims entitled to priority), in and upon all of the Collateral (as defined in the Term Loan DIP Credit Agreement and referred to herein as the "Term Loan Collateral"), excluding any lien on property and/or proceeds recovered as a result of transfers of obligations avoided or actions maintained or taken pursuant to the Avoidance Actions.

15.     In addition to the grant of post-petition liens upon the Term Loan Collateral, as adequate protection for the diminution in value of their interest in the Pre-Petition Collateral (including the Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out Expenses, the Pre-Petition Term Loan Agent for the benefit of itself and the Pre-Petition Term Loan Secured Parties, was granted: (i) valid, binding, enforceable and perfected replacement liens upon and security interests in all Term Loan Collateral (the "Term Loan A/L Replacement Lien"), and (ii) an allowed superpriority administrative expense claim to the extent

---

[4] On August 7, 2014, the Debtors filed a Motion and on August 27, 2013, the Court entered the Order (A) Authorizing the Debtors to Enter into the Eleventh Amendment to the Term Loan DIP Credit Agreement and (B) Granting Related Relief [D.I. 1451] (the "Eleventh Amendment DIP Order").  Pursuant to the Eleventh Amendment DIP Order, the Debtors are authorized to borrow an additional $1.5 million under the Term Loan DIP Credit Agreement.

of the diminution for value of the Pre-Petition Collateral, as provided by Section 507(b) of the Bankruptcy Code (the "Term Loan A/L Adequate Protection Superpriority Claim").

16.     The Term Loan A/L Replacement Lien is (i) subject to the Intercreditor Agreement and (ii) junior and subordinate only to (A) the Carve-Out Expenses, (B) the liens and security interests granted to Wayzata as the DIP Term Loan Agent and DIP Term Loan Secured Parties in the Pre-Petition Collateral securing the Term DIP Obligations, (C) the liens and security interests granted to Wells Fargo in the Term Loan Collateral securing the Revolving DIP Obligations, and (D) the Term Loan Permitted Encumbrances and Term Loan Permitted Liens and Claims (each as defined in the DIP Order).

17.     The Term Loan A/L Adequate Protection Superpriority Claim is (i) subject to the Intercreditor Agreement, and (ii) junior only to (A) the Carve-Out Expenses, (B) the Term Loan Superpriority Claim and (C) the Revolving Loan Superpriority Claim. and otherwise has priority over all administrative expense claims and unsecured claims against Debtors and their estates.

### B.     The Original Marketing of the Assets and Winddown of the Debtors Business Operations

18.     Prior to the Petition Date, the Debtors, in conjunction with Evercore Partners ("Evercore"), their initial investment banker, conducted a full marketing process in order to identify parties interested in purchasing the assets or equity of the Debtors, either in-court (if necessary) or out of court.  The only firm offer received was the offer for substantially all of the Debtors' assets by an affiliate of Wayzata, Smelter Acquisition, LLC ("Smelter Acquisition") pursuant to the terms of a stalking horse agreement (the "Initial Stalking Horse Agreement").

19.     Following the Petition Date, Evercore continued and expanded their marketing efforts to identify interested financial or strategic buyers but, ultimately, the Debtors did not receive any additional bids.  Accordingly, on May 9, 2013, the Debtors filed the *Notice of*

*Auction Cancellation and Identifying Smelter Acquisition LLC as the Successful Bidder in Accordance with the Bidding Procedures* [D.I. 288].  On June 10, this Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief* (the "Smelter Acquisition Sale Order") [D.I. 368].

20.     While the Smelter Acquisition Sale Order authorized the Debtors to execute the Initial Stalking Horse Agreement and close upon the sale to Smelter Acquisition, as a result of substantial increases in the cost of electricity over the prior four years, the Debtors were required to satisfy a condition precedent (the "Condition Precedent") improving upon the terms of the Unique Arrangement (as defined below) as a condition to Smelter Acquisition's obligation to close.

21.     Pursuant to section 4905.31 of the Ohio Revised Code, electricity customers in the state of Ohio are eligible to petition the Public Utilities Commission of Ohio (the "PUCO") for modifications to the terms by which they purchase electricity for the benefit of economic development within the state.  As the largest user of electricity in the state of Ohio, the Debtors availed themselves of this process and, in 2009, the Debtors entered into an arrangement (the "Unique Arrangement") by which they purchased electricity from Ohio Power Company and Columbus Southern Power Company (n/k/a "AEP-Ohio").

22.     Following entry into the Initial Stalking Horse Agreement and in an effort to satisfy the Condition Precedent, the Debtors sought emergency relief from the PUCO to modify the Unique Arrangement.  On July 11, 2013, the PUCO docketed an Entry (the "PUCO Denial Entry") denying the Debtors' request for emergency relief, and setting a schedule for a full

hearing process.  Ultimately, on October 2, 2013, the PUCO issued its Opinion and Order (the "PUCO Order") providing limited relief.  Upon entry of the PUCO Order the Debtors were unable to satisfy the Condition Precedent, and, accordingly, the transaction with Smelter Acquisition did not close.

23.    Upon the entry of the PUCO Denial Entry, the Debtors began to take all appropriate efforts to reduce the continued cash drain and preserve assets for the benefit of the stakeholders.  On August 1, 2013, the Debtors began the initial process of reducing operations, including reducing the number of operating potlines at the Hannibal Smelter from four to two and reducing operations at the Burnside Refinery.  Upon entry of the PUCO Order and the Debtors' inability to satisfy the Condition Precedent, the decision was made to curtail all remaining operations at the Hannibal Smelter and as of October 7, 2013, the Debtors ceased production of aluminum in Hannibal.  The Burnside Refinery remained in a "hot idle" status, such that it could be sold as a going concern and brought back to operational status in the near term.

24.    On October 8, 2013, the Debtors received a letter from Wells Fargo notifying the Debtors of existing events of default under the terms of the Revolving Loan DIP Credit Agreement and on October 10, 2013 then received a letter from Wayzata notifying the Debtors of existing events of default under the terms of the Term Loan DIP Credit Agreement (the "Notices of Event of Default").

C.    *The Post-Default Winddown Process*

25.    Following the receipt of the Notices of Event of Default, Wells Fargo placed an individual on-site at the Hannibal Facility to oversee all disbursements by the Debtors, and Wells Fargo coordinated with the Debtors, on a daily basis, with respect to each and every disbursement that was made.  The Debtors, Wells Fargo, and Wayzata agreed on the terms of a

budget (as amended or supplemented the "Budget"), which provided for the continued funding of certain of the Debtors' obligations, as detailed within the Budget, subject to certain terms and conditions.[5]

26.     The Debtors then had numerous conversations with Wells Fargo, Wayzata, the Steelworkers, the Creditors' Committee and others regarding the strategy to wind down, liquidate assets, and maximize value for the benefit of the stakeholders.  On October 16, 2013, the Debtors filed the *Emergency Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105, 363, 365 and 503(c) of the Bankruptcy Code:  (A) Approving (I) a Plan to Wind Down the Debtors' Businesses and (II) Protections for Certain Employees Implementing the Wind Down of the Debtors' Businesses; (B) Authorizing the Debtors' to Modify Employee Benefit Plans Consistent with the Wind Down Plan; and (C) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind Down Plan* (the "Wind Down Plan Motion") [D.I. 677].  Over the subsequent ten months, the Court has entered eleven interim Orders with respect to the Wind Down Plan Motion (individually and collectively, the "Wind Down Orders"); each with a budget attached that has been approved by the Debtors' then applicable post-petition lenders.

27.     As part of the winddown process, the Debtors have sold assets to maximize recoveries for the benefit of their estates and constituents.  The initial priority was to pursue a transaction for the Burnside Refinery, which could be sold as a going concern and for which there was a party that had expressed interest in the facility on a stand-alone basis.  Accordingly, on October 26, 2013, the Debtors filed a motion and on November 12, 2013, the Court entered the *Order Authorizing (A) The Sale of Certain Assets of the Debtors Free and Clear of All*

---

[5] As further detailed below, the Debtors have paid the Debtors' revolving DIP loan in full and entered into a payoff letter with the DIP Revolving DIP Agent on May 1, 2014.  With the payoff of the revolving DIP loan, the Debtors are coordinating all budgets with the DIP Term Loan Agent.

*Claims, Liens, Liabilities, Rights, Interests, and Encumbrances; (B) The Debtors to Enter Into and Perform their Obligations Under the Asset Purchase Agreement; (C) The Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases (D) The Guaranty and the Guaranty Dip Funding; and (E) Granting Related Relief* (the "Burnside Sale Order") [D.I. 832], authorizing the sale of the Burnside Refinery to Almatis, Inc. ("Almatis").  On December 12, 2013, the transaction authorized pursuant to the Burnside Sale Order (the "Burnside Sale") was consummated.

28.     Concurrent with pursuing a sale of the Burnside Refinery as a going concern, the Debtors sought to maximize value by selling raw materials pursuant to a Court-approved process.  Accordingly, on October 16, 2013, the Debtors filed a motion and on November 4, 2013, the Court entered the *Order Establishing Procedures for the Sale of Excess Assets* (the "Excess Sale Order") [D.I. 783].  Pursuant to the Excess Sale Order, the Debtors entered into ten agreements to sell various raw materials, including without limitation, alumina, anodes, copper, scrap steel and aluminum fluoride.  The total proceeds from the sales of raw materials (the "Raw Material Sales") exceeded $32,500,000.

29.     Throughout the winddown process, the Debtors sought to maintain a positive relationship with the Steelworkers.  Recognizing, however, that the curtailment of operations would necessarily require substantial modifications to the collective bargaining agreement, on October 27, 2013 the Debtors filed a motion, and on November 7, 2013, the Court entered the *Order Authorizing and Approving, Effective as of October 15, 2013, the Employment and Retention of Industrial Investment Banking Group, as Part of Sea Port Group Securities, LLC as Investment Banker* (the "Sea Port Retention Order") [D.I. 827].   Following successful negotiations with the Steelworkers and with the help of Sea Port Group Securities, LLC ("Sea

Port"), on November 15, 2013, the Court entered the *Order, Pursuant to Sections 105(A), 363(B), 1113 and 1114 of the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing and Approving the Settlement Agreement By and Among the Debtors and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union* (the "Steelworkers Settlement Order") [D.I. 862].  Throughout this winddown and sales process, the Debtors have sought to maintain open communication with the Steelworkers and to seek their input on efforts to preserve jobs, or the opportunity for jobs, with respect to the Hannibal Facility.

30.    As a result of Sea Port's efforts in obtaining the Steelworkers Settlement Order and their familiarity with the Debtors, the Debtors sought to retain the same individuals from Sea Port that assisted in the union negotiations to assist in pursuing sales of the Debtors' remaining assets, including the mineral rights assets and the property, plant and equipment at the facility in Hannibal, Ohio.  During this time, these individuals started a new firm, and on January 28, 2014, the Debtors filed an application and on February 21, 2014 the Court entered the *Order Authorizing and Approving, Effective as of January 28, 2014, the Employment and Retention of Calibre Group, LLC as Financial Advisor and Investment Banker* (the "Calibre Retention Order") [D.I. 1108].  Upon their retention, Calibre actively marketed all remaining assets of the Debtors as a single transaction or through multiple transactions.

31.    Calibre reached out to more than 125 parties, including financial and strategic operators, redevelopers, and parties with specialty interests including interest solely in the mineral rights contained within the property.  Following receipt of initial indications of interest, the Debtors identified two parties with combined bids representing the highest or otherwise best bid for the Debtors' remaining assets.

32.    The Debtors identified Triad Hunter, LLC ("Triad Hunter") as the party submitting the highest and best bid for the subsurface oil and gas assets (the "Mineral Rights Assets"). Through the negotiations with Triad Hunter, and upon a commitment to increase the consideration paid for the Mineral Rights Assets (by in excess of 10% over their prior bid), the Debtors agreed to seek a sale of the Mineral Rights Assets without a formal auction process. After an objection to the sale was lodged, Triad Hunter agreed to further increase its bid for the Mineral Rights Assets.

33.    On July 1, 2014, the Court entered the *Order (A) Authorizing and Approving the Sale of Mineral Rights Assets Free and Clear of all Liens, Claims, Encumbrances and Interests; and (B) Granting Related Relief* (the "Mineral Rights Sale Order") [D.I. 1355]. The transaction (the "Mineral Rights Sale") closed on July 24, 2014.

34.    Through the marketing process, the Debtors identified CCP ORMT Acquisition LLC (the "PPE Stalking Horse Bidder") as the party that submitted the highest and otherwise best bid for certain property, plant and equipment assets of the Debtors (the "PPE Assets"). Accordingly, on June 9, 2014, the Debtors entered into a stalking horse agreement with the PPE Stalking Horse Bidder and filed the *Debtors' Motion For Orders (A)(I) Approving the Bidding Procedures, (II) Scheduling Hearing to Consider Sale; (III) Approving Form and Manner of Notice Thereof; and (IV) Authorizing Bid Protections, (B) (I) Authorizing and Approving Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "PPE Sale Motion") [D.I. 1270] to establish an auction process designed to maximize recoveries for the parties in interest in these bankruptcy proceedings. On June 19,

2014, the Court entered an Order approving certain bidding procedures and establishing an auction process (the "Bidding Procedures Order") [D.I. 1294].

35.     Pursuant to the bidding procedures approved by such Order (as modified by the Debtors), the Debtors received three (3) qualified bids and on June 26, 2014, the Debtors conducted an auction. Following numerous rounds of bidding, the Debtors identified Niagara Worldwide LLC ("Niagara") as submitting the highest and best bid for the PPE Assets.  On July 17, 2014, the Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief* (the "PPE Sale Order") [D.I. 1391].  The transaction (the "PPE Sale") closed on July 30, 2014.

36.     Finally, the Debtors sought to fully administer their assets through a sale of remaining assets to Wayzata.  Concurrently with filing this Motion, the Debtors filed the Remaining Asset Sale Motion.  Upon the consummation of the sale transaction and settlement agreements contemplated by the Remaining Asset Sale Motion, all assets of the Debtors will have been sold, and all proceeds will have been distributed in accordance with Orders of this Court.

## RELIEF REQUESTED

37.     The Debtors seek entry of an order: (i) dismissing the Bankruptcy Cases, (ii) authorizing the dissolution of the Debtor entities and resignation of the officers and directors, (iii) terminating KCC as the Claims and Noticing Agent, and (iv) granting such other relief as is just and appropriate.

**BASIS FOR THE RELIEF REQUESTED**

A.    *Dismissal of the Chapter 11 Cases Under Section 1112(b), For "Cause," is Appropriate*

38.    Section 1112(b)(1) provides that, absent unusual circumstances, upon request of a party in interest and after notice and a hearing, the court shall convert a case to chapter 7 "or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b)(1).

39.    Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of 16 factors that provide "cause" such that dismissal is appropriate.  11 U.S.C. § 1112(b)(4)(A)-(P). See, In re Gateway Access Solutions, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007) ("[g]enerally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise") (quoting In re Brown, 951 F.2d 564, 572 (3d Cir. 1991).  One such ground is where a party in interest shows that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).

40.    To satisfy section 1112(b)(4)(A), the debtor must establish both: (i) that there is a continuing diminution in the value of the estate, and (ii) that the debtor does not have a reasonable likelihood of rehabilitation.  See, e.g. In re Citi-Toledo Partners, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("[s]ection 11129(b)(1) contemplates a 'two-fold' inquiry into whether there has been a 'continuing diminution of the estate and absence of a reasonable likelihood of rehabilitation'" (citing In re Photo Promotion Assocs, Inc., 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985)).

41.    The Debtors easily satisfy this two-fold inquiry.  First, the Debtors have liquidated all of their assets through the sales transactions as described above.  The Debtors no longer conduct any business and have no remaining assets that could be used to satisfy the claims of any class of creditors.  Meanwhile, administrative claims, such as professional fees and United

States Trustee fees continue to accrue each day the chapter 11 cases remain open, further eroding the position of the Prepetition Term Loan Lender.  Second, as the Debtors have curtailed all operations and sold all assets, it is simply impossible for the Debtors to rehabilitate their businesses.

42.    The Debtors have monetized all of their assets and, upon the consummation of the sale of the Remaining Assets, the Debtors will have no remaining sources of income now or in the future and will receive funds solely to the extent consented to and paid by Wayzata, exclusively for use by the Debtors in the winddown and dissolution of the Debtors and these chapter 11 cases.  As a result, the Debtors do not have sufficient funding to satisfy the requirements of section 1129 of the Bankruptcy Code necessary to confirm a chapter 11 plan in these cases, and, as such continuing these cases will not result in further recoveries to creditors, but instead, will lead to incurrence of further administrative costs the Debtors simply cannot afford to fund.

43.    In sum, the Debtors have met their burden, and their chapter 11 cases should be dismissed under section 1112(b) of the Bankruptcy Code, effective as of 11:59 p.m. (prevailing Eastern Time on the date the Debtors submit a Certification of Counsel finding all Certification Events have occurred (the "Dismissal Date") due to the continuing losses that would otherwise be incurred and the further diminution in the value of the estate, and the absence of any likelihood of rehabilitation and the fact that a proposed plan is not feasible.

**B.    *Dismissal Is in the Best Interest of the Debtors' Creditors and Estates***

44.    Once a Court determines that cause exists to dismiss a chapter 11 cases, the court must then evaluate whether dismissal is in the best interest of the debtor's creditors and the parties in interest.  See, e.g. Rollex Corp. v. Assoc'd Materials (In re Superior Siding & Window), 14 F.3d 240, 242 (4th Cir. 1994) ("[o]nce 'cause' is established, a court is required to

consider this second question of whether to dismiss or convert").  Based on the facts and circumstances presented in these cases, it is in the best interest of the Debtors' estates and their creditors that these bankruptcy cases be dismissed.

45.    First, a dismissal of a chapter 11 bankruptcy case meets the best interest of creditors test where a debtor has nothing to reorganize, and the debtor's assets are fixed and liquidated.  See, Camden Ordinance Mfg. Co. of Ark., Inc. v. United States Trustee (In re Camden Ordinance Mfg. Co. of Ark., Inc.), 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business that ceased business was not feasible); In re Brogdon Inv., Co., 22 B.R. 546, 549 ((Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).  As detailed above, upon the consummation of the sale of Remaining Assets, the Debtors have no assets remaining and nothing left to reorganize.  The only remaining path for the Debtors is to fully and finally winddown their estates and dissolve their corporate entities.  It is in the best interest of the creditors to dismiss the chapter 11 cases because the Debtors' operations no longer exist, no funds are available to finance any chapter 11 plan, and no assets will remain in the estates to fund any claims other than those of the Prepetition Term Loan Lender.

46.    Second, the best interest of creditors test is met where an interested party, other than the debtor, feels that dismissal is a proposer disposition of the case.  See Camden Ordinance, 245 B.R. at 798; In re Mazzocone, 183 B.R. 402, 414 (Bankr. E.D. Pa. 1995) (factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7 where debtor and United States Trustee both favored dismissal).  Here, the Prepetition Term Loan Lender (who has funded these bankruptcy proceedings) and Creditors' Committee both fully support the Debtors' decision to seek dismissal, and have had an opportunity to review this

Motion in advance of its filing.  In addition, the Debtors have shared a draft of this Motion with the United States Trustee in advance of filing.

47.     Third, the best interest of creditors test is met where a debtor demonstrates the ability to oversee its own liquidation.  See Camden Ordinance, 245 B.R. at 798, Mazzocone, 183 B.R. at 412 ("[o]nly when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation . . . should a debtor not be permitted to remain in bankruptcy").  The Debtors have completed the liquidation of their assets through a series of sales over the last twelve months.  Upon consummation of the sale of the Remaining Assets, the liquidation will be complete and the Debtors are confident that there is nothing further to pursue in these chapter 11 cases that will provide value for its creditors.

48.     Finally, dismissal of the Debtors' chapter 11 cases will maximize the value of the Debtors' estates because conversion to chapter 7, and appointment of a trustee, is unnecessary and could impose significant additional administrative costs upon the Debtors' estates.  Under the circumstances, even in a chapter 7 liquidation, the chapter 7 trustee would not have any assets with which to pay any administrative expenses or other claims because the sole beneficiary would be the Prepetition Term Loan Lender.  By continuing in bankruptcy, including through a conversion to chapter 7, the Debtors estates would incur additional administrative expenses that they would be unable to pay.  Thus, in a balancing of equities of these cases, it is clear that it is in the best interest of the Debtors' estates and their creditors to dismiss these chapter 11 cases effective as of the Dismissal Date.

49.     The Debtors submit that permitting the dismissal of their chapter 11 cases furthers the Bankruptcy Code's goal of efficient administration of the Debtors' bankruptcy estates,

eliminates the accrual of administrative expense obligations, and brings closure to these cases in an organized and timely manner.

**C.**     ***Dissolution of the Debtors and Discharge of the Officers and Directors Is Appropriate Under the Circumstances of these Proceedings***

50.     Notwithstanding anything contained in their respective organizational documents to the contrary, the Debtors seek authorization, but not direction, to take such actions and expend such funds[6] as may be necessary or appropriate to wind up and/or dissolve as corporate entities under applicable state law without the approval of, or any further action by, a board of directors, shareholders or any other party.   The Debtor further seeks authority for the authorized representatives of the Debtors, including the Debtors' directors and officers, to execute and file, as and when such representative determines to do so, with any necessary state entities, a copy of this Order and such other documents as may be necessary to effect such winding up or dissolution.   Finally, the Debtors seek authority for such authorized representatives to propose and vote upon a resolution indicating that there are no remaining assets of the Debtors, all of the assets of the Debtors were sold and distributed pursuant to Orders of the Court on or before the Dismissal Date, and that there will be no further distribution to creditors.

51.     Finally, upon the occurrence of the date of dissolution, the Debtors propose that the members of the board of directors, managers, and officers, as the case may be, of each of the Debtors shall be deemed to have resigned.

**D.**     ***The Discharge of KCC is Appropriate***

52.     Upon the occurrence of the Dismissal Date, KCC should be relieved and discharged as the Debtors' claims and noticing agent in these cases, provide that KCC shall

---

[6] The available funds shall be carved out of Wayzata's interest in the Remaining Assets and funded solely in accordance with the budget attached to the asset purchase agreement for the sale of the Remaining Assets to Wayzata

provide necessary noticing services in connection with the dismissal and winddown of the Debtors estates, at the direction of the Debtors. The Debtors further propose that KCC be entitled to charge the fees and costs that it incurs in providing any post-dismissal noticing services, to the extent not otherwise contemplated by the winddown budget being paid by Wayzata, against the retainer it currently holds. Upon the payment in full of its obligations, any remaining amounts held by KCC shall be remitted directly to Wayzata as purchaser of the Remaining Assets.

### E.    Continued Effect, Validity, and Enforceability of Prior Orders of This Court

53.    Finally, the Debtors request that, notwithstanding section 349 of the Bankruptcy Code, all prior Orders of this Court entered in the chapter 11 cases shall remain in full force and effect and shall survive the dismissal of the chapter 11 cases.

### NOTICE

54.    Notice of this Motion, in the form attached hereto as <u>Exhibit B</u> (the "<u>Notice</u>"), and the Motion has been provided to: (i) counsel for the Debtors' post-petition lenders; (ii) the Office of the United States Trustee; (iii) counsel to the Creditors' Committee and (iv) all other parties that have requested notices in these cases. The Notice has been provided to all other persons who are required to be noticed in accordance with Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

### CONCLUSION

55.    The Debtors believe that, given the circumstances of these chapter 11 cases, the best interest of the Debtors' estates, creditors, and all parties in interest is through a timely dismissal of the bankruptcy cases. Further, to bring complete closure to these matters, the Debtors believe it appropriate to authorize the dissolution of the Debtor entities, the resignation of the board of directors and officers, and the resolution of the board finding that all assets have

been liquidated and there will be no further distribution to creditors.  Finally, the Debtors believe it is appropriate to discharge KCC and for an order noting that all prior Orders of this Court shall remain in full force and effect, notwithstanding the dismissal of these proceedings.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion, and grant such other and further relief as the Court may deem just and proper.

Dated: September 30, 2014
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Daniel B. Butz*
Robert J. Dehney (No. 3578)
Daniel B. Butz (No. 4227)
Erin R. Fay (No. 5268)
1201 N. Market St., 16th Flr.
PO Box 1347
Wilmington, DE  19899-1347
Telephone:  302-658-9200
Facsimile:  302-658-3989

-and-

DINSMORE & SHOHL LLP
Kim Martin Lewis, Esq. (OH Bar #0043533)
Patrick D. Burns, Esq. (OH Bar #0081111)
255 E. 5th St., Ste. 1900
Cincinnati, OH  45202
Telephone:  513-977-8200
Facsimile:  513-977-8141

*Counsel to Debtors and Debtors In Possession*

7266469v7